## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ROBERT SCATURO,<br><br>individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>FANATICS, INC.; FANATICS, LLC; FANATICS COLLECTIBLES INTERMEDIATE HOLDCO, INC.; FANATICS SPV, LLC; MAJOR LEAGUE BASEBALL; MAJOR LEAGUE BASEBALL PROPERTIES, INC.; MAJOR LEAGUE BASEBALL PLAYERS ASSOCIATION; MLB PLAYERS, INC.; NATIONAL FOOTBALL LEAGUE; NFL PROPERTIES LLC; NATIONAL FOOTBALL LEAGUE PLAYERS ASSOCIATION; NFL PLAYERS, INC.; NATIONAL BASKETBALL ASSOCIATION; NBA PROPERTIES, INC.; NATIONAL BASKETBALL ASSOCIATION PLAYERS ASSOCIATION; ONETEAM PARTNERS LLC,<br><br>Defendants. | CIVIL ACTION NO. 25-cv-2202<br><br><br>JURY TRIAL DEMANDED<br><br>CLASS ACTION COMPLAINT |

## **CLASS ACTION COMPLAINT**

1.      Plaintiff Robert Scaturo brings this action against Fanatics, Inc., Fanatics, LLC, Fanatics Collectibles Intermediate Holdco, Inc., Fanatics SPV, LCC, and Fanatics Holdings, Inc. (collectively, "Fanatics"); Major League Baseball ("MLB"); Major League Baseball Properties,

Inc. ("MLBP"); Major League Baseball Players Association ("MLBPA"); MLB Players, Inc. ("MLBPI"); National Football League ("NFL"); NFL Properties LLC ("NFLP"); National Football League Players Association ("NFLPA"); NFL Players, Inc. ("NFLPI"); National Basketball Association ("NBA"); NBA Properties, Inc. ("NBAP"); and National Basketball Players Association ("NBAPA"), and OneTeam Partners LLC ("OneTeam") (collectively, Defendants); on behalf of himself and a proposed class of direct purchasers of NBA player trading cards, NFL player trading cards, and MLB player trading cards (or collectively, and alternatively, Major U.S. Professional Sports Leagues trading cards).

    2.     In summary, as alleged herein, beginning in August 2021 and continuing through the present, Defendant Fanatics, in a conspiracy involving all Defendants, has engaged in a campaign to monopolize the market for NBA player trading cards, NFL player trading cards, and MLB player trading cards by first inducing those leagues and players associations to join its anticompetitive conspiracy by securing long term exclusive licensing contracts with all major sports leagues by promising them a share of the future trading card monopoly profits; and then weaponizing its resulting market dominance even before those agreements took effect to coerce market participants in an expansive scheme to systematically exclude from the market its only remaining competitor, resulting in fewer choices, lower quality, and higher prices for direct purchasers of NBA player trading cards, NFL player trading cards, and MLB player trading cards. Plaintiff seeks treble damages and injunctive relief, demanding a trial by jury of all issues so triable, under Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 and 2), and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15, 26).

3.     Plaintiff alleges the following based upon personal knowledge as to matters relating to himself, and upon information and belief and based on the investigation of counsel as to all other matters:

## I.    NATURE OF THE ACTION

4.     In the United States, the market for professional sports trading cards has grown rapidly in recent years, with sales exceeding an estimated $5 billion in 2024, and projected to nearly triple by 2031.

5.     To effectively compete in this market, manufacturers must obtain licenses from both professional sports players associations to use the names, images, and likenesses of players, and from professional sports leagues to use the names, logos, and uniforms of the players' teams.

6.     Manufacturers must also obtain professional athletes' official jerseys to embed a piece of a jersey in certain high value specialty cards, and must enter contracts with individual players to obtain rights to a player's hand-signed autograph, and to use that player's name, image, and likeness on an individual basis.

7.     Finally, manufacturers rely on highly-skilled employees to design and market professional sports trading cards, and rely on highly-specialized manufacturers to produce them.

8.     Historically, licenses from professional sports leagues and professional sports players associations are awarded through (1) a public bidding process (2) resulting in non-exclusive license agreements or in exclusive license agreements typically of 5 years or less, and (3) with staggered terms, wherein no single licensee controls exclusive rights across all of the major sports player leagues and players associations at once.

9.      Since entering the professional sports player trading card business, Fanatics has engaged in an overarching scheme to monopolize the market for NBA player trading cards, NFL player trading cards, and MLB player trading cards, involving at least the following elements:

10.     **Exclusive Deals:**  Fanatics obtained long-term exclusive licenses – at least 10 years, and in most cases, 20 years – by promising sports leagues and players associations an equity stake in its future monopoly profits in exchange for those long-term exclusive licenses. Fanatics made this deal with *all* major sports leagues and sports players associations, eliminating competitors and securing monopoly power. These were "back room" deals, accomplished without any open bidding process. These agreements, most of which were announced in August 2021, marked the first time in history that a single card manufacturer secured exclusive licenses across *all* six major professional sports licensors.

11.     **Competitor Acquisition:** Prior to 2022, Topps was the dominant company in the market for MLB player trading cards, with an exclusive license with MLB until 2025 and a semi-exclusive license with the MLBPA through 2022. In January 2022, about 5 months after Fanatics announced its long-term exclusive licensing deals with the sports leagues and players associations, Fanatics acquired Topps for $500 million, giving Fanatics dominance of the market for MLB player trading cards. The acquisition price was only roughly a third of Topps' valuation in acquisition talks just prior to Fanatics initiating its monopolistic campaign. Having eliminated one of the two major sports trading card competitors, Fanatics trained its sights on the other.

12.     **Control Over Manufacturing:** Fanatics acquired a controlling share of GC Packaging ("GCP"), an essential card manufacturer used by Fanatics' only remaining professional sports trading card competitor, Panini America Inc. ("Panini"), and then restricted production to choke off Panini's supply, resulting in supply disruptions and contract cancellations. GCP provides

highly-specialized manufacturing services, and, according to Panini, is the only provider able to meet Panini's technological quality and capacity requirements, handling over 90% of Panini's production needs.

13.     **Employee Raiding:** Fanatics then began leveraging its unlawfully-acquired exclusive license agreements with all major leagues and players associations, using threats and false statements to poach dozens of Panini's employees, further undermining its ability to compete. For example, Fanatics threatened to blacklist Panini employees from ever working in the industry again when Fanatics' exclusive long-term licenses took effect unless they immediately quit Panini and joined Fanatics. The fact that this employee raiding occurred years prior to Fanatics license agreements taking effect suggests that the purpose was to harm its only remaining competitor rather than to meet any legitimate near-term business needs.

14.     **Interference with Player Deals:** Fanatics strong-armed athletes to refuse agreements with Panini, using a similar combination of payoffs and threats. For example, Fanatics threatened that players would never get an autograph deal when Fanatics' long-term contracts took effect in the future unless they immediately signed with Fanatics, essentially paying players *not* to provide autographs of the most important player trading cards during the critical early years of their careers.

15.     **Disparagement & Coercion:** Fanatics spread false statements about Panini's business and pressured distributors, retailers, and "case breakers"[1] to cut ties with Panini, declaring that—after the anticompetitive campaign Fanatics itself had orchestrated—Panini was now,

---

[1] A "case breaker" is someone who purchases sealed cases or boxes of trading cards and then opens them live—often via online streaming platforms—for collectors and buyers. Case breaking has become a major part of the trading card industry, creating a community-driven experience and increasing accessibility to high-value cards without buyers having to purchase entire cases or boxes themselves.

"dead." For example, Fanatics told players, agents, and players associations that Panini would soon lose all licensing rights, go bankrupt, and be unable to fulfill its financial and contractual obligations to athletes.

16.    **Refusal to Deal:** Fanatics used its monopoly over sales of professional sports jerseys and memorabilia to block Panini from acquiring the jerseys necessary for production of some of Panini's most valuable and innovative products, which integrate a piece of a player's jersey into that player's trading card. Prior to May 2023, Panini had a multi-year business relationship with Fanatics for purchase of player jerseys; it was only after Fanatics entered the professional sports card trading market that Fanatics terminated sales of jerseys to Panini. This termination fulfilled a threat that Fanatics' CEO, Michael Rubin, put to Panini shortly beforehand, removing any doubt as to Fanatics' anticompetitive motives.

17.    While Fanatics' exclusive licenses across all major professional sports leagues and players associations will not take full effect until 2026, through its anticompetitive scheme, the price effects of Defendants' anticompetitive conduct can already be seen in the market. The graphs below track price changes for certain MLB player trading card sets, and show that in the few years since the onset of the Defendants' anticompetitive campaign, the price of Topps trading cards has increased by 50% while the price of comparable Panini cards has remained relatively flat or even declined.





18.    Fanatics has already acquired market dominance, and has wielded that power to

control prices and exclude competition in at least the following ways: (1) Fanatics has required

local card shops to accept Fanatics' unilaterally-set minimum price requirements, or risk being cut

off from supply, resulting in higher prices and reduced output; (2) Fanatics has threatened to cut off supply to local card shops that sell trading cards on business-to-business websites, reducing consumer choice; (3) Fanatics has forced case breakers onto Fanatics' new case-breaking platform (Fanatics Live) under threat to block their acquisition of cases otherwise, and then imposed draconian terms to drive them out of business, leaving only Fanatics' own case-breakers operating exclusively only on Fanatics' platform, reducing output and raising prices; and (4) coercing big box retailers to limit the lines of trading cards offered in their stores to only those owned by Fanatics/Topps, further reducing competition and consumer choice.

19.     The anticompetitive effects of this conduct will continue, and will only intensify, once Fanatics' monopolistic takeover is complete. And because of high barriers to entry and the capital-intensive nature of the business, there is little chance that Panini or any other competitor will survive—let alone be in a position to challenge Fanatics—after its exclusive contracts across all major professional sports expire 10-20 years from now, which was presumably Fanatics' plan all along.

20.     To make matters worse, Fanatics has a reputation for monopolizing markets and then raising prices while simultaneously reducing product quality.  For example, after Fanatics cornered the market for officially licensed professional sports apparel, complaints about product quality have been widespread.

21.     Defendants' anticompetitive scheme has reduced output and competition in, and thereby artificially inflated prices in, the market for newly-issued Major U.S. Professional Sports Leagues trading cards.  Plaintiff and members of the proposed Class have been injured by paying these artificially inflated prices.

## II.     JURISDICTION AND VENUE

22.     Plaintiff brings claims under Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1 and 2, seeking treble damages pursuant to Section 4 of the Clayton Antitrust Act, 15 U.S.C. § 15, and injunctive relief pursuant to Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26. This Court has subject matter jurisdiction over the Plaintiff's claims pursuant to 28 U.S.C. §§ 1331 and 1337(a).

23.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and (c) and 15 U.S.C. §§ 15 and 22, as each Defendant resides, transacts business, committed an illegal or tortious act, has an agent, and/or can be found in this District.

24.     This Court has personal jurisdiction over the Defendants, as each of the Defendants is either incorporated in this District, markets and distributes Trading Cards in this District, enters into contracts within this District, and/or otherwise transacts business within this District.

## III.     INTERSTATE COMMERCE

25.     The market for Trading Cards in the United States is a national market.

26.     Defendant Fanatics has marketed its Trading Cards to individual consumers online and to retail stores in all 50 states.

27.     Defendant Fanatics' business in Trading Cards involves a continuous and uninterrupted flow of commerce across state lines.

28.     The anticompetitive actions of Defendant Fanatics, independently and in collusion with the League Defendants and Player Association Defendants (as defined below), have had a substantial effect on interstate trade and commerce in the market for Trading Cards.

IV.    **PARTIES**

29.    Plaintiff Robert Scaturo is a resident of Austin, TX, who purchased Trading Cards directly from Topps, a subsidiary of Defendant Fanatics, Inc. during the Class Period at prices that were artificially inflated as a result of Fanatics' and its conspirators' anticompetitive conduct, and thereby suffered antitrust injury.

30.    Defendant Major League Baseball ("MLB") is an unincorporated association of the 30 Major League Baseball teams (29 from the United States), and is based in New York, NY.

31.    Defendant Major League Baseball Properties, Inc. ("MLBP") is based in New York, NY, and is responsible for licensing the names, marks, and logos of each of the MLB's teams, including to trading card companies.

32.    Defendant Major League Baseball Players Association ("MLBPA") is the labor union representing Major League Baseball players, and is based in New York, NY.

33.    Defendant MLB Players, Inc. ("MLBPI") is the affiliate of MLBPA that is responsible for licensing the names, images, and likenesses of Major League Baseball players, and is based in New York, NY.

34.    Defendant National Football League ("NFL") is an association of the 32 National Football League teams, all from the United States, and is based in New York, NY.

35.    Defendant NFL Properties LLC ("NFLP") is a Delaware LLC based in New York, NY responsible for the licensing of the names, marks, and logos of each of the NFL's teams, including to trading card companies.

36.    Defendant NFL Players Association ("NFLPA") is the labor union representing National Football League players, and is based in Washington, DC.

37.    Defendant NFL Players, Inc. ("NFLPI") is the affiliate of NFLPA that is responsible for licensing the names, images, and likenesses of National Football League players, and is based in Washington, DC.

38.    Defendant National Basketball Association ("NBA") is an association of the 30 National Basketball Association teams (29 from the United States), and is based in New York, NY.

39.    Defendant NBA Properties, Inc. ("NBAP") is responsible for the licensing of the names, marks, and logos of each of the NBA's teams, including to trading card companies, and is based in New York, NY.

40.    Defendant National Basketball Players Association ("NBAPA") is the labor union representing National Basketball Association players, and is based in New York, NY. NBAPA is responsible for licensing the names, images, and likenesses of National Basketball Association players.

41.    Defendants MLB, MLBP, NFL, NFLP, NBA, and NBAP are collectively referred to as the "League Defendants".

42.    Defendants MLBPA, MLBPI, NFLPA, NFLPI, and NBAPA are collectively referred to as the "Player Association Defendants".

43.    Defendant OneTeam Partners, LLC, is a Delaware corporation with its principal place of business in Santa Monica, CA. OneTeam Partners was founded in 2019 as a joint venture between MLBPA and NFLPA, and it markets and licenses the names, images, and likenesses of the athletes and players associations that it represents.

44.    Defendant Fanatics, Inc. is a Delaware corporation with its principal place of business in Jacksonville, FL.

45.    Defendant Fanatics, LLC, is a Delaware LLC with its principal place of business in Jacksonville, FL.

46.    Defendant Fanatics Holdings, Inc. is a Delaware corporation with its principal place of business in Jacksonville, FL.

47.    Defendant Fanatics Collectibles Intermediate Holdco, Inc., d/b/a Fanatics Trading Cards, is a subsidiary of Fanatics Holdings, Inc., and a Delaware corporation with its principal place of business in Jacksonville, FL.

48.    Defendant Fanatics SPV, LLC, is a Delaware LLC with its principal place of business in Jacksonville, FL.

49.    Defendant Fanatics, Inc.; Fanatics, LLC; Fanatics Holdings, Inc.; Fanatics Collectibles Intermediate Holdco, Inc.; and Fanatics SPV, LLC are technically separate entities but operate as one unified company under the name "Fanatics". The allegations herein are against the Fanatics companies both individually, and collectively.

50.    Defendant Topps is a manufacturer of Trading Cards that was acquired by Fanatics in January 2022.

## V.    CLASS ACTION ALLEGATIONS

51.    Plaintiff brings this action on behalf of himself and all others similarly situated pursuant to Federal Rule of Civil Procedure 23 as representative of a Class defined as follows:

> All persons or entities in the United States that purchased MLB Trading Cards, NFL Trading Cards, or NBA Trading Cards directly from one of the Defendants during the period beginning January 1, 2022 until such time as the anticompetitive conduct alleged herein ceases (the "Class Period"). Excluded from the Class are (a) Defendants, their subsidiaries, affiliate entities, and employees, and (b) all federal or state government entities or agencies.

52. The members of the Class are so numerous that joinder is impracticable. Millions of persons and entities have purchased Trading Cards directly from Fanatics during the Class Period.

53. There are numerous questions of law and fact that are common to the Class and that predominate over any issues affecting individual members of the Class, including, inter alia:

a. Whether Fanatics engaged in a monopolistic scheme to monopolize the markets for MLB Trading Cards, NFL Trading Cards, and NBA Trading Cards in the United States;

b. Whether Fanatics' acquisition of Topps was directed at monopolizing the market for MLB Trading Cards in the United States;

c. Whether Fanatics' acquisition of a controlling stake in GC Packaging, LLC was directed at harming competitor Panini and monopolizing the markets for NFL Trading Cards and NBA Trading Cards in the United States;

d. Whether Fanatics has used its controlling stake in GC Packaging, LLC to deliberately harm the business of competitor Panini in order to monopolize the markets for NFL Trading Cards and NBA Trading Cards in the United States;

e. Whether Fanatics systematically recruited key Panini employees in order to harm a competitor;

f. Whether Fanatics signed exclusive deals with NFL and NBA rookies in order to prevent Panini from issuing cards with those players' handwritten autographs during the remaining term of Panini's licenses with those leagues and players associations;

g. Whether Fanatics induced the NFLPA to terminate its agreement with Panini;

13

h.      Whether Fanatics used its market dominance to threaten to cut off distributors if they did not agree to give Fanatics higher margins;

i.      Whether Fanatics used its market dominance to force retailers to agree to refuse to sell other companies' cards or risk being cut off from Fanatics' cards;

j.      Whether Fanatics used its market dominance to force retailers to agree to charge minimum prices for Trading Cards or risk being cut off from Fanatics' cards;

k.      Whether Fanatics' long-term exclusive contracts with the League Defendants substantially foreclose competition in the markets for MLB Trading Cards, NFL Trading Cards, and NBA Trading Cards;

l.      Whether Fanatics' long-term exclusive contracts with the Players Association Defendants substantially foreclose competition in the markets for MLB Trading Cards, NFL Trading Cards, and NBA Trading Cards;

m.      Whether Fanatics has substantial market power in the market for MLB Trading Cards in the United States;

n.      Whether Fanatics has substantial market power in the market for NFL Trading Cards in the United States;

o.      Whether Fanatics has substantial market power in the market for NBA Trading Cards in the United States;

p.      Whether Fanatics' anticompetitive scheme has artificially raised prices and reduced competition in the markets for MLB Trading Cards, NFL Trading Cards, and NBA Trading Cards in the United States;

q.      Whether Fanatics' agreements with the League Defendants and the Players Association Defendants have artificially raised prices and reduced competition in the

markets for MLB Trading Cards, NFL Trading Cards, and NBA Trading Cards in the United States;

      r.     Whether Fanatics' scheme has a legitimate pro-competitive justification;

      s.     Whether Fanatics' exclusive agreements with the League Defendants and Players Association Defendants had anticompetitive effects;

      t.     Whether Fanatics' exclusive agreements with the League Defendants and Players Association Defendants had a legitimate pro-competitive justification;

      u.     Whether Fanatics' exclusive agreements with the League Defendants and Players Association Defendants had anticompetitive effects that outweigh their alleged pro-competitive justifications;

      v.     Whether the conduct herein artificially maintained, preserved, or enhanced Fanatics' market power and monopoly power in the markets for MLB Trading Cards, NFL Trading Cards, and NBA Trading Cards;

      w.     The operative time period and extent of Defendants' antitrust violations;

      x.     Whether the conduct alleged herein caused damages to the members of the Class in the form of overcharges paid for Trading Cards, and the proper measure of such overcharge damages; and

      y.     The appropriate injunctive and equitable relief for the Class.

54.     Plaintiff's interests are typical of, and not antagonistic to, those of other or absent members of the Class, such that he can fairly and adequately represent and protect their interests.

55.     Plaintiff has retained counsel with substantial experience litigating complex antitrust class actions, including substantial experience litigating such cases within this District.

56.     Class treatment of Plaintiff's federal antitrust claims is a superior method for the fair and efficient adjudication of this controversy in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender.

57.     Plaintiff knows of no difficulty likely to be encountered in the maintenance of this action as a class action under Federal Rule of Civil Procedure 23.

## VI.    FACTS

### A.  Background

58.     Professional sports trading cards have been a fixture in American culture for more than a century, growing into a multibillion-dollar industry. Trading cards featuring professional athletes are valued both as collectibles and as investments, creating a thriving and competitive market.

59.     The modern trading card market emerged in the 1950s with Topps becoming the dominant player through its long-term licensing deals with Major League Baseball.

60.     During the 1980s and 1990s, competition increased significantly with manufacturers like Upper Deck, Fleer, and Donruss entering the market. This period of time saw innovation in card design, including holographic images, memorabilia cards, and autographed cards.

61.     For decades, licensing deals between sports leagues and manufacturers were typically awarded for terms of three to five years, ensuring that manufacturers competed regularly for licensing rights and maintained high standards of quality and innovation.

62.     Manufacturers also competed to sign individual athletes to exclusive contracts for autographs and memorabilia, which led to a competitive and dynamic market offering a range of products at different price points.

63.     Panini is the American subsidiary of an Italian company founded in 1961. It entered the U.S. trading card market in 2009 after (1) entering into a four-year exclusive deal with the NBA, which at the time acted on behalf of both the league and the Players' Association concerning licensing rights; and (2) acquiring Donruss Playoff L.P., which held non-exclusive licenses with the NFL and NFLPA.

64.     Panini rapidly gained market share through its licenses with the NBA and NFL, its innovative product lines, quality control, marketing, and distribution. It currently holds exclusive licenses from the NFL (through March 2026), the NFLPA (through February 2026), and the NBA (through September 2025), as well as a license from the NBAPA through September 2025. Panini's current exclusive license with the NFLPA is the longest such contract it has, for a term of ten years.

## B.  Anticompetitive Conduct

65.     Fanatics started as a sports apparel company. In 2021, it began expanding aggressively into the trading card industry with a strategic plan to eliminate competition through unprecedented long-term exclusive licensing agreements, predatory vertical integration, and coercing market participants to harm Fanatics' competitors.

### *Fanatics enters into long-term exclusive dealing agreements with Leagues*

66.     In August 2021, Fanatics announced the acquisition of the leading professional sports licenses in North America: MLB, the MLB Players Association, the NBA, the NBA Players

Association, and the NFL Players Association. Thereafter, Fanatics acquired the NFL exclusive license and for the first time, one licensee held the exclusive license to all six of the Major League Licenses for Major U.S Professional Sports Leagues trading cards.

67.    In January 2022, Fanatics acquired Topps, which was the dominant producer of MLB player trading cards, and which had an exclusive license with the MLB and a semi-exclusive license with the MLBPA. Because of that transaction, Fanatics also obtained the exclusive license with Major League Soccer (MLS).

68.    Fanatics now owned four licenses (NFL, NFL Players Association, MLB, and MLB Players Association) that have a 20-year term. The NBA and NBA Players Association license agreements have a 10-year term. Before this, no single firm had ever held all six Major League Licenses for the Major U.S. Professional Sports Leagues at the same time, and no contract had ever been for the duration Fanatics was now securing.

69.    With Fanatics about to possess long-term exclusive licenses of unprecedented duration covering every Major U.S. Professional Sports League and their respective players associations, Fanatics positioned itself to drive Panini and any other competitor out of the market and erected significant barriers to the market. Fanatics has successfully foreclosed one hundred percent of the market for Major U.S. Professional Sports Leagues trading cards for the next decade at least. Rivals have been sidelined due to these exclusive agreements and consumers will suffer.

70.    To induce these agreements, Fanatics entered into equity arrangements whereby the Leagues and players associations obtained equity interest in Fanatics in exchange for granting Fanatics exclusive licenses. In acquiring all six U.S. Major Sports League licenses, Fanatics leveraged its relationships with leaders of the players associations and certain League personnel, and offered equity stakes and other considerations premised on the monopoly profits Fanatics

expected to earn when it locked up the trading card market. The collective equity stake of the Leagues and players associations (plus NHL and MLS) is worth approximately $5 to $10 billion.[2] In this way, Fanatics and each of the leagues and each of their player associations agreed to split the monopoly profits caused by the anticompetitive agreements.

71.    In 2019, MLB Players Association and the NFL Players Association created a joint venture called OneTeam, which "specializes in the collective licensing rights of athletes."[3] OneTeam is a joint venture which has been "'instrumental in transforming an entire industry: trading cards,' as the unions representing MLB, NFL and NBA players 'struck an exclusive agreement' with Fanatics."[4] MLBPA Executive Director Tony Clark and NFLPA Executive Director DeMaurice Smith "said that the deal 'never would have happened' if their organizations had not joined forces to create OneTeam."[5] OneTeam was central to the NFL Players Association and MLB Players Association's entering into the exclusive deals with Fanatics.

72.    Both the NFL Players Association and the MLB Players Association worked together and jointly agreed on the deals with Fanatics through OneTeam.

### Fanatics acquires Topps

73.    On or about January 4, 2022, Fanatics announced that it had purchased Topps from the private investment firm Tornante for an estimated $500 million. At the time of the acquisition, Topps had an exclusive license with MLB that ran until 2025 and a semi-exclusive license with the MLBPA that ran until the end of 2022.

---

[2] Jabari Young, *Fanatics wants to be a $100 billion company – here's how it plans to get there*, CNBC (Apr. 11, 2022, 4:55PM), http://www.cnbc.com/2022/04/11/fantatics-aims-to-be-100-billion-company.html.
[3] ONETEAM, http://www.joinoneteam.com/.
[4] *OneTeam demonstrates power of combining players' group NIL rights*, SPORTS BUS. J. (Oct. 7, 2021), http://www.sportsbusinessjournal.com/Daily/Issues/2021/10/07/Marketing-and-Sponsorship/OneTeam.aspx.
[5] *Id.*

74.    Through this acquisition, Fanatics also acquired the exclusive license with MLS for trading cards. Fanatics used the monopoly power and effective market control created by its exclusive deals with the Major U.S. Professional Sports Leagues and the respective players associations to acquire further exclusive privileges.

### Fanatics acquires GC Packaging, LLC

75.    In March 2022, Fanatics acquired a controlling stake in GC Packaging, LLC ("GCP").  Founded in 1976 by John Tinnon, GCP became an important part of the trading card industry. Tinnon, who passed away in 2020, is considered by many to be a pioneer in graphic arts finishing. GCP was a critical vendor who provided high-tech, custom manufacturing of trading cards for Panini. GCP was a key input for competition in the Relevant Markets.

76.    GCP was Panini's primary manufacturer of trading cards in the United States. GCP was one of the only manufacturers able to meet Panini's technological quality and capacity requirements, and the only one that was positioned to meet its production schedule.

77.    There are few firms that have the technological skills or equipment to produce trading cards manufactured by Panini. Conventional or specialty print shops are not an option. Manufacturing trading cards require print and finishing technologies that are unique to the production of many types of trading cards that are vital to Panini's business and valued by consumers.

78.    The manufacturing process of trading cards requires more exacting standards of printing than is typical of the printing industry. Few manufacturers can provide the necessary print registration, color variance, foil stamping, guillotine cutting, slitting borders, lamination, wrapping, sorting, and packaging—all while dealing with a variety of substrates of varying degrees

of thickness that must be paired precisely with the correct, custom-mixed, spot color. In addition, since Panini's trading cards had features such as adding pieces of jerseys, sneakers, and other memorabilia to the cards increases the technological complexity of the production process exponentially.

79.     Consumers today demand precision. When the demanding technical requirements are coupled with the need for tight security measures because of the high value of certain special or rare cards, there are only a few manufacturers able to produce high-quality trading cards in the United States. GCP was the only manufacturer that had the necessary equipment, technology, expertise and capacity to manufacture trading cards according to the exacting standards Panini required and the only manufacturer in position to meet Panini's requirements.

80.     GCP had a contract with or for the benefit of Panini to produce most of Panini's trading cards in the United States. In fact, GCP manufactured over ninety percent of Panini's trading cards.

81.     Because GCP's manufacturing was essential to Panini's operations, Panini contract with GCP prohibited GCP from undergoing a change in control without Panini's consent. Fanatics' acquisition of control of GCP—without notice to, or consent by, Panini was in direct violation of this contractual provision.

82.     Fanatics was clearly aware of the Panini-GCP agreement and of GCP's contractual obligation to produce trading cards for Panini.

83.     Panini was GCP's most important purchaser of trading card manufacturing services, with many of its production lines being devoted to Panini's business at the time Fanatics acquired control of GCP. Since 2009, Panini had collaborated with GCP on research and development to allow GCP to develop substantial know-how in meeting Panini's design and

production requirements, including incorporating bits of uniforms, shoes and other memorabilia into its trading cards.

84.    The close collaboration with Panini allowed GCP to develop unique technological and production capabilities. As Panini's contract manufacturer of its trading cards, GCP had access to Panini's trade secrets, such as information about its production runs, production mixes, and form breaks (detailed product specifications that are the secret recipe for producing a run of cards).

85.    Fanatics had no need for owning or controlling GCP's manufacturing services to meet its own production. Fanatics targeted and acquired control of GCP to eliminate Panini's ability to compete in the U.S. trading cards market and force its exit from the Relevant Market.

86.    Fanatics' acquisition of GCP severely restricted Panini's ability to manufacture trading cards in the United States.

87.    After acquiring this control, Fanatics' CEO, Michael Rubin, told Panini's CEO, Mark Warsop, that Fanatics could now turn off the GCP machines devoted to Panini whenever it wanted, and from time-to-time Fanatics did stop producing trading cards for Panini.

88.    Between 2019 and 2021, GCP consistently delivered well over ninety percent of Panini's requested production volume requirement: 91% in 2019, 99% in 2020, and 97% in 2021.

89.    In November 2021, prior to Fanatics' acquisition of GCP, GCP advised Panini that it would have the capacity to produce 297 million packs in 2022 and 336 million packs in 2023 for Panini.

90.    In 2022, GCP delivered on Rubin's threats to turn off GCP's machines devoted to Panini. GCP delivered only 58% of Panini's requested production, totaling 181 million packs for the year. This represented a shortfall of 116 million packs of trading cards. In 2023, GCP delivered around 61% of Panini's requested production, a shortfall of 132 million packs.

91.     GCP failed to meet its production outputs by altering its production schedule. Panini had scheduled with GCP to produce at least twenty-one releases for November 2022 and seventeen releases in December 2022. On October 18, 2022, Panini was told by GCP that it would only produce six to eight projects per month for November and December 2022. GCP gave no reason for this reduction. GCP produced only four in November and twelve in December rather than the nearly forty originally contractually scheduled.

92.     Fanatics' purposeful disruption of Panini's production led to a significant shortfall of over 100 million packs of trading cards, which resulted in the cancellation of orders and reduced sales.

### *Fanatics raids Panini's workforce to undermine Panini's ability to compete*

93.     As part of its anticompetitive conduct to monopolize the Relevant Market, Fanatics raided Panini's design and marketing staff.

94.     Fanatics knew Panini's employees had employment contracts with Panini. These contracts with its employees had non-disclosure provisions that prohibited employees from sharing Panini's proprietary information and well as non-solicitation provisions preventing employees from recruiting other employees as well.

95.     Panini's employment contracts contained non-disclosure provisions requiring Panini employees to notify prospective employers like Fanatics of the terms and conditions before accepting employment.

96.     Prior to initiating the raid, Fanatics opened an office in Dallas, Texas, just miles away from Panini's headquarters. The raid began on or about April 4, 2023, and Fanatics ultimately

succeeded in hiring thirty-six Panini employees. Before launching the raid on the rank and file, Fanatics attempted to recruit Panini America's Chief Executive Officer, Mark Warsop.

97.    Fanatics succeeded in raiding Panini through a combination of threats and improper inducements to Panini's employees.  First, Fanatics used its monopoly power and effective market control of its future exclusive dealing arrangements to induce some employees to come to Fanatics now by threatening them with never working in the industry ever again once Panini's licenses expired.

98.    Fanatics also threatened Panini's employees that Fanatics would soon take over Panini's business before Panini's licenses expired and they would be out of work, such that if they wished to continue in the industry, they would have to join Fanatics.

99.    Fanatics also offered some Panini employees compensation packages at levels that only make economic sense only as part of a scheme to force Panini out of business prior to the expiration of Panini's licenses with the NFL and NBA.

100.    Fanatics aided and encouraged these Panini employees to misappropriate Panini's trade secrets and helped recruit other Panini employees away from Panini in violation of their employment contracts with Panini in contravention of their non-disclosure and non-solicitation provisions.

101.    Fanatics did not need to raid Panini's employees in 2023. These newly hired employees were not necessary to meet Fanatics' staffing needs until 2025 or 2026, unless Fanatics planned to or managed to drive Panini out of the Relevant Market.

*Fanatics enters into exclusive deals with star, rookie players not to deal with Panini*

102.    Original, hand-written autographs on trading cards—particularly those of star rookies—drive significant demand among collectors and investors. The ability to secure contracts with individual athletes for the rights to use their autographs is thus a key competitive element in the trading card market.

103.    In April 2023, Fanatics began aggressively targeting star rookie players with exclusive autograph deals as part of its strategy to eliminate Panini as its only meaningful competitor in the trading card market. Fanatics had already secured exclusive long-term licenses with the NBA and NFL that would take effect in the coming years. To weaken Panini's position before those licenses began, Fanatics started paying top rookie athletes to sign exclusive autograph deals—not so that Fanatics could immediately use those autographs on trading cards, but to prevent Panini from doing so. The goal was to deprive Panini of the ability to create valuable autographed rookie cards during the final years of Panini's licenses with the NBA and NFL.

104.    Panini holds exclusive licenses with the NBA and NFL until 2025 and 2026, respectively, to use those Leagues' marks, such as team uniforms, logos, and color combinations. Fanatics cannot sell star rookie players' original, handwritten autographs on its own trading cards with NBA and NFL marks until 2025 and 2026.

105.    The terms of these deals ensured that these players' autographs would not appear on Panini cards, even though Fanatics could not yet use the autographs on its own licensed products.

106.    Fanatics' exclusive dealing arrangements with rookie players deprives consumers for years of the full range of trading cards with all professional athletes in the NFL and NBA. These agreements are another example of Fanatics' anticompetitive conduct.

***Fanatics disparages Panini to third parties***

107.    Fanatics' anticompetitive conduct also took the form of disseminating false and derogatory statements about Panini to three sets of third parties that were critical to Panini's operations under their existing licenses: (1) players, player agents, and player representatives; (2) players associations; and (3) Panini's employees. In order to harm Panini and drive it out of business in the Relevant Market, Fanatics informed these third parties that Panini was incapable of performing for them, that it would be out of business soon, and that it lacked the capital necessary to meet their obligations to them.

108.    Each of these statements was false. Panini had the capacity and capital to meet its contractual and financial obligations. Moreover, it was the only exclusive and licensed trading card partner of the NBA and NFL.

109.    Fanatics disseminated these false and derogatory statements about Panini to players, player agents, and player representatives to induce players not to do business with Panini and, instead to sign exclusive licensing agreements with Fanatics, even to the extent of forfeiting their ability to deal with Panini while their exclusive licenses remained in effect with the NBA and NFL.

110.    In or around April 2023, Michael Rubin, Mike Mahan, Omar Wilkes, and other Fanatics employees told some of the biggest and most influential sports agencies representing current and prospective NFL and NBA players, including CAA Sports and WME Sports (William Morris Endeavor), that Panini would be unable to fulfill its contractual obligations to athletes, that Panini was going bankrupt, and that Panini would lose its licenses with the NFL, NFL Players Association, NBA, and NBA Players Association by June 2023.

111.    Fanatics also disseminated false and derogatory statements about Panini to players associations to induce the associations to breach their contracts with Panini.

***Fanatics threatens to continue to harass Panini and cut off Panini's supply of uniforms***

112.    Panini's trading cards were unique because they incorporated a piece of a player's jersey into their Premium (and some Mass Market) cards.  So, access to players' jerseys was another critical input into the Relevant Market.  For years, Panini obtained most of its supply of official player jerseys from Fanatics.

113.    In or around May 2023, Fanatics CEO, Michael Rubin, approached Panini to advise it that Fanatics would no longer supply Panini with any jerseys for Panini to offer to consumers as a unique element to its trading cards.  Since then, Panini has been unable to submit new orders for jerseys from Fanatics.

114.    Rubin also added that Fanatics would not stop its campaign against Panini and would continue to sign exclusive deals with players that Panini would have otherwise partnered with to offer licensed, original, handwritten autographed trading cards to consumers.

***Fanatics induces the NFL Players Association to terminate its license agreement with Panini***

115.    Fanatics and Rubin knew that Panini had an exclusive deal with the NFLPA because their own exclusive deal was set to begin when Panini's expired in 2025.

116.    The NFLPA agreement with Fanatics had an acceleration provision which provided that in the event the NFLPA were to terminate its agreement with Panini, the effective date of the Fanatics deal would automatically accelerate, making Fanatics' agreement effective immediately.

117.    Fanatics induced the NFLPA (and others) to find a way to claim a breach in its agreement with Panini before its term expired, to transfer the rights to an entity in which it held an equity stake.

118.    Fanatics' raiding of Panini for its employees in April 2023 was central to Fanatics and Rubin's plan to pressure Panini to exit the Relevant Market. That raid provided the pretext for the NFLPA to point (wrongly) to language in its Panini agreement providing for termination if Panini suffered a material change in executive management.

119.    In August 2023, the NFLPA terminated its licensing agreement with Panini.

120.    In an ensuing arbitration proceeding, the panel of arbitrators unanimously found that the NFL Players Association breached its licensing agreement with Panini and they were ordered to pay over $7 million in damages to Panini.

### *Fanatics encourages another breach with Panini*

121.    Panini also holds the exclusive agreement to produce and sell trading cards between Panini and World Wrestling Entertainment (WWE) that runs through 2025.

122.    Fanatics knows of this contract and embarked on a campaign to have it terminated early, so that Fanatics' own exclusive deal with WWE would begin once Panini's expired.

123.    Within days of the NFLPA's attempt to terminate its contract with Panini and announcing that Fanatics was its new exclusive partner, WWE followed suit and terminated its contract with Panini.

124.    There was no factual or legal basis for WWE's termination of its contract with Panini. WWE was encouraged to breach this contract as part of Fanatics' attempt to drive Panini from the trading card business, and this reflects Fanatics' efforts to leverage its market power and monopoly power in the Relevant Market to harm competition in another market.

125.    Following the announcement of the deals that would allow it to control the Relevant Market in the future, Fanatics engaged in a real-time campaign to bully market participants by threatening to exclude them from the Relevant Market when Fanatics' exclusive licenses begin if they did not comply with Fanatics' immediate demands.

126.    Fanatics used its monopoly power to control the distribution of trading cards to big-box retailers and other major retail outlets. After securing its exclusive licensing deals and acquiring Topps, Fanatics pressured distributors who supply trading cards to major retailers to agree to higher margins for the cards. If the distributors refused to comply, Fanatics threatened to cut them off entirely from the supply of licensed trading cards. This pressure likely forced distributors to compromise on quality of service and terms to big-box retailers.

127.    At the same time, Fanatics also renegotiated terms directly with big-box retailers requiring them to carry a more limited range of trading card products, specifically only those manufactured or distributed by Fanatics through Topps. By doing so, Fanatics reduced the overall variety of trading cards available to consumers at major retail outlets, further limiting consumer choice. Fanatics made it clear that because of its long-term exclusive licenses with the leagues and players' associations, it would soon have total control over the trading card supply. Retailers and distributors therefore faced the Hobson's choice to either comply with Fanatics' terms or risk losing access to the most popular and profitable trading cards on the market.

128.    After securing its exclusive licensing deals and acquiring Topps, Fanatics also leveraged its monopoly power to impose anticompetitive terms on local card shops. Fanatics' control over the market allowed it to dictate the terms under which local card shops could sell its products, even though these shops had previously operated with greater autonomy. Fanatics used

this control to harm competition and limit consumer choice by forcing local card shops to accept restrictive terms or risk being cut off from the supply of highly sought-after trading cards.

129.    Fanatics distributed contracts to local card shops with terms that allowed Fanatics to unilaterally set minimum prices for its trading cards at any time. While Fanatics referred to these price floors as "suggestions," the contracts made clear that failure to comply with these minimum prices could result in Fanatics suspending or terminating the shop's account. Fanatics' ability to enforce these terms was rooted in its control over the supply of trading cards for the NFL, NBA, and MLB—products that, if Fanatics is allowed to monopolize the market, no other manufacturer can legally provide. Local card shops therefore had little choice but to comply if they wanted to stay in business.

130.    Fanatics also restricted consumer choice by pressuring local card shops not to sell trading cards on business-to-business trading card websites, threatening to cut off their supply of licensed trading cards if they did so. This type of restriction limits the ability of local shops to reach a broader customer base, and it prevents consumers from accessing alternative sources for purchasing trading cards.

131.    Fanatics also targeted another key segment of the trading card industry: "case breakers." Case breakers open sealed cases and packs of trading cards during livestreams, allowing customers to "buy into the break" and receive specific cards based on predetermined rules. Since case breakers rely on having a steady supply of trading card cases to operate, they are particularly vulnerable to supply chain pressure. Fanatics exploited this vulnerability by warning case breakers that they would lose access to trading card cases unless they moved their operations to Fanatics' new case-breaking platform—Fanatics Live—on terms so one-sided that they would likely drive many case breakers out of business altogether.

132.    This strategy serves two anticompetitive goals for Fanatics. First, it forces case breakers to abandon other established case-breaking platforms and migrate to Fanatics Live, consolidating market activity under Fanatics' control. Second, after the case breakers have switched to Fanatics Live, Fanatics can apply further pressure to weaken or eliminate them, ensuring that only case breakers directly aligned with Fanatics or operating under Fanatics' preferred terms will survive. This will reduce the number of independent case breakers, limit consumer choice, and decrease the overall supply of case-breaking services.

133.    Defendants intended to harm, and indeed its anticompetitive actions have harmed competition in the trading card market, resulting in higher prices, reduced competition, and reduced product choice. This is the type of injury that the antitrust laws were intended to prevent and is a direct and proximate result of Defendants' anticompetitive actions, and therefore Defendants have caused antitrust injury to the Class.

## VII.    RELEVANT MARKET – NEWLY-ISSUED TRADING CARDS FROM THE MAJOR U.S. PROFESSIONAL SPORTS LEAGUES

134.    Defendants had market power in the market for newly issued Major U.S. Professional Sports Leagues trading cards. They had the power to raise and maintain the price of these trading cards at supracompetitive levels profitably without losing substantial sales.

135.    To the extent Plaintiff's claims require the definition of a relevant product market, the relevant product market is the market for newly issued trading cards created by card producers for NBA, NFL, and MLB players that are fully licensed with league and player association marks.

136.    To the extent Plaintiff's claims require the definition of a relevant geographic market, the relevant geographic market for is the United States.

31

137.    Because of fan loyalty and the desirability of newly issued player trading cards from the most popular sports leagues that include the league logo, league players association logo, team uniform, team color combinations, and player images, there is no economic substitute for newly issued, fully licensed Major U.S. Professional Sports Leagues trading cards in the United States. A small but significant non-transitory increase in the price of newly issued fully licensed Major U.S. Professional Sports Leagues trading cards in the United States would not substantially raise demand for player trading cards from earlier years, non-licensed trading cards from the Major U.S. Professional Sports Leagues, trading cards from other sports leagues, or other types of trading cards.

## VIII.    RELEVANT MARKET – ALTERNATIVE – THE MARKETS FOR NEWLY ISSUED NBA PLAYER TRADING CARDS, NFL PLAYER TRADING CARDS, AND MLB PLAYER TRADING CARDS

138.    In the alternative, to the extent Plaintiff's claims require the definition of a relevant product market, Plaintiff alleges separate relevant product markets for NBA player trading cards, NFL player trading cards, and MLB player trading cards.

139.    At all relevant times, Defendants had substantial market power in the markets for NBA player trading cards, NFL player trading cards, and MLB player trading cards. They had the power to raise and maintain the price of these trading cards at supracompetitive levels profitably without losing substantial sales.

140.    To the extent Plaintiffs' claims require the definition of a relevant product market for NBA player trading cards, NFL player trading cards, and MLB player trading cards, the relevant product markets are:

        a.    the market for newly issued trading cards created by card producers for NBA players that are fully licensed with league and player association marks;

b.  the market for newly issued trading cards created by card producers for NFL players that are fully licensed with league and player association market; and

c.  the market for newly issued trading cards created by card producers for MLB players that are fully licensed with league and player association marks.

141.  To the extent Plaintiff's claims require the definition of a relevant geographic market for NBA player trading cards, NFL player trading cards, and MLB player trading cards, the relevant geographic market for each of them is the United States.

142.  Because of fan loyalty and the desirability of newly issued player trading cards from the NBA, NFL, and MLB that include the league logo, league players association logo, team uniform, team color combinations, and player images, there is no economic substitute for fully licensed NBA, NFL, and MLB player trading cards in the United States. A small but significant non-transitory increase in the price of newly issued fully licensed NBA, NFL, and MLB player trading cards in the United States would not substantially raise demand for player trading cards from earlier years, non-licensed trading cards from the Major U.S. Professional Sports Leagues, trading cards from other sports leagues, or other types of trading cards.

143.  And because each of the major professional sports leagues—the NBA, NFL, and MLB—is well-established, unique, and has its own devoted followers, many sports fans do not consider professional player trading cards from one league to be interchangeable with another. For these fans, cross price elasticity of demand is limited to each of these professional sports leagues individually.

**SUBSTANTIAL FORECLOSURE**

144.    Defendants, collectively, have market power in the overall market for Major U.S. Professional Sports Leagues trading cards, and alternatively, in the markets for MLB player trading cards, NBA player trading cards, and NFL player trading cards individually.

145.    Fanatics' exclusive agreements foreclose competition entirely in the markets for MLB player trading cards, NBA player trading cards, and NFL player trading cards, and is poised to maintain that exclusion for decades, all but ensuring the permanent demise of any viable competitors even thereafter due to the capital requirements and barriers to entry.

146.    Following acquisition of its rival, Topps, Fanatics already holds a 100% monopoly in the market for MLB player trading cards.  And while Fanatics' exclusive licensing agreements for NBA and NFL player trading cards technically take effect in September 2025 and March 2026, respectively, Fanatics has already obtained and begun to enforce its market power in those submarkets through the other elements of its anticompetitive scheme.

**COUNT ONE**

**Conspiracy in Restraint of Trade (15 U.S.C. §1)**

**(Against Defendants Fanatics, OneTeam, MLB, and MLBP)**

147.    Plaintiff repeats and reiterates each of the allegations contained in the paragraphs above as if fully set forth herein.

148.    The relevant product market is the MLB Trading Card market, and the relevant geographic market is the United States.

149.    Since Fanatics purchased Topps in January 2022, it has possessed market power in the market for MLB Trading Cards.

150.    Fanatics has engaged in a scheme to monopolize the market for MLB Trading Cards.

151.    Fanatics has used its monopoly power to impose anticompetitive terms on distributors and retailers, including requiring higher margins from distributors, requiring exclusivity from big-box retailers, and imposing minimum pricing requirements on local card shops.

152.    MLB and MLBP violated 15 U.S.C. §1 by entering into an anticompetitive agreement to unreasonably restrain trade in the market for MLB Trading Cards.

153.    Fanatics gave MLB an equity stake in Fanatics in order to induce it to enter into the agreement herein, thereby sharing a portion of its supracompetitive profits with MLB in exchange for MLB allowing it to gain long-term monopoly control of the market for MLB Trading Cards.

154.    This long-term exclusive agreement was intended to, and did in fact, give Fanatics long-term monopoly control of the market for MLB Trading Cards. This has raised the price of MLB Trading Cards.

155.    MLB and MLBP are liable for this anticompetitive agreement with Fanatics under a "rule of reason" standard under the antitrust laws.

156.    There is and was no legitimate, non-pretextual, pro-competitive business justification for this anticompetitive agreement that outweighs its harmful effect on purchasers of MLB Trading Cards and competition. Even if there were some conceivable and cognizable justification, the agreement was not necessary to achieve such a purpose.

157.    As a direct and proximate result of MLB and MLBP's anticompetitive agreement with Fanatics, Plaintiff and the Class have been injured in their business or property by the violation of 15 U.S.C. § 1. The injury to Plaintiff and the Class consists of having paid higher prices for MLB Trading Cards than they would have paid in the absence of those violations. Such injury, called "overcharges," is of the type that the antitrust laws were designed to prevent, and it flows from that which makes the defendants' conduct unlawful.

## COUNT TWO

## Conspiracy in Restraint of Trade (15 U.S.C. §1)

## (Against Defendants Fanatics, OneTeam, MLBPA, and MLBPI)

158.    Plaintiff repeats and reiterates each of the allegations contained in the paragraphs above as if fully set forth herein.

159.    The relevant product market is the MLB Trading Card market, and the relevant geographic market is the United States.

160.    Since Fanatics purchased Topps in January 2022, it has possessed market power in the market for MLB Trading Cards.

161.    Fanatics has engaged in a scheme to monopolize the market for MLB Trading Cards.

162.    Fanatics has used its monopoly power to impose anticompetitive terms on distributors and retailers, including requiring higher margins from distributors, requiring exclusivity from big-box retailers, and imposing minimum pricing requirements on local card shops.

163.    MLBPA and MLBPI violated 15 U.S.C. §1 by entering into an anticompetitive agreement with Fanatics to unreasonably restrain trade in the market for MLB Trading Cards.

164.    Fanatics gave MLBPA an equity stake in Fanatics in order to induce it to enter into the agreement herein, thereby sharing a portion of its supracompetitive profits with MLBPA in exchange for MLBPA allowing it to gain long-term monopoly control of the market for MLB Trading Cards.

165.    This long-term exclusive agreement was intended to, and did in fact, give Fanatics long-term monopoly control of the market for MLB Trading Cards.

166.    MLBPA and MLBPI are liable for this anticompetitive agreement with Fanatics under a "rule of reason" standard under the antitrust laws.

167.    There is and was no legitimate, non-pretextual, pro-competitive business justification for this anticompetitive agreement that outweighs its harmful effect on purchasers of MLB Trading Cards and competition. Even if there were some conceivable and cognizable justification, the agreement was not necessary to achieve such a purpose.

168.    As a direct and proximate result of MLBPA and MLBPI's anticompetitive agreement with Fanatics, Plaintiff and the Class have been injured in their business or property by the violation of 15 U.S.C. § 1. The injury to Plaintiff and the Class consists of having paid higher

37

prices for MLB Trading Cards than they would have paid in the absence of those violations. Such injury, called "overcharges," is of the type that the antitrust laws were designed to prevent, and it flows from that which makes the defendants' conduct unlawful.

## COUNT THREE

### Conspiracy in Restraint of Trade (15 U.S.C. §1)
### (Against Defendants Fanatics, OneTeam, NFL, and NFLP)

169.    Plaintiff repeats and reiterates each of the allegations contained in the paragraphs above as if fully set forth herein.

170.    The relevant product market is the NFL Trading Card market, and the relevant geographic market is the United States.

171.    Fanatics has engaged in a scheme to monopolize the market for NFL Trading Cards.

Fanatics entered into an exclusive agreement with the NFL and NFLP under which it will have a 20-year exclusive agreement to monopolize the market for NFL Trading Cards.

172.    Fanatics has used its impending monopoly power to impose anticompetitive terms on distributors and retailers, including requiring higher margins from distributors, requiring exclusivity from big-box retailers, and imposing minimum pricing requirements on local card shops.

173.    The NFL and NFLP violated 15 U.S.C. §1 by entering into an anticompetitive agreement with Fanatics to unreasonably restrain trade in the market for NFL Trading Cards.

174.    Fanatics gave the NFL an equity stake in Fanatics in order to induce it to enter into the agreement herein, thereby sharing a portion of its supracompetitive profits with the NFL in

exchange for the NFL allowing it to gain long-term monopoly control of the market for NFL Trading Cards.

175.    This long-term exclusive agreement was intended to, and will in fact, give Fanatics long-term monopoly control of the market for NFL Trading Cards.

176.    The NFL and NFLP are liable for this anticompetitive agreement with Fanatics under a "rule of reason" standard under the antitrust laws.

177.    There is and was no legitimate, non-pretextual, pro-competitive business justification for this anticompetitive agreement that outweighs its harmful effect on purchasers of NFL Trading Cards and competition. Even if there were some conceivable and cognizable justification, the agreement was not necessary to achieve such a purpose.

178.    As a direct and proximate result of the NFL and NFLP's anticompetitive agreement with Fanatics, Plaintiff and the Class have been injured in their business or property by the violation of 15 U.S.C. § 1. The injury to Plaintiff and the Class consists of having paid higher prices for NFL Trading Cards than they would have paid in the absence of those violations. Such injury, called "overcharges," is of the type that the antitrust laws were designed to prevent, and it flows from that which makes the defendants' conduct unlawful.

## COUNT FOUR
### Conspiracy in Restraint of Trade (15 U.S.C. §1)

### (Against Defendants Fanatics, OneTeam, NFLPA, and NFLPI)

179.    Plaintiff repeats and reiterates each of the allegations contained in the paragraphs above as if fully set forth herein.

180.    The relevant product market is the NFL Trading Card market, and the relevant geographic market is the United States.

181.    Fanatics has engaged in a scheme to monopolize the market for NFL Trading Cards.

182.    Fanatics entered into an exclusive agreement with the NFLPA and NFLPI under which it will have a 20-year exclusive agreement to monopolize the market for NFL Trading Cards.

183.    Fanatics has used its impending monopoly power to impose anticompetitive terms on distributors and retailers, including requiring higher margins from distributors, requiring exclusivity from big-box retailers, and imposing minimum pricing requirements on local card shops.

184.    The NFLPA and NFLPI violated 15 U.S.C. §1 by entering into an anticompetitive agreement with Fanatics to unreasonably restrain trade in the market for NFL Trading Cards.

185.    Fanatics gave the NFLPA an equity stake in Fanatics in order to induce it to enter into the agreement herein, thereby sharing a portion of its supracompetitive profits with the NFLPA in exchange for the NFLPA allowing it to gain long-term monopoly control of the market for NFL Trading Cards.

186.    This long-term exclusive agreement was intended to, and will in fact, give Fanatics long-term monopoly control of the market for NFL Trading Cards.

187.    The NFLPA and NFLPI are liable for this anticompetitive agreement with Fanatics under a "rule of reason" standard under the antitrust laws.

188.    There is and was no legitimate, non-pretextual, pro-competitive business justification for this anticompetitive agreement that outweighs its harmful effect on purchasers of NFL Trading Cards and competition. Even if there were some conceivable and cognizable justification, the agreement was not necessary to achieve such a purpose.

189.    As a direct and proximate result of the NFLPA and NFLPI's anticompetitive agreement with Fanatics, Plaintiff and the Class have been injured in their business or property by the violation of 15 U.S.C. § 1. The injury to Plaintiff and the Class consists of having paid higher prices for NFL Trading Cards than they would have paid in the absence of those violations. Such injury, called "overcharges," is of the type that the antitrust laws were designed to prevent, and it flows from that which makes the defendants' conduct unlawful.

## COUNT FIVE

### Conspiracy in Restraint of Trade (15 U.S.C. §1)

### (Against Defendants Fanatics, NBA and NBAP)

190.    Plaintiff repeats and reiterates each of the allegations contained in the paragraphs above as if fully set forth herein.

191.    The relevant product market is the NBA Trading Card market, and the relevant geographic market is the United States.

192.    Fanatics has engaged in a scheme to monopolize the market for NBA Trading Cards.

193.    Fanatics entered into an exclusive agreement with the NBA and NBAP under which it will have an (at least) 10-year exclusive agreement to monopolize the market for NBA Trading Cards.

194.    Fanatics has used its impending monopoly power to impose anticompetitive terms on distributors and retailers, including requiring higher margins from distributors, requiring exclusivity from big-box retailers, and imposing minimum pricing requirements on local card shops.

195.    The NBA and NBAP violated 15 U.S.C. §1 by entering into an anticompetitive agreement with Fanatics to unreasonably restrain trade in the market for NBA Trading Cards.

196.    Fanatics gave the NBA an equity stake in Fanatics in order to induce it to enter into the agreement herein, thereby sharing a portion of its supracompetitive profits with the NBA in exchange for the NBA allowing it to gain long-term monopoly control of the market for NBA Trading Cards.

197.    This long-term exclusive agreement was intended to, and will in fact, give Fanatics long-term monopoly control of the market for NBA Trading Cards.

198.    The NBA and NBAP are liable for this anticompetitive agreement with Fanatics under a "rule of reason" standard under the antitrust laws.

199.    There is and was no legitimate, non-pretextual, pro-competitive business justification for this anticompetitive agreement that outweighs its harmful effect on purchasers of NBA Trading Cards and competition. Even if there were some conceivable and cognizable justification, the agreement was not necessary to achieve such a purpose.

200.    As a direct and proximate result of the NBA and NBAP's anticompetitive agreement with Fanatics, Plaintiff and the Class have been injured in their business or property by the violation of 15 U.S.C. § 1. The injury to Plaintiff and the Class consists of having paid higher prices for NBA Trading Cards than they would have paid in the absence of those violations. Such injury, called "overcharges," is of the type that the antitrust laws were designed to prevent, and it flows from that which makes the defendants' conduct unlawful.

## COUNT SIX

## Conspiracy in Restraint of Trade (15 U.S.C. §1)

**(Against Defendants Fanatics and NBAPA)**

201.    Plaintiff repeats and reiterates each of the allegations contained in the paragraphs above as if fully set forth herein.

202.    The relevant product market is the NBA Trading Card market, and the relevant geographic market is the United States.

203.    Fanatics has engaged in a scheme to monopolize the market for NBA Trading Cards.

204.    Fanatics entered into an exclusive agreement with the NBAPA under which it will have an (at least) 10-year exclusive agreement to monopolize the market for NBA Trading Cards.

205.    Fanatics has used its impending monopoly power to impose anticompetitive terms on distributors and retailers, including requiring higher margins from distributors, requiring exclusivity from big-box retailers, and imposing minimum pricing requirements on local card shops.

206.    The NBAPA violated 15 U.S.C. §1 by entering into an anticompetitive agreement with Fanatics to unreasonably restrain trade in the market for NBA Trading Cards.

207.    Fanatics gave the NBAPA an equity stake in Fanatics in order to induce it to enter into the agreement herein, thereby sharing a portion of its supracompetitive profits with the NBAPA in exchange for the NBAPA allowing it to gain long-term monopoly control of the market for NBA Trading Cards.

208.    This long-term exclusive agreement was intended to, and will in fact, give Fanatics long-term monopoly control of the market for NBA Trading Cards.

209.    The NBAPA is liable for this anticompetitive agreement with Fanatics under a "rule of reason" standard under the antitrust laws.

210.    There is and was no legitimate, non-pretextual, pro-competitive business justification for this anticompetitive agreement that outweighs its harmful effect on purchasers of NBA Trading Cards and competition. Even if there were some conceivable and cognizable justification, the agreement was not necessary to achieve such a purpose.

211.    As a direct and proximate result of the NBAPA's anticompetitive agreement with Fanatics, Plaintiff and the Class have been injured in their business or property by the violation of 15 U.S.C. § 1. The injury to Plaintiff and the Class consists of having paid higher prices for NBA Trading Cards than they would have paid in the absence of those violations. Such injury, called "overcharges," is of the type that the antitrust laws were designed to prevent, and it flows from that which makes the defendants' conduct unlawful.

### COUNT SEVEN

### Monopolization (15 U.S.C. §2)

### (Against Defendant Fanatics)

212.    Plaintiff repeats and reiterates each of the allegations contained in the paragraphs above as if fully set forth herein.

213.    The relevant product market is the market for newly issued Major U.S. Professional Sports Leagues trading cards, or alternatively the MLB Trading Card market, the NFL Trading Card market, and the NBA Trading Card market. The relevant geographic market is the United States.

214.    Defendant Fanatics has engaged in a scheme to monopolize the market for newly issued Major U.S. Professional Sports Leagues trading cards, or alternatively the MLB Trading Card market, the NFL Trading Card market, and the NBA Trading Card market.

215.    Fanatics has willfully acquired and maintained a monopoly the market for newly issued Major U.S. Professional Sports Leagues trading cards, or alternatively the MLB Trading Card market, the NFL Trading Card market, and the NBA Trading Card market.

216.    Defendant Fanatics did not acquire this monopoly through superior products, business acumen, or historical accident, but rather through its anticompetitive conduct alleged herein.  There are no procompetitive justifications to offset the anticompetitive harm caused by Fanatics unlawful conduct.

217.    Plaintiff has suffered an injury of the type the antitrust laws were intended to prevent and is an efficient and appropriate enforcer of the antitrust laws.

218.    Fanatics has used its monopoly power to impose anticompetitive terms on distributors and retailers, including requiring higher margins from distributors, requiring exclusivity from big-box retailers, and imposing minimum pricing requirements on local card shops.

219.    Fanatics gave the leagues and players associations an equity stake in Fanatics in order to induce it to enter into the agreement herein, thereby sharing a portion of its supracompetitive profits with the leagues and players associations in exchange for allowing it to gain long-term monopoly control of the market for Major U.S. Professional Sports Leagues trading cards.

220.    These long-term exclusive agreements were intended to, and did in fact, give Fanatics long-term monopoly control of the market for Major U.S. Professional Sports Leagues trading cards. This has raised the price of Major U.S. Professional Sports Leagues trading cards.

221.    As a direct and proximate result of Fanatics' anticompetitive scheme as alleged herein, Plaintiff and the Class have been injured in their business or property by the violation of 15 U.S.C. § 2. The injury to Plaintiff and the Class consists of having paid higher prices for Major U.S. Professional Sports Leagues trading cards than they would have paid in the absence of those violations. Such injury, called "overcharges," is of the type that the antitrust laws were designed to prevent, and it flows from that which makes the defendants' conduct unlawful.

**WHEREFORE, Plaintiff demands a trial by jury and hereby respectfully requests:**

(a)    That the Court determine that Plaintiff's claim regarding the Class alleged herein is suitable for class treatment and certify the proposed Class pursuant to Fed. R. Civ. P. 23;

(b)    That the Court appoint Plaintiff as the representative of the Class;

(c)    That Plaintiff's counsel be appointed as counsel for the Class;

(d)    That the Court award, pursuant to 15 U.S.C. § 15, compensatory and trebled damages to the Class resulting from Defendants' violations of the Sherman Act;

(e)    That the Court order, pursuant to 15 U.S.C. § 26, permanent injunctive relief preventing Defendants from continuing their unlawful acts in violation of the Sherman Act;

(f)    That Plaintiff and the Class be awarded their costs, expenses, and reasonable attorney's fees in bringing this action;

(g)     That Plaintiff and the Class be awarded pre-judgment and post-judgment interest on all sums awarded; and

(h)     Such other and further relief as this Court may deem just and proper.

## IX.     DEMAND FOR JURY TRIAL

222.     Pursuant to Fed. R. Civ. P. 38(b), Plaintiff Robert Scaturo, on behalf of himself and the proposed class, respectfully demands a trial by jury of all issues properly triable to a jury in this case.

Dated: March 17, 2025                    Respectfully submitted,

    */s/ John Radice*

    _____

John Radice
Kenneth Pickle
Daniel Rubenstein
A. Luke Smith (*pro hac vice forthcoming*)
Kenneth Walsh
**RADICE LAW FIRM, P.C.**
475 Wall Street
Princeton, NJ 08540
Phone: (646) 245-8502
Fax: (609) 385-0745
jradice@radicelawfirm.com
kpickle@radicelawfirm.com
drubenstein@radicelawfirm.com
lsmith@radicelawfirm.com
kwalsh@radicelawfirm.com

*Counsel for Plaintiff and*
*the Proposed Class*

47