## IN THE UNTED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ROBERT SCATURO, SCOTT BUBNICK, JOSEPH DAVIDOV, STEVEN MARDAKHAEV, AND JONATHAN MADAR individually and on behalf of all others similarly situated,<br><br>        Plaintiff,<br><br>    v.<br><br>FANATICS, INC.; FANATICS, LLC; FANATICS COLLECTIBLES INTERMEDIATE HOLDCO, INC.; FANATICS SPV, LLC; MAJOR LEAGUE BASEBALL; MAJOR LEAGUE BASEBALL PROPERTIES, INC.; MAJOR LEAGUE BASEBALL PLAYERS ASSOCIATION; MLB PLAYERS, INC.; NATIONAL FOOTBALL LEAGUE; NFL PROPERTIES LLC; NATIONAL FOOTBALL LEAGUE PLAYERS ASSOCIATION; NFL PLAYERS, INC.; NATIONAL BASKETBALL ASSOCIATION; NBA PROPERTIES, INC.; NATIONAL BASKETBALL ASSOCIATION PLAYERS ASSOCIATION; ONETEAM PARTNERS LLC,<br><br>        Defendants. | Case No. 1:25-cv-02202-LTS-VF<br><br>**ORAL ARGUMENT REQUESTED** |

## MAJOR LEAGUE BASEBALL AND MAJOR LEAGUE BASEBALL PROPERTIES, INC.'S CORRECTED MEMORANDUM OF LAW IN SUPPORT OF MOTION TO COMPEL ARBITRATION AND MOTION TO DISMISS COMPLAINT

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.    INTRODUCTION ...................................................................................................1

II.   BACKGROUND ...................................................................................................3

    A.    The Parties ................................................................................................3

    B.    Fanatics' Alleged Anticompetitive Scheme.............................................4

    C.    Allegations Relating to MLB...................................................................4

    D.    Allegations Regarding Relevant Product Markets and Market Power ...................5

III.  MOTION TO COMPEL ARBITRATION ............................................................6

IV.   MOTION TO DISMISS ........................................................................................8

    A.    Plaintiffs lack standing to bring claims against MLB..............................8

        1.    Plaintiffs lack Article III standing because they fail to allege that any named plaintiff purchased products in the relevant market. ...............8

        2.    Plaintiffs allege no facts showing that their alleged injury "flows from" MLB's allegedly anticompetitive conduct. .....................................9

        3.    *Illinois Brick* bars Plaintiffs' Sherman Act claims against MLB. ............13

        4.    Plaintiffs are not efficient enforcers of the antitrust laws against MLB.................................................................................................15

    B.    The First Amended Complaint fails to state a claim against MLB.......................16

        1.    Plaintiffs fail to adequately allege a conspiracy involving MLB. .............17

        2.    Plaintiffs fail to allege a relevant product market.....................................17

        3.    Plaintiffs have failed to allege harm to consumers. ...................................19

V.    CONCLUSION....................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*In re A2P SMS Antitrust Litig.*,
   972 F. Supp. 2d 465 (S.D.N.Y. 2013)........................................................................7

*In re Am. Express Anti-Steering Rules Antitrust Litig.*,
   19 F.4th 127 (2nd Cir. 2021) ..........................................................................11, 12

*In re Amazon.com, Inc. eBook Antitrust Litig.*,
   2023 WL 6006525 (S.D.N.Y. July 31, 2023) ...........................................................14

*Apple Inc. v. Pepper*,
   587 U.S. 273, 280 (2019).....................................................................13, 14, 15

*ASARCO LLC v. Goodwin*,
   756 F.3d 191 (2d Cir. 2014).................................................................................8

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)...........................................................................................3, 8

*Ass'n of Commuter Rail Emps. Loc. No. 9 v. Metro-N. Commuter R.R. Co.*,
   600 F. Supp. 3d 367 (S.D.N.Y. 2022).....................................................................9

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,
   459 U.S. 519 (1983).............................................................................................16

*Astra Oil Co. v. Rover Navigation, Ltd.*,
   344 F.3d 276 (2d Cir. 2003).................................................................................7

*In re ATM Fee Antitrust Litig.*,
   686 F.3d 741 (9th Cir. 2012) ..............................................................................14

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007)...............................................................................................3

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
   429 U.S. 477 (1977)........................................................................................2, 8, 9

*Chapman v. N.Y. State Div. for Youth*,
   546 F.3d 230 (2d Cir. 2008)..................................................................................19

*Denney v. BDO Seidman, L.L.P.*,
   412 F.3d 58 (2d Cir. 2005).....................................................................................7

*Dickson v. Microsoft Corp.*,
309 F.3d 193, 215 (4th Cir. 2002) ......................................................................15

*In re Digit. Music Antitrust Litig.*,
812 F. Supp. 2d 390 (S.D.N.Y. 2011) ..........................................................9, 11, 10

*E & L Consulting, Ltd. v. Doman Indus. Ltd.*,
472 F.3d 23 (2d Cir. 2006).................................................................................20

*Fed. Trade Comm'n v. Endo Pharms. Inc.*,
82 F.4th 1196 (D.C. Cir. 2023).........................................................................10

*Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*,
711 F.3d 68 (2d Cir. 2013)...........................................................................8, 11

*Gelboim v. Bank of Am. Corp.*,
823 F.3d. 759 (2d Cir. 2016)...........................................................................15

*Geneva Pharms. Tech. Corp. v. Barr Labs., Inc.*,
386 F.3d 485 (2d Cir. 2004)............................................................................17

*Gianna Enters. v. Miss World (Jersey) Ltd.*,
551 F. Supp. 1348 (S.D.N.Y. 1982).................................................................19

*Grigson v. Creative Artists Agency, L.L.C.*,
210 F.3d 524 (5th Cir. 2000) .............................................................................7

*Illinois Brick Co. v. Ill.*,
431 U.S. 720 (1977)...........................................................................2, 13, 14, 15

*Kansas v. UtiliCorp United Inc.*,
497 U.S. 199 (1990)..........................................................................................15

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*,
383 F. Supp. 3d 187 (S.D.N.Y. 2019)...............................................................15

*Laumann v. Nat'l Hockey League*,
907 F. Supp. 2d 465 (S.D.N.Y. 2012)..........................................................14, 15

*Laydon v. Cooperatieve Rabobank U.A.*,
55 F.4th 86 (2d Cir. 2022) ............................................................................11, 12

*Live Face on Web, LLC v. Five Boro Mold Specialist Inc.*,
2016 WL 1717218 (S.D.N.Y. Apr. 28, 2016)......................................................8

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992)............................................................................................9

*Major League Baseball Props., Inc. v. Salvino, Inc.*,
    542 F.3d 290 (2d Cir. 2008)..........................................................................16

*Ohio v. Am. Express Co.*,
    585 U.S. 529 (2018)......................................................................................19

*In re Oral Phenylephrine Mktg. & Sales Pracs. Litig.*,
    755 F. Supp. 3d 208 (E.D.N.Y. Oct. 29, 2024)...........................................13

*Pac. Bell. Tel. Co. v. linkLine Commc'ns, Inc.*,
    555 U.S. 438 (2009)......................................................................................20

*Panini Am., Inc. v. Fanatics, Inc.*,
    2025 WL 753954 (S.D.N.Y. Mar. 10, 2025) ...................................... 12, 16

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
    2024 WL 1014159 (E.D.N.Y. Mar. 8, 2024) ....................................... 14, 15

*Pilon v. Discovery Commc'ns, LLC*,
    769 F. Supp. 3d 273 (S.D.N.Y. 2025)............................................................6

*Polargrid LLC v. Videsh Sanchar Nigam Ltd.*,
    2006 WL 2266351 (S.D.N.Y. Aug. 7, 2006) ...............................................19

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
    124 F.3d 430 (3d Cir. 1997)..........................................................................18

*Reid v. Tandym Grp., LLC*,
    697 F. Supp. 3d 62 (S.D.N.Y. 2023)..............................................................7

*In re Set-Top Cable Television Box Antitrust Litig.*,
    2011 WL 1432036 (S.D.N.Y. Apr. 8, 2011), *aff'd sub nom. Kaufman v. Time Warner*, 836 F.3d 137 (2d Cir. 2016) ....................................................19

*Sharikov v. Philips Med. Sys. MR, Inc.*,
    103 F.4th 159 (2d Cir. 2024) ..........................................................................8

*Shaw v. Rolex Watch, U.S.A., Inc.*,
    673 F. Supp. 674 (S.D.N.Y. 1987).................................................................18

*Simon v. KeySpan Corp.*,
    694 F.3d 196 (2d Cir. 2012)..........................................................................13

*Spinelli v. Nat'l Football League*,
    903 F.3d 185 (2nd Cir. 2018)........................................................................16

*Spinelli v. Nat'l Football League*,
    96 F. Supp. 3d 81 (S.D.N.Y. 2015)..............................................10, 17, 18, 20

*Subsolutions, Inc. v. Doctor's Assocs.*,
  62 F. Supp. 2d 616 (D. Conn. 1999) ...................................................................18

*Tanaka v. Univ. of S. Cal.*,
  252 F.3d 1059 (9th Cir. 2001) ...........................................................................18

*TechReserves Inc. v. Delta Controls Inc.*,
  2014 WL 1325914 (S.D.N.Y. Mar. 31, 2014) ....................................................16

*Theatre Party Assocs. v. Shubert Org.*,
  695 F. Supp. 150 (S.D.N.Y. 1988).....................................................................18

*Todd v. Exxon Corp.*,
  275 F.3d 191 (2d Cir. 2001)...............................................................................18

*Wis. Interscholastic Athletic Ass'n v. Gannett Co., Inc.*,
  658 F.3d 614 (7th Cir. 2011) .............................................................................10

**Federal Statutes**

15 U.S.C. § 1 ..............................................................................................5, 6, 12, 16

15 U.S.C. § 15 ....................................................................................................12, 13

**Rules**

Federal Rule of Civil Procedure 12(b)(1) ..................................................................8, 9

Federal Rule of Civil Procedure 12(b)(6) ................................................................8, 16

## I.    INTRODUCTION[1]

In this putative civil antitrust class action, five consumers ("Plaintiffs") allege that Defendants Major League Baseball and Major League Baseball Properties, Inc. (collectively, "MLB") violated antitrust laws by doing nothing more than entering into a presumptively lawful exclusive trading card license with Defendant Fanatics, Inc. ("Fanatics").  Plaintiffs' lone claim against MLB is legally baseless, factually deficient, and cannot proceed in this Court.

Plaintiffs seek to represent a class of trading card purchasers and claim that Fanatics engaged in a series of anticompetitive actions that allegedly increased the prices of those cards. Plaintiffs' complaint borrows liberally from an antitrust lawsuit that one of Fanatics' competitors, Panini America, Inc. ("Panini"), filed against Fanatics. But rather than pursue claims solely against Fanatics—the defendant that Plaintiffs claim engaged in an anticompetitive scheme—Plaintiffs assert claims against major professional sports leagues, their players' unions, and their intellectual property licensing entities.

As an initial matter, three Plaintiffs' claims cannot proceed in this Court. As set forth in Fanatics' motion to compel arbitration, Plaintiffs Scott Bubnick, Joseph Davidov, and Jonathan Madar entered into robust arbitration agreements with Fanatics and its affiliates that cover any card purchases made through Fanatics' website or online stores. MLB joins Fanatics' motion to compel arbitration, and may enforce these agreements as a non-signatory under the doctrine of equitable estoppel.

Even if this Court were to consider those three Plaintiffs' claims notwithstanding their enforceable agreements to arbitrate, those claims—as well as the other named Plaintiffs' claims—would fail on the merits. In attempting to lash together a series of independent actions by different parties, Plaintiffs' overreaching complaint loses sight of the linchpin fact for their consumer claim: they must allege that MLB took action that directly caused them antitrust

---

[1] In all quotations appearing herein, all internal quotation marks, citations, and alterations have been omitted, and all emphases added, unless otherwise noted.

injury. Yet with respect to MLB, Plaintiffs allege nothing of the sort. The only conduct Plaintiffs ascribe to MLB is that MLB did what any licensor is allowed to do: it entered into an exclusive license agreement. First Amended Complaint ("FAC") ¶ 67. No consumer was injured when MLB entered into its license with Fanatics, which resembled the other exclusive trading card deals MLB had been executing for years. Moreover, MLB entered into that license months before Fanatics acquired Topps, entered into additional licenses with other leagues or unions, engaged in any of the alleged threats against Panini, or took any of the actions that allegedly raised consumer prices. Plaintiffs do not explain how, as a factual or legal matter, MLB should be held accountable for the alleged actions taken by other, unrelated entities *after* MLB executed its license agreement. And although Plaintiffs lump the MLB agreement together with the NFL's and NBA's separate license agreements with Fanatics, Plaintiffs nowhere allege or even suggest that any of these leagues coordinated, conspired, or were even aware of each other's arrangements. Thus, according to Plaintiffs' own allegations, MLB is ultimately nothing more than an upstream licensor. Extending the reach of antitrust claims to sweep in such independent licensing activity would dramatically expand the scope of potential liability. The law does not support Plaintiffs' strained efforts, and their complaint should be dismissed for multiple reasons.

*First*, Plaintiffs lack standing to sue MLB under both the test for antitrust standing and the rule barring indirect purchaser suits for damages, as set forth in *Illinois Brick Co. v. Ill.*, 431 U.S. 720, 730 (1977). Plaintiffs lack antitrust standing because they allege no facts showing that their alleged injury "flows from" MLB's allegedly anticompetitive conduct. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). MLB's alleged wrongful conduct amounts to nothing more than entering into a license agreement. Plaintiffs' claimed injuries do not flow from that agreement, but from Fanatics' alleged subsequent independent conduct regarding Topps, Panini, GC Packaging, and retail outlets—none of which has anything to do with MLB. Plaintiffs' claims against MLB also run headlong into *Illinois Brick*'s categorial rule barring indirect purchaser lawsuits for damages under the Sherman Act. MLB sells Plaintiffs nothing; it is merely an upstream licensor of intellectual property. Allegedly, MLB's exclusive license

caused "overcharges" that were passed down to Plaintiffs. But such an indirect claim for money damages fails as a matter of black-letter antitrust law. MLB's alleged equity interest in Fanatics does not make Plaintiffs' claims against MLB any more direct. Rather, MLB's non-controlling ownership stake is just further indication that MLB is at least a step removed from any claim purchasers may have against Fanatics.

*Second*, even if Plaintiffs have standing to sue MLB (they do not), they have failed to state a viable Sherman Act claim. Plaintiffs' bare allegations regarding an alleged "conspiracy" involving MLB fail to satisfy the plausibility standard announced in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). Plaintiffs also fail to allege a relevant antitrust market. Their single-league "MLB Trading Card market" is incognizable as a matter of law. And even if it were an actionable market, Plaintiffs do not allege that MLB's agreement with Fanatics actually harmed consumers in that market.

Because Plaintiffs have already amended their complaint once—and because the issues affecting Plaintiffs' claims against MLB are structural and cannot be remedied—further amendment would be futile. The Court should dismiss the claims against MLB with prejudice.

## II.    BACKGROUND

### A.    The Parties

Plaintiffs Robert Scaturo, Scott Bubnick, Joseph Davidov, Steven Mardakhaev, and Jonathan Madar allege that "Defendant Fanatics, in a conspiracy involving all Defendants, engaged in a campaign to monopolize the market for" MLB, NFL, and NBA trading cards. FAC ¶ 2. Plaintiffs name seventeen different defendants who were allegedly part of this conspiracy, including Fanatics, three major sports leagues, and the licensing companies, players' associations, and players' association licensing affiliates associated with those leagues. *Id.* ¶¶ 35–54. Plaintiffs nowhere allege any sort of agreement among or between the disparate members of this alleged conspiracy. In other words, there are no allegations that MLB ever coordinated

with any of these other league or union defendants about any of the alleged conduct set forth in the complaint.

Plaintiffs seek to represent a nationwide class of people and businesses who purchased MLB, NFL, and NBA trading cards "directly from one of the Defendants" starting on January 1, 2022, and continuing into the present. *Id.* ¶ 56 (defining the "Class Period"). The Complaint alleges that each named Plaintiff purchased cards "at prices that were artificially inflated" as a result of Defendants' conduct. *Id.* ¶¶ 29-33. The Complaint nowhere alleges that any specific Plaintiff purchased any MLB trading cards during the Class Period. Nor does it allege that any specific Plaintiff purchased anything whatsoever directly from MLB.

### B.    Fanatics' Alleged Anticompetitive Scheme

Plaintiffs allege that, from the 1950s to 2022, Topps was the "dominant player" in the trading card industry thanks to its "long-term licensing deals with Major League Baseball." FAC ¶ 64. Panini entered the trading card industry in 2009 after executing licensing deals with the NFL and NBA, but not with MLB. *Id.* ¶ 68. Fanatics, Plaintiffs allege, is a sports apparel company that began expanding into trading cards in 2021. *Id.* ¶ 70. In January 2022, Fanatics acquired trading card competitor Topps for $500 million, allegedly "giving Fanatics dominance of the market for MLB trading cards." *Id.* ¶ 11. Since 2010, Topps had been MLB's exclusive trading card licensee. At the time of the Fanatics acquisition, "Topps had an exclusive license with MLB that ran until 2025." *Id.* ¶ 79.

Plaintiffs' remaining allegations concern Fanatics' allegedly anticompetitive conduct and its alleged effects on trading card availability and price, but have nothing to do with MLB.

### C.    Allegations Relating to MLB

Plaintiffs' sole factual allegation regarding MLB's allegedly anticompetitive conduct is that in August 2021, Fanatics "announced" that it had acquired a license with MLB, along with the other "leading professional sports licenses in North America." FAC ¶ 71. Plaintiffs allege that "Fanatics gave MLB an equity stake in Fanatics" to "induce it" to execute this "long-term

exclusive agreement," which allegedly gave Fanatics "monopoly control of the market for MLB Trading Cards" and increased the price of those cards. *Id.* ¶¶ 159–60. Plaintiffs claim that the agreement fails the "rule of reason" test under the antitrust laws. *Id.* ¶ 161.

With respect to MLB, Plaintiffs' allegations regarding causation and damages are boilerplate: "As a direct and proximate cause of Fanatics, MLB, and MLBP's anticompetitive agreement, Plaintiff and the Class have been injured in their business or property by the violation of 15 U.S.C. § 1." *Id.* ¶ 163. Plaintiffs describe their alleged injury as "overcharges" that were passed onto them in the form of "higher prices for MLB Trading Cards than they would have paid" absent the alleged antitrust violations. *Id.* In conclusory fashion, Plaintiffs state that this injury "flows from that which makes the Defendants' conduct unlawful." *Id.*

### D.    Allegations Regarding Relevant Product Markets and Market Power

In the body of their complaint, Plaintiffs define the "relevant product market" as "the market for newly issued trading cards created by card producers for NBA, NFL, and MLB players that are fully licensed with league and player association marks." FAC ¶ 141. Even though MLB is nowhere alleged to have licensed, marketed, or had any role in producing NFL or NBA trading cards, Plaintiffs allege that all "Defendants had market power in the market for newly issued Major U.S. Professional Sports Leagues trading cards." *Id.* ¶ 140. As an "alternative" to this market, Plaintiffs allege a separate "market[] . . . for MLB player trading cards." *Id.* ¶ 144; *see also id.* ¶ 146(c). Plaintiffs use this alternative single-licensor market in their lone claim against MLB. *Id.* ¶ 154.

In conclusory fashion, Plaintiffs allege that "Defendants, collectively, have market power in the overall market for Major U.S. Professional Sports Leagues trading cards, and alternatively, in the markets for [each league's] player trading cards . . . individually." *Id.* ¶ 150. Plaintiffs allege that Fanatics "holds a 100% monopoly in the market for MLB player trading cards" after and due to the "acquisition of its rival, Topps." *Id.* ¶ 152.

Based on the allegations set forth above, Plaintiffs bring a claim for conspiracy in restraint of trade under 15 U.S.C. § 1 against MLB (Count One). They claim that MLB violated the Sherman Act by "entering into an anticompetitive agreement to unreasonably restrain trade in the market for MLB trading cards." FAC ¶ 158. Although Plaintiffs never define that "agreement," presumably they are referring to the exclusive license agreement that Fanatics and MLB executed in May 2021. According to Plaintiffs, the exclusive agreement gave Fanatics monopoly control of the market for MLB Trading Cards," which "raised the price" of those cards. *Id.* ¶ 160. Plaintiffs allege that Fanatics possessed market power in the market for MLB trading cards "[s]ince Fanatics purchased Topps in January 2022[.]" *Id.* ¶ 155.

## III.    MOTION TO COMPEL ARBITRATION

As explained in Fanatics' motion to compel arbitration, Plaintiffs Scott Bubnick, Joseph Davidov, and Jonathan Madar are bound by the Terms of Use agreements found on Fanatics' and its affiliates' websites. These terms include broad arbitration provisions. *See, e.g.*, Declaration of Nigel Ponds in support of Fanatics' Motion to Compel Arbitration ("Ponds Decl.") Ex. 6 ("[A]ny and all disputes, claims, and causes of action . . . arising out of or connected with [the use of Fanatics' and its affiliates' websites] shall be resolved exclusively by binding arbitration[.]").[2] MLB joins in and adopts Fanatics' arguments that these provisions are binding and enforceable. They preclude the three Plaintiffs' claims against MLB from proceeding in this Court.[3]

The arbitration agreements to which at least three Plaintiffs assented delegate threshold questions of arbitrability to the arbitrator, not the court, and arbitration should be compelled on that basis alone. *See Pilon v. Discovery Commc'ns, LLC*, 769 F. Supp. 3d 273, 291 (S.D.N.Y.

---

[2] All applicable Terms of Use to which Plaintiffs Bubnick, Madar, and Davidov assented contain language that is materially identical to this quoted language. *See* Ponds Decl. Exs. 6-9. All applicable Terms of Use likewise delegate the question of arbitrability to the arbitrator. *See* Ponds Decl. Exs. 6-9 (incorporating AAA rules, which require the question of arbitrability to be determined by the arbitrator).

[3] MLB hereby adopts and incorporates the arguments of Defendants Major League Baseball Players Association ("MLBPA") and MLB Players Inc. ("MLBPI") that Plaintiffs' claims are subject to arbitration. MLB reasserts them here in abbreviated form for the Court's convenience.

2025). But if this Court reaches the issue of arbitrability, then the law permits MLB to enforce these agreements as a non-signatory under the doctrine of equitable estoppel. *See Reid v. Tandym Grp., LLC*, 697 F. Supp. 3d 62, 75 (S.D.N.Y. 2023). There are "a number of common law principles of contract law that may allow non-signatories to enforce an arbitration agreement, including equitable estoppel." *Id.* Equitable estoppel applies when (1) "the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed" and (2) "there is 'a relationship among the parties of a nature that justifies a conclusion that the party which agreed to arbitrate with another entity should be estopped from denying an obligation to arbitrate a similar dispute' with the non-signatory." *Id.* at 76.

Here, the issues sought to be resolved in arbitration (*i.e.* Plaintiffs' claims of competitive harm based on their purchase of cards on Fanatics' websites) are clearly intertwined with the agreements compelling arbitration, which govern all disputes arising out of or connected with the use of said sites. Plaintiffs' claims against MLB therefore "arise from" the contractual obligations set forth in the arbitration agreement between Plaintiffs and Fanatics. *See Astra Oil Co. v. Rover Navigation, Ltd.*, 344 F.3d 276, 277 (2d Cir. 2003). And Plaintiffs' allegations that Fanatics and MLB conspired to violate federal antitrust law are sufficient to create a "close relationship" between Fanatics and MLBPA for purposes of arbitration. *See Denney v. BDO Seidman, L.L.P.,* 412 F.3d 58, 70 (2d Cir. 2005) ("Having alleged [that] . . . defendants acted in concert to defraud plaintiffs . . . plaintiffs cannot now escape the consequences of those allegations by arguing that [defendants] lack the requisite close relationship[.]")*; Grigson v. Creative Artists Agency, L.L.C.*, 210 F.3d 524, 527 (5th Cir. 2000) ("[A]pplication of equitable estoppel is warranted when the signatory to the contract containing an arbitration clause raises allegations of substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract."). For these reasons, the Court should apply the doctrine of equitable estoppel to allow non-signatory MLB to enforce the arbitration agreements for Plaintiffs' antitrust claims. *See, e.g.*, *In re A2P SMS Antitrust Litig.*, 972 F. Supp.

2d 465, 476 (S.D.N.Y. 2013) (granting non-signatory defendant's motion to compel arbitration of antitrust claims based on equitable estoppel).

## IV.    MOTION TO DISMISS

For any claims against MLB not subject to arbitration, the Court should grant MLB's Motion to Dismiss pursuant to Rules 12(b)(1) and (b)(6).

Faced with a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), it is Plaintiffs' burden to show that jurisdiction exists. To establish antitrust standing, Plaintiffs must adduce facts demonstrating that (1) they suffered an injury of the type the antitrust laws were intended to prevent, (2) their injury "flows from" that which makes MLB's conduct unlawful or anticompetitive, and (3) they are efficient enforcers of the antitrust laws in these circumstances. *See Brunswick*, 429 U.S. at 489. "Antitrust standing is a threshold, pleading-stage inquiry and when a complaint by its terms fails to establish this requirement," the Court "must dismiss it as a matter of law." *Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*, 711 F.3d 68, 75 (2d Cir. 2013).

To survive a Rule 12(b)(6) motion, the "complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face[.]" *Iqbal*, 556 U.S. at 678. Although the Court assumes the truth of "well-pleaded factual allegations," it will not accept "legal conclusions" or "conclusory statements." *Sharikov v. Philips Med. Sys. MR, Inc.*, 103 F.4th 159, 166 (2d Cir. 2024). "A complaint that contains only 'naked assertions' or 'a formulaic recitation of the elements of a cause of action' does not suffice." *Live Face on Web, LLC v. Five Boro Mold Specialist Inc.*, 2016 WL 1717218, at *2 (S.D.N.Y. Apr. 28, 2016) (quoting *Twombly*, 550 U.S. at 555). In deciding a motion to dismiss, the Court considers only the complaint, exhibits attached to it, and "any document upon which the complaint heavily relies." *ASARCO LLC v. Goodwin*, 756 F.3d 191, 198 (2d Cir. 2014).

### A.    Plaintiffs lack standing to bring claims against MLB.

#### 1.    Plaintiffs lack Article III standing because they fail to allege that any

8

**named plaintiff purchased products in the relevant market.**

Each plaintiff must demonstrate Article III standing, including an injury-in-fact, causation, and redressability. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Here, Plaintiffs have failed at the threshold; their complaint contains no specific allegations that any Plaintiff actually purchased newly issued, fully licensed MLB Trading Cards. Rather, they allege only that each Plaintiff "purchased Trading Cards directly from *a* Defendant" and that they collectively bought "MLB, NFL, and NBA Trading Cards directly from *one or more of the Defendants*." FAC ¶¶ 29–34. These vague and collective allegations fail to satisfy Article III. Moreover, although Fanatics sets forth evidence as part of its Motion to Compel Arbitration that certain Plaintiffs appear to have purchased MLB Trading Cards, there is no evidence that Plaintiffs Robert Scaturo, John Madar, or Steven Mardakhaev did so.[4] With no allegation or other evidence that those three Plaintiffs ever purchased products in the relevant market, they cannot establish that they suffered injury at all. In short, Plaintiffs have failed even to allege that any Plaintiff, much less all of them, suffered an injury caused by MLB's alleged conduct. The Court should therefore dismiss Plaintiffs' claims against MLB.

### 2. Plaintiffs allege no facts showing that their alleged injury "flows from" MLB's allegedly anticompetitive conduct.

Plaintiffs fail to demonstrate antitrust standing. Their alleged "injury"—higher prices for MLB trading cards—in no cognizable sense "flows from that which makes [MLB]'s acts" allegedly unlawful or anticompetitive. *Brunswick*, 429 U.S. at 489. It is insufficient for an antitrust plaintiff merely to assert that the "supracompetitive price that . . . purchasers must pay . . . flows from Defendants' anticompetitive conduct," because that is "nothing more than *ipse dixit*." *In re Digit. Music Antitrust Litig.*, 812 F. Supp. 2d 390, 402 (S.D.N.Y. 2011). Indeed, where plaintiffs fail to "demonstrate an adequate connection between the alleged misconduct and

---

[4] The Court may consider external evidence when ruling on a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1). *See Ass'n of Commuter Rail Emps. Loc. No. 9 v. Metro-N. Commuter R.R. Co.*, 600 F. Supp. 3d 367, 374 (S.D.N.Y. 2022).

an effect on the [relevant] market" or where "the alleged injury is too attenuated from the source of the alleged misconduct," no antitrust standing exists. *Id.*

That is the case here. Plaintiffs' sole allegation against MLB is that it entered into an exclusive licensing agreement with Fanatics in 2021, just as it had with other card companies in years prior. FAC ¶ 71. But that is something that any licensor of intellectual property has the lawful right to do. "An exclusive license, which merely confers upon the licensee the ability to exploit the licensor's exclusive intellectual property rights, does not violate the antitrust laws." *Spinelli v. Nat'l Football League*, 96 F. Supp. 3d 81, 118 (S.D.N.Y. 2015); *see also Fed. Trade Comm'n v. Endo Pharms. Inc.*, 82 F.4th 1196, 1204 (D.C. Cir. 2023) (holding, in the patent context, that a licensor has the lawful right to assign its rights through exclusive licensing agreements without offending the antitrust laws). It has long been the law that exclusive licensing agreements "are common because they reasonably serve to maintain or enhance the value of an artistic or intellectual product." *Wis. Interscholastic Athletic Ass'n v. Gannett Co., Inc.*, 658 F.3d 614, 627 (7th Cir. 2011) (citing *Home Box Off., Inc. v. FCC*, 587 F.2d 1248, 1253 (D.C. Cir. 1978)). Here, where a licensing agreement is vertical (meaning that it "occur[s] between companies at different levels of the distribution chain"), the agreement is "presumptively legal under the antitrust laws." *Spinelli*, 96 F. Supp. 3d at 118. To defeat that presumption at the pleading stage, an antitrust plaintiff "must allege facts showing exceptional circumstances, such as evidence of predatory practices or a 'unique' opportunity to leverage two distinct monopolies." *Id.* Plaintiffs have made no such showing here, nor can they. No antitrust injury can flow from MLB's legally permissible licensing actions.

Moreover, the complaint draws no legally meaningful connection between MLB and the so-called supracompetitive pricing. Plaintiffs' barebones claim seeks to hold MLB liable for conduct taken by another party—Fanatics—well after MLB executed its license. While Plaintiffs assert that Fanatics "gave MLB an equity stake" to "induce" an agreement through which Fanatics would share "supracompetitive profits with MLB in exchange for" MLB granting Fanatics "long-term monopoly control" over the market for MLB trading cards, *id.* ¶¶ 159–60,

10

Plaintiffs allege no facts regarding any such agreement or inducement other than the unremarkable fact that the parties executed a licensing agreement. MLB did nothing improper by entering that licensing agreement, and no subsequent action by Fanatics transforms MLB's permissible behavior into anticompetitive conduct. In short, Plaintiffs fail to allege that MLB had anything whatsoever to do with any of the actions that (a) caused Fanatics to obtain market power in any relevant market and (b) caused Plaintiffs' alleged price injuries. Plaintiffs' conclusory allegation that their injuries were a "direct and proximate result" of MLB's agreement with Fanatics, FAC ¶ 163, is "nothing more than *ipse dixit*." *In re Digit. Music*, 812 F. Supp. 2d at 402.

Antitrust standing requires more than an allegation that, but for the agreement, Fanatics could never have taken its purportedly anticompetitive steps. "It is not enough for the actual injury to be causally linked to the asserted violation." *Gatt*, 711 F.3d at 76. Rather, Plaintiffs must plead and establish "proximate cause." *Laydon v. Cooperatieve Rabobank U.A.*, 55 F.4th 86, 98 (2d Cir. 2022). Demanding a showing of proximate cause ensures that the law "limit[s] a person's responsibility for the consequences of ***that person's own acts***." *In re Am. Express Anti-Steering Rules Antitrust Litig.*, 19 F.4th 127, 139 (2nd Cir. 2021). When considering causation, courts "compare the anticompetitive effect of the ***specific practice at issue*** to the actual injury the plaintiff alleges." *Gatt*, 711 F.3d at 76. Courts employ "the so-called 'first-step rule,' under which 'injuries that happen at the first step following the harmful behavior are considered proximately caused by that behavior.'" *Laydon*, 55 F.4th at 98 (quoting *Schwab Short-Term Bond Mkt. Fund*, 22 F.4th 103, 116 (2d Cir. 2021)). The claimed injury must directly flow from the defendant's own alleged conduct, and "[d]irectness in the antitrust context means close in the chain of causation." *Gatt*, 711 F.3d at 78.

Here, the chain of causation between the "specific practice at issue" and Plaintiffs' asserted injury is too attenuated to support antitrust standing. *Id.* at 76. Plaintiffs suffered no injury at all as a result of MLB executing a licensing agreement with Fanatics. MLB had been executing similar licenses for years and no Plaintiff alleges any injury from them. Nor did any

injury "happen[] at the first step following" that allegedly harmful behavior. *Laydon*, 55 F.4th at 98. The MLB-Fanatics agreement, by itself, did nothing to raise prices or harm consumers. Nor did it even give Fanatics market power in MLB trading cards. It was Fanatics' purchase of Topps that allegedly did that (FAC ¶¶ 11, 155), and it was Fanatics' subsequent purported efforts to harm Panini and disrupt supply that allegedly raised prices (FAC ¶¶ 157, 160). Those are not MLB's acts. It necessarily follows that, under "familiar principles of proximate causation," *In re Am. Express*, 19 F.4th at 139, Plaintiffs may not bring a Clayton Act claim against MLB, an upstream licensor that played no direct role in causing Plaintiffs' alleged injuries.

In Panini's pending action against Fanatics, the Court previously credited Panini's allegation that its asserted injury—market exclusion—flowed from "Fanatics' scheme of creating unprecedented, economically unjustified, decade(s)-long exclusive deals with all six Relevant Licensors," and that "by soliciting and entering into these deals, *Fanatics* engaged in anticompetitive conduct." *Panini Am., Inc. v. Fanatics, Inc.*, 2025 WL 753954, at *7–8 (S.D.N.Y. Mar. 10, 2025). But the Court's analysis concerned differently situated parties alleging a different claim (Panini brought "a claim Section 2 of the Sherman Act for attempted monopolization" against Fanatics). *Id.* at *7. By contrast, the consumer Plaintiffs here assert a claim against MLB under Section 1 of the Sherman Act for conspiracy in restraint of trade. To pursue such a claim, Plaintiffs' alleged injury—higher trading card prices—must flow from MLB's alleged unlawful conduct. But as was true in *Panini*, most of Plaintiffs' "allegations of anticompetitive conduct concern" Fanatics, and specifically "events that occurred <u>after</u> Fanatics procured its exclusive licenses." *Id.* (emphasis in original). The Court's holding that Panini had standing to assert a monopolization claim against Fanatics based on Fanatics' conduct when entering into various exclusive licensing agreements in no way means that trading card purchasers likewise have standing to assert an antitrust conspiracy claim against MLB based on MLB's decision—made before all of Fanatics' alleged anticompetitive conduct—to enter into a single license with Fanatics.

In sum, Plaintiffs lack antitrust standing to assert a claim against MLB because they have failed to show that their alleged injury flows from anything that could be said to make MLB's conduct unlawful or anticompetitive. The Court should therefore dismiss Count 1 against MLB.

### 3.    *Illinois Brick* bars Plaintiffs' Sherman Act claims against MLB.

The Court should also dismiss Plaintiffs claim against MLB because *Illinois Brick Co. v. Illinois* bars indirect purchasers from seeking money damages under section 4 of the Clayton Act. *See Simon v. KeySpan Corp.*, 694 F.3d 196, 201–02 (2d Cir. 2012) ("Generally, only direct purchasers have standing to bring civil antitrust claims."). Plaintiffs allege that they are "direct purchasers" of player trading cards, including MLB cards. FAC ¶ 1. But they are suing not only Fanatics, the company that sells the products, but also MLB, an upstream licensor of intellectual property. MLB, however, did not sell the plaintiffs anything, and Plaintiffs make no allegations to the contrary.[5] Rather, Plaintiffs allege that Fanatics obtained the license as an input to its trading card products, and then took a variety of actions that allegedly increased the prices of its output. These price increases were then passed through the distribution chain as "overcharges" to card buyers—who are not making their purchases from MLB. *Id.* ¶ 163. With respect to MLB, Plaintiffs are quintessential indirect purchasers.

The case law makes this clear. In *Apple Inc. v. Pepper*, the Supreme Court held that "indirect purchasers who are *two or more steps removed from the antitrust violator* in a distribution chain may not sue. By contrast, direct purchasers—that is, those who are 'the immediate buyers from the alleged antitrust violators'—may sue." 587 U.S. 273, 280 (2019); *see also In re Oral Phenylephrine Mktg. & Sales Pracs. Litig.*, 755 F. Supp. 3d 208, 218 (E.D.N.Y. Oct. 29, 2024). As the Supreme Court explained:

> if manufacturer A sells to retailer B, and retailer B sells to consumer C, *then C may not sue A.* But B may sue A if A is an antitrust violator. And C may sue B if B is an antitrust violator. That is the straightforward rule of *Illinois Brick*.

---

[5] At most, Plaintiffs allege in a vague and collective fashion that each "purchased Trading Cards directly from *a* Defendant" and that they collectively bought "MLB, NFL, and NBA Trading Cards directly from *one or more of the Defendants*." FAC ¶¶ 29–34.

*Apple*, 587 U.S. at 280. Although the supply chain at issue here concerns an IP licensor rather than a "manufacturer," the same logic prevails. In other words, intellectual property owner A (MLB) granted a license to manufacturer/retailer B (Fanatics), which, through various distribution channels, including subsidiary Topps, sold a product to consumer C (Plaintiffs). In that case, "C may not sue A." *Id.* But that is exactly what Plaintiffs attempt in their claim against MLB. Plaintiffs' general and ambiguous allegation that they "purchased MLB … Trading Cards from one or more of the Defendants" does not establish the necessary facts—a direct purchase from MLB—to demonstrate standing under *Illinois Brick*. If any Plaintiff directly purchased a relevant product from MLB, he must allege that fact.

Some courts have recognized two exceptions to *Illinois Brick*'s rule, but neither applies here. The first is the "ownership or control exception." *Laumann v. Nat'l Hockey League*, 907 F. Supp. 2d 465, 481 (S.D.N.Y. 2012). This exception applies where the direct purchaser is a subsidiary of a co-conspirator such that there is no realistic possibility that the direct purchaser will sue. *See In re ATM Fee Antitrust Litig.*, 686 F.3d 741, 756 (9th Cir. 2012). Even with Plaintiffs' allegation that MLB holds an equity interest in Fanatics, the exception has no possible application with respect to MLB. Plaintiffs do not allege that Fanatics is a subsidiary of MLB or otherwise controlled by it, such that there would be no reasonable possibility of Fanatics bringing suit against MLB.

The second exception is the "co-conspirator exception," which applies where "[t]he consumer plaintiff is a direct purchaser from the dealer who has conspired illegally with the manufacturer with respect to the very price paid by the consumer." *Laumann*, 907 F. Supp. 2d at 481. This exception also has no bearing here for two reasons. First, neither the Supreme Court nor the Second Circuit has recognized the co-conspirator exception. *See In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 2024 WL 1014159, at *9 n.18 (E.D.N.Y. Mar. 8, 2024); *In re Amazon.com, Inc. eBook Antitrust Litig.*, 2023 WL 6006525, at *17 (S.D.N.Y. July 31, 2023) ("[E]ven if Plaintiffs had adequately pled the existence of a conspiracy between Amazon the Publishers, the Second Circuit has not endorsed or adopted the co-conspirator

exception."). And in *Kansas v. UtiliCorp United Inc.*, 497 U.S. 199, 216 (1990), the Supreme Court warned lower federal courts against creating new exceptions to the *Illinois Brick* rule. Second, even if such an exception exists, Plaintiffs cannot invoke it merely by alleging a "conspiracy" in a general sense, but instead must plead "a particular type of conspiracy," namely, "price-fixing." *Dickson v. Microsoft Corp.*, 309 F.3d 193, 215 (4th Cir. 2002). Were it otherwise, Plaintiffs could evade *Illinois Brick*'s categorical bar "solely based upon artful pleading." *Id.* Accordingly, if a co-conspirator exception exists, then plaintiffs must show "that intermediaries . . . have fixed the price paid directly by the plaintiff[.]" *In re Payment* Card, 2024 WL 1014159, at *9 n.18; *see also Laumann*, 907 F. Supp. 2d at 481 (requiring, for the exception to apply, an allegation of conspiracy to set "the very price paid by the consumer"). Plaintiffs make no such allegation here. MLB is nowhere alleged to have engaged in price-fixing or in doing anything whatsoever to set trading card prices.

In short, Plaintiffs are indirect purchasers vis-à-vis MLB. The "straightforward rule of *Illinois Brick*" therefore bars their claim for damages. *Apple*, 587 U.S. at 280.

### 4.    Plaintiffs are not efficient enforcers of the antitrust laws against MLB.

Courts consider four factors when determining whether a plaintiff is an efficient enforcer of antitrust laws: whether (1) the alleged violation directly or remotely caused the asserted injury; (2) there is another class of persons who would be motivated to sue; (3) the injury is speculative; and (4) there is a risk of duplicative or difficult-to-apportion damages. *See Gelboim v. Bank of Am. Corp.*, 823 F.3d. 759, 772 (2d Cir. 2016). For the reasons set forth above, Plaintiffs fail the first factor: their alleged injuries are indirect and remote from MLB's alleged conduct. *See supra*, Part IV(A)(2)-(3); *see also In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187, 223 (S.D.N.Y. 2019) (finding indirect purchasers who bought through an intermediary were not efficient enforcers). Plaintiffs also fail the second factor: a better suited plaintiff—Fanatics' competitor, Panini—has already sued, which "diminishes the justification for allowing a more remote party" to act as a "private attorney

general." *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 542 (1983). The third and fourth factors also favor dismissal: Plaintiffs' alleged injuries are speculative as to MLB, and Plaintiffs make no effort to identify or quantify what amount, if any, of their alleged damages stems from MLB's conduct.

### B.    The First Amended Complaint fails to state a claim against MLB.

Even if the Court were to determine that Plaintiffs have standing to assert their Sherman Act claim against MLB, the Court should still dismiss Count 1 for failure to state a claim under Rule 12(b)(6). Plaintiffs have failed to adequately allege an actionable conspiracy in violation of the antitrust laws or a relevant product market.

Section 1 of the Sherman Act prohibits "[e]very contract, combination . . . or conspiracy" that unreasonably restrains trade or commerce. 15 U.S.C.A. § 1. "To state a claim under Section One. . .  Plaintiff must allege sufficient facts to plausibly establish that (i) Defendants entered into a contract, combination, or conspiracy that (ii) unreasonably restrained competition or trade (iii) in the relevant market and (iv) caused Plaintiff to suffer an antitrust injury." *TechReserves Inc. v. Delta Controls Inc*., 2014 WL 1325914, at *4 (S.D.N.Y. Mar. 31, 2014) (granting motion to dismiss for failure to state claim under Sherman Act). Courts "presumptively appl[y] [a] rule of reason analysis, under which antitrust plaintiffs must demonstrate that a particular contract or combination is in fact unreasonable and anticompetitive before it will be found unlawful." *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 315 (2d Cir. 2008) (holding MLB licensing practices are reviewed under rule of reason analysis). "Under the rule of reason, plaintiffs 'bear[] the initial burden of showing that the challenged action has had an *actual* adverse effect on competition as a whole in the relevant market.'" *Spinelli v. Nat'l Football League,* 903 F.3d 185, 212 (2nd Cir. 2018). Each alleged vertical agreement must be analyzed independently. *See Panini*, 2025 WL 753964, at *9.

1. **Plaintiffs fail to adequately allege a conspiracy involving MLB.**

Plaintiffs have failed to allege that the contract between MLB and Fanatics constitutes a conspiracy to restrain trade. Again, all Plaintiffs allege is that MLB and Fanatics entered into an exclusive licensing agreement, which is presumptively legal under the antitrust laws. *See Spinelli*, 96 F. Supp. 3d at 118. To be sure, Plaintiffs make more allegations against Fanatics, but none of these allegations assert or suggest that MLB played any role in the events following the execution of the MLB-Fanatics agreement. Those events include Fanatics' decision to acquire a controlling stake in Topps, which Plaintiffs allege is what gave Fanatics market power in their proffered single-league market for MLB cards. FAC ¶ 155. Plaintiffs cannot transform an otherwise lawful business transaction into an antitrust violation by simply labeling MLB as a "co-conspirator" to the alleged subsequent actions taken unilaterally by Fanatics. If this were enough to establish liability, no licensor could enter into such a contract without fear of being called into court as an antitrust violator if their licensee is alleged to subsequently engage in an anticompetitive scheme.

2. **Plaintiffs fail to allege a relevant product market.**

Although Plaintiffs generally discuss a primary market consisting of cards from all three of the accused leagues, their claim against MLB is based on an "alternative" market, FAC ¶ 144, consisting of only the individual league's cards, *id.* ¶ 154. These allegations of an "MLB Trading Card market" are legally and factually deficient.

"Evaluating market power begins with defining the relevant market." *Geneva Pharms. Tech. Corp. v. Barr Labs., Inc.*, 386 F.3d 485, 496 (2d Cir. 2004). To state a claim, Plaintiffs must plead facts establishing a relevant market of "products reasonably interchangeable by consumers for the same purposes" within an area of effective competition. *Id.* Bare allegations, without more, are insufficient to put the parties or the Court on notice of Plaintiffs' allegations. "Cases in which dismissal on the pleadings is appropriate frequently involve either (1) failed attempts to limit a product market to a single brand, franchise, institution, or comparable entity that competes with potential substitutes or (2) failure even to attempt a plausible explanation as

to why a market should be limited in a particular way." *Todd v. Exxon Corp.*, 275 F.3d 191, 200 (2d Cir. 2001). The Complaint here fails in both respects.

      **First**, an MLB single-league market fails as a matter of law. Courts in this district and elsewhere have recognized that "the distribution of a single brand, like the manufacture of a single brand, does not constitute a legally cognizable market . . . because to define the market as that group of products over which a defendant exercises control would as an analytic matter read[ ] the market definition step out of the Sherman Act." *Spinelli*, 96 F. Supp. 3d at 111.[6]

      In *Spinelli*, for example, the court dismissed a complaint alleging a relevant market for "commercial licensing of NFL-related stock photographs," reasoning that this league-specific market was particularly implausible "in the face of Plaintiffs' allegations identifying a potential broader market for licensing of sports-related photographs." *Id.* at 112 ("Second Circuit precedent instructs that there exist available substitutes for the intellectual property of a professional sports organization."). The same is true here: Plaintiffs attempt to cabin the trading card market to single leagues while not only identifying a broader multi-league market, as in *Spinelli*, but *asserting* such a market as a basis for their antitrust claims. The Court should not allow Plaintiffs to manipulate alleged markets to fit each defendant's realm of control and thereby circumvent the market definition step of the rule-of-reason analysis.

      **Second**, Plaintiffs do not attempt to "define [their] proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand" as required

---

[6] *Re-Alco Indus., Inc. v. Nat'l Ctr. for Health Educ., Inc.*, 812 F. Supp. 387, 391–92 (S.D.N.Y. 1993) (one particular brand of health education materials is not a relevant product market); *Theatre Party Assocs. v. Shubert Org.*, 695 F. Supp. 150, 153–55 (S.D.N.Y. 1988) (tickets to the play "Phantom of the Opera" are not a relevant product market); *Shaw v. Rolex Watch, U.S.A., Inc.*, 673 F. Supp. 674, 678–79 (S.D.N.Y. 1987) (Rolex watches clearly are interchangeable with other high quality time pieces); *Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1063–64 (9th Cir. 2001) (UCLA women's soccer program does not constitute its own market because other college programs compete to recruit student-athletes); *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 438 (3d Cir. 1997) (market cannot be limited to products approved by Domino's Pizza for Domino's stores); *Subsolutions, Inc. v. Doctor's Assocs.*, 62 F. Supp. 2d 616, 625 (D. Conn. 1999) (Subway franchise is not a distinct market from comparable franchise opportunities).

to state a claim. *Chapman v. N.Y. State Div. for Youth*, 546 F.3d 230, 238 (2d Cir. 2008). For example, Plaintiffs do not explain, or even address, the exclusion from the market of other MLB collectibles, which are often collected by similar consumers and for similar purposes as baseball cards. Plaintiffs likewise fail to justify limiting the proposed market only to newly issued cards instead of previously issued or vintage cards, which are utilized similarly in the market. Plaintiffs' failure to even address these potential substitute products is fatal to the proposed MLB card market. *See id.* ("[W]here the plaintiff … alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products … the relevant market is legally insufficient and a motion to dismiss may be granted."); *see also Gianna Enters. v. Miss World (Jersey) Ltd.*, 551 F. Supp. 1348, 1354 (S.D.N.Y. 1982) ("The Court cannot accept the market boundaries offered by plaintiff without at least a theoretically rational explanation for excluding [alternative products].").

In short, Plaintiffs' conclusory market definition runs afoul of black-letter law and lacks sufficient factual support. Because "[f]ailure to adequately plead a relevant well-defined market requires dismissal of a complaint," the Court should dismiss Count 1 against MLB. *Polargrid LLC v. Videsh Sanchar Nigam Ltd.*, 2006 WL 2266351, at *6 (S.D.N.Y. Aug. 7, 2006).[7]

### 3.      Plaintiffs have failed to allege harm to consumers.

Even if Plaintiffs had pled a relevant market (they have not), their claims would still fail because they have failed to plead facts showing that the MLB-Fanatics agreement had actual and substantial anticompetitive effects that harmed consumers in that relevant market. *Ohio v. Am. Express Co.*, 585 U.S. 529, 541 (2018). Indeed, absent "a showing of actual adverse effect on competition market-wide," nothing in the antitrust laws prevents a licensor or manufacturer from

---

[7] Because they have failed to properly define a relevant market, Plaintiffs cannot allege that MLB possessed market power in any alleged market under the rule of reason, nor have they tried. *In re Set-Top Cable Television Box Antitrust Litig.,* 2011 WL 1432036, at *11 (S.D.N.Y. Apr. 8, 2011), *aff'd sub nom. Kaufman v. Time Warner*, 836 F.3d 137 (2d Cir. 2016) ("Plaintiffs' plausible product and geographic market definitions render as vague, contradictory and implausible their allegations directed to market power.").

"terminat[ing] a distributor" and "appoint[ing] an exclusive distributor." *E & L Consulting, Ltd. v. Doman Indus. Ltd.*, 472 F.3d 23, 29 (2d Cir. 2006).

Plaintiffs cannot make such a showing. As explained above, licensors enjoy the right to choose whom they allow to exploit their intellectual property, including by replacing one exclusive licensee with a different one. *See Spinelli*, 96 F. Supp. 3d at 116–18. Indeed, it has long been the law that businesses enjoy the right to decide with whom they wish to deal; antitrust law in no way required MLB to continue licensing Panini or to license multiple downstream distributors. *See, e.g.*, *Pac. Bell. Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 448 (2009) ("As a general rule, businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing.").

Nor have Plaintiffs adequately pled substantial foreclosure in any relevant market, having failed to plead a relevant market in the first place. And Plaintiffs' conclusory attempts to allege reduced output, lower quality, or increased prices in the relevant market fail as well. Plaintiffs allege that prices for a small subset of Topps MLB Trading Cards rose during the relevant period, compared to Panini's cards. *See* FAC ¶ 17. No facts support these price assertions, and there is no reason to plausibly conclude that the MLB-Fanatics agreement caused the purported price increases. What's more, Plaintiffs' comparison makes no sense. They define the relevant market as "fully licensed" MLB Trading Cards. *Id.* ¶ 141. But Panini had no MLB license during the relevant period. FAC ¶ 79. As such, Plaintiffs are either comparing Topps card prices with trading cards that were not fully licensed, (i.e. outside the relevant market), or else tacitly acknowledging that Panini was not foreclosed from competing in the relevant market.

## V.     CONCLUSION

The Court should compel to arbitration the claims of Plaintiffs Scott Bubnick, Joseph Davidov, and Jonathan Madar against MLB. For any Plaintiffs with claims against MLB not subject to arbitration, the Court should grant with prejudice MLB's motion to dismiss.

*//*

Respectfully submitted,

Dated:  July 28, 2025

By:    */s/ R. Adam Lauridsen*
R. ADAM LAURIDSEN
CODY S. HARRIS
ANJALI SRINIVASAN
TAYLOR L. REEVES
KEKER, VAN NEST & PETERS LLP
633 Battery Street
San Francisco, CA 94111-1809
Telephone:  415 391 5400
Facsimile:  415 397 7188

Attorneys for Defendants
MAJOR LEAGUE BASEBALL and
MAJOR LEAGUE BASEBALL
PROPERTIES, INC.

## <u>CERTIFICATE OF COMPLIANCE</u>

Counsel of Record hereby certifies that this Memorandum of Points and Authorities

complies with Local Civil Rule 7.1(c) and Section A(2)(h) of Judge Swain's Individual

Practices. This memorandum contains approximately 7,312 words, excluding the case caption,

table of contents, table of authorities, and signature blocks. Counsel relies on the word count of

the computer program used to prepare this brief.

Dated: July 28, 2025

                              By:    */s/ Adam Lauridsen*
                                     R. ADAM LAURIDSEN