# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| ROBERT SCATURO, SCOTT BUBNICK, JOSEPH DAVIDOV, STEVEN MARDAKHAEV, AND JONATHAN MADAR, *individually and on behalf of all others similarly situated*,<br><br>  Plaintiffs,<br><br>  v.<br><br>FANATICS, INC.; FANATICS, LLC; FANATICS COLLECTIBLES INTERMEDIATE HOLDCO, INC.; FANATICS SPV, LLC; FANATICS HOLDINGS, INC.; MAJOR LEAGUE BASEBALL; MAJOR LEAGUE BASEBALL PROPERTIES, INC.; MAJOR LEAGUE BASEBALL PLAYERS ASSOCIATION; MLB PLAYERS, INC.; NATIONAL FOOTBALL LEAGUE; NFL PROPERTIES LLC; NATIONAL FOOTBALL LEAGUE PLAYERS ASSOCIATION; NFL PLAYERS, ASSOCIATION; NBA PROPERTIES, INC.; NATIONAL BASKETBALL ASSOCIATION PLAYERS ASSOCIATION; AND ONETEAM PARTNERS LLC,<br><br>  Defendants. | Case No. 1:25-cv-02202-LTS-VF<br><br>Chief District Judge Laura Taylor Swain |

# PURCHASER PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE AMENDED COMPLAINT

## TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ........................................................................................................1

II. SUMMARY OF FACTUAL ALLEGATIONS...................................................................3

    A.  Trading Card Industry.......................................................................................3

        1.  Panini entered the U.S. trading card market. ...............................................4

        2.  Fanatics entered the Trading Card market and aggressively acted to drive out Panini. ...........................................................................................4

    B.  The *Panini* Decision Recognized the Following Facts and Settled Certain Issues. ..........................................................................................................10

    C.  Defendants Filed Redundant, Overlapping Briefs in Support of Their Motions to Dismiss................................................................................................12

III. LEGAL STANDARD.................................................................................................13

IV. ARGUMENT ..........................................................................................................13

    A.  Plaintiffs Sufficiently Allege Sherman Act Section 2 Monopolization and Attempted Monopolization Claims Against Fanatics. ...........................................13

        1.  Plaintiffs plausibly allege monopolization (Count 7). ..............................15

        2.  Plaintiffs plausibly allege Fanatics' attempted monopolization of Trading Cards (Count 8).....................................................................................24

    B.  Plaintiffs Sufficiently Allege Section 1 Sherman Act Claims Against All Defendants. ...................................................................................................26

        1.  Plaintiffs sufficiently allege market power. ..............................................29

        2.  Plaintiffs plausibly allege that Defendants' licensing agreements foreclose competition in the Trading Card market at least a decade........................32

        3.  Plaintiffs sufficiently allege Defendants' licenses have negatively impacted consumers.....................................................................................36

        4.  Defendants' procompetitive justifications are not weighed on a motion to dismiss, and would fail even if they were.................................................40

5.   None of Defendants' arguments undermines the plausibility of Plaintiffs' Section 1 allegations. .................................................................42

C.   Plaintiffs Have Standing for Each of Their Claims. ...............................................53

1.   Plaintiffs meet the requirements for Article III standing. ........................53

2.   Plaintiffs meet the requirements for class standing. ................................58

3.   Plaintiffs' claims are ripe. .......................................................................59

4.   Plaintiffs have antitrust standing...............................................................61

5.   None of Plaintiffs' claims is barred by *Illinois Brick*. .............................70

V.   CONCLUSION...........................................................................................................72

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*1-800 Contacts, Inc. v. Federal Trade Commission*, 1 F.4th 102 (2d Cir. 2021) ........................ 44

*AD/SAT, Division of Skylight, Inc. v. Associated Press*, 181 F.3d 216 (2d Cir. 1999)........... 14, 27

*Allen v. Dairy Farmers of America, Inc.*, 748 F. Supp. 2d 323 (D. Vt. 2010) ................ 17, 23, 27

*Alpern v. Cavarocchi*, No. 98-3105, 1999 WL 257695 (E.D. Pa. 1999)...................................... 48

*American Bird Conservancy v. Harvey*, 232 F. Supp. 3d 292 (E.D.N.Y. 2017) .......................... 57

*American Federation of Government Employees v. United States Office of Personnel
    Management*, 786 F. Supp. 3d 647 (S.D.N.Y. 2025)................................................................. 54

*American Medical Association v. United Healthcare Corp.*, No. 00-civ-2800,
    2007 WL 683974 (S.D.N.Y. Mar. 5, 2007) .............................................................................. 68

*American Needle, Inc. v. National Football League*, 560 U.S. 183 (2010)............... 26, 49, 50, 51

*Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162 (2d Cir. 2012) ....................... 13, 41, 42

*Andrx Pharmaceuticals, Inc. v. Elan Corp.*, 421 F.3d 1227 (11th Cir. 2005)............................. 30

*Arar v. Ashcroft*, 585 F.3d 559 (2d Cir. 2009)............................................................................ 13

*Arcesium, LLC v. Advent Software, Inc.*, No. 20-cv-04389, 2021 WL 1225446
    (S.D.N.Y. Mar. 31, 2021) ................................................................................................. 61, 70

*Arrington v. Burger King Corp.*, No. 1:18-cv-24128-JEM, ECF No. 111
    (S.D. Fla. April 9, 2025) ........................................................................................................ 43

*Associated General Contractors, Inc. v. California State Council of Carpenters*,
    459 U.S. 519 (1983)............................................................................................................... 37

*Balaklaw v. Lovell*, 14 F.3d 793 (2d Cir. 1994)............................................................. 35, 47, 48

*Bell Semiconductor, LLC v. Broadcom Corp.*, No. 24-CV-156 (ER),
    2024 WL 5118494 (S.D.N.Y. Dec. 16, 2024) ......................................................................... 40

*Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263 (2d Cir. 1979).................................... 42

*Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251 (1946)................................................... 39, 61

*Bi-Rite Enterprises, Inc. v. Button Master*, 555 F. Supp. 1188 (S.D.N.Y. 1983)........................ 51

*Blue Shield of Virginia v. McCready*, 457 U.S. 465 (1982) ....................................................... 61

*Bohnak v. Marsh & McLennan Cos.*, 79 F.4th 276 (2d Cir. 2023)............................................. 53

*Bookhouse of Stuyvesant Plaza, Inc. v. Amazon.com, Inc.*, 985 F. Supp. 2d 612
    (S.D.N.Y. 2013) ................................................................................................................ 45, 46

*Brantley v. NBC Universal, Inc.*, 675 F.3d 1192 (9th Cir. 2012) ................................................ 15

*Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297 (3d Cir. 2007) ............................................. 15

*Brunswick Corp. v. Riegel Textile Corp.*, 752 F.2d 261 (7th Cir. 1984) ...................................... 48

*California v. American Stores Co.*, 495 U.S. 271 (1990) ............................................................. 56

*Carter v. HealthPort Technologies, LLC*, 822 F.3d 47 (2d Cir. 2016)........................................... 55

*Casey's Distriuting., Inc. v. National Football League*, No. 22-3934,
    2025 WL 1928544 (S.D.N.Y. July 14, 2025) ..................................................................... 48

*Cinema Village Cinemart, Inc. v. Regal Entertainment Group*, 2016 WL 5719790
    (S.D.N.Y. Sept. 29, 2016)...................................................................................... 45, 46

*Coffey v. Healthtrust, Inc.*, 955 F.2d 1388 (10th Cir. 1992)......................................................... 48

*Contant v. Bank of America Corp.*, No. 17-civ-3139, 2018 WL 1353290
    (S.D.N.Y. Mar. 15, 2018) ............................................................................................. 70

*Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984)........................................... 52

*Daniel v. American Board of Emergency Medicine*, 428 F.3d 408 (2d Cir. 2005) ...................... 64

*DIRECTV, LLC v. Nexstar Media Group,, Inc.*, 724 F. Supp. 3d 268 (S.D.N.Y. 2024).............. 69

*E & L Consulting, Ltd. v. Doman Industries Ltd.*, 472 F.3d 23 (2d Cir. 2006) ........................... 46

*Federal Trade Commission  v. Actavis, Inc.*, 570 U.S. 136 (2013) ............................................. 21

*Feldman v. Pro Football, Inc.*, 579 F. Supp. 2d 697 (D. Md. 2008) ........................................... 57

*Fleer Corp. v. Topps Chewing Gum, Inc.*, 658 F.2d 139 (3d Cir. 1981) ......................... 46, 48, 51

*Fund Liquidation Holdings LLC v. Bank of America Corp.*, 991 F.3d 370 (2d Cir. 2021).......... 55

*Gelboim v. Bank of America Corp.*, 823 F.3d 759 (2d Cir. 2016).......................................... 41, 62

*Geneva Pharmaceuticals Technology Corp. v. Barr Laboratories Inc.*,
    386 F.3d 485 (2d Cir. 2004)................................................................................... passim

*Haelan Laboratories, Inc. v. Topps Chewing Gum, Inc.*, 202 F.2d 866 (2d Cir. 1953) ......... 47, 51

*Hayden Publishing Co. v. Cox Broadcasting Corp.*, 730 F.2d 64 (2d Cir. 1984) ....................... 17

*Idaho Potato Commission v. M & M Produce Farm & Sales*, 335 F.3d 130
    (2d Cir. 2003)........................................................................................................ 47, 48

*Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977) ..................................................................... 70

*In re Aggrenox Antitrust Litigation*, 199 F. Supp. 3d 662 (D. Conn. 2016).................... 20, 22, 29

*In re Aggrenox Antitrust Litigation*, 94 F. Supp. 3d 224 (D. Conn. 2015).................................. 16

*In re Aluminum Warehousing Antitrust Litigation*, 833 F.3d 151 (2d Cir. 2016) ................. 62, 63

*In re Aluminum Warehousing Antitrust Litigation*, 95 F. Supp. 3d 419 (S.D.N.Y. 2015) ..... 16, 18

*In re Cardizem CD Antitrust Litigation*, 105 F. Supp. 2d 618 (E.D. Mich. 2000) ...................... 31

*In re Ciprofloxacin Hydrochloride Antitrust Litigation*, 363 F. Supp. 2d 514
    (E.D.N.Y. 2005)......................................................................................................... 30

*In re Commodity Exchange Inc., Gold Futures & Options Trading Litigation*,
    213 F. Supp. 3d 631 (S.D.N.Y. 2016)....................................................................... 49

*In re DDAVP Direct Purchaser Antitrust Litigation*, 585 F.3d 677 (2d Cir. 2009) .............. 67, 69

*In re DDAVP Indirect Purchaser Antitrust Litigation*, 903 F. Supp. 2d 198
(S.D.N.Y. 2012) ......................................................................................................... 57

*In re Delta Dental Antitrust Litigation*, 484 F. Supp. 3d 627 (N.D. Ill. 2020) ........................... 43

*In re Digital Music Antitrust Litigation*, 812 F. Supp. 2d 390 (S.D.N.Y. 2011) ........................ 66

*In re Dynamic Access Memory (DRAM) Antitrust Litigation*, 516 F. Supp. 2d 1072
(N.D. Cal. 2007) ......................................................................................................... 71

*In re EpiPen (Epinephrine Injection, USP) Marketing, Sales Practices & Antitrust
Litigation*, 44 F.4th 959 (10th Cir. 2022) .................................................................... 41

*In re European Government Bonds Antitrust Litigation*, No. 19 Civ. 2601 (VM),
2020 WL 4273811 (S.D.N.Y. July 23, 2020) .................................................. 28, 42, 69

*In re Flat Glass Antitrust Litigation*, 191 F.R.D. 472 (W.D. Pa. 1999) ...................................... 39

*In re Frito-Lay North America, Inc. All Natural Litigation*, No. 12–MD–2413 (RRM)(RLM),
2013 WL 4647512 (E.D.N.Y. Aug. 29, 2013) ............................................................. 59

*In re Google Digital Advertising Antitrust Litigation*, 721 F. Supp. 3d 230
(S.D.N.Y. 2024) ......................................................................................................... 63

*In re Juul Labs, Inc., Antitrust Litigation*, 555 F. Supp. 3d 932 (N.D. Cal. 2021) ..................... 43

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litigation*,
383 F. Supp. 3d 187 (S.D.N.Y. 2019) ..................................................................... 40, 69

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litigation*,
No. 14-MD-2542 (VSB), 2025 WL 1802952 (S.D.N.Y. June 30, 2025) ............................... 61

*In re Loestrin 24 Fe Antitrust Litigation*, 261 F. Supp. 3d 307 (D.R.I. 2017) ............................ 30

*In re Lorazepam & Clorazepate Antitrust Litigation*, 467 F. Supp. 2d 74 (D.D.C. 2006) .......... 31

*In re Nasdaq Market–Makers Antitrust Litigation,* 169 F.R.D. 493
(S.D.N.Y. 1996) ..................................................................................... 27, 28, 37, 50

*In re Nexium (Esomeprazole) Antitrust Litigation*, 968 F. Supp. 2d 367
(D. Mass. 2013) ......................................................................................................... 20

*In re Nexium Antitrust Litigation*, 777 F.3d 9 (1st Cir. 2015) ..................................................... 39

*In re Payment Card Interchange Fee & Merchant Discount Antitrust Litigation*,
729 F. Supp. 3d 298 (E.D.N.Y. 2024) ..................................................................... 29, 42, 52

*In re Payment Card Interchange Fee & Merchant Discount Antitrust Litigation*,
No. 05-MD-1720 (MKB), 2024 WL 1014159 (E.D.N.Y. Mar. 8, 2024) ............................... 28

*In re Platinum & Palladium Antitrust Litigation*, 61 F.4th 242 (2d Cir. 2023) ..................... 62, 64

*In re Propranolol Antitrust Litigation*, 249 F. Supp. 3d 712 (S.D.N.Y. 2017) ........................... 65

*In re Refrigerant Compressors Antitrust Litigation*, No. 09-md-02042,
2013 WL 1431756 (E.D. Mich. Apr. 9, 2013) .............................................................. 71

*In re Static Random Access (SRAM) Antitrust Litigation*, No. 07-cv-01819,
    2008 WL 4447592 (N.D. Cal. Sept. 29, 2008) ......................................... 39

*In re Terazosin Hydrochloride Antitrust Litigation*, 352 F. Supp. 2d 1279 (S.D. Fla. 2005) ...... 31

*In re Tether & Bitfinex Crypto Asset Litigation*, 576 F. Supp.3d 55 (S.D.N.Y. 2021)................. 26

*IQ Dental Supply v. Henry Schein, Inc.*, 924 F.3d 57 (2d Cir. 2019) ........................................ 62

*Knoll Pharmaceuticals Co. v. Teva Pharmaceuticals USA, Inc.*, No. 01–1646,
    2001 WL 1001117 (N.D. Ill. Aug. 24, 2001) ......................................... 31

*L. G. Balfour Co. v. Federal Trade Commision*, 442 F.2d 1 (7th Cir. 1971) ............................. 44

*Langan v. Johnson & Johnson Consumer Cos.*, 897 F.3d 88 (2d Cir. 2018) ............................. 58

*Laumann v. National Hockey League*, 907 F. Supp. 2d 465 (S.D.N.Y. 2012)...................... 22, 71

*Laydon v. Coöperatieve Rabobank U.A.*, 55 F.4th 86 (2d Cir. 2022)........................................ 70

*Laydon v. Mizuho Bank, Ltd.*, No. 12–cv–3419 (GBD), 2014 WL 1280464
    (S.D.N.Y. Mar. 28, 2014) ......................................................................... 69

*Leegin Creative Leather Products, Inc. v. PSKS, Inc.*, 551 U.S. 877 (2007) ............. 24, 27, 36, 43

*LePage's Inc. v. 3M*, 324 F.3d 141 (3d Cir. 2003) ............................................................. 42, 52

*Lorenzo v. Qualcomm Inc.*, 603 F. Supp. 2d 1291 (S.D. Cal. 2009) ........................................ 71

*Louisiana Wholesale Drug Co. v. Sanofi-Aventis*, No. 07–7343, 2008 WL 169362
    (S.D.N.Y. Jan. 18, 2008)........................................................................... 30

*MacDermid Printing Solutions LLC v. Cortron Corp.*, 833 F.3d 172 (2d Cir. 2016)................. 15

*Mathias v. Daily News, L.P.*, 152 F. Supp. 2d 465 (S.D.N.Y. 2001) .................................... 31, 32

*McWane, Inc. v. Federal Trade Commission*, 783 F.3d 814 (11th Cir. 2015) ........................... 25

*Merced Irrigation District v. Barclays Bank PLC*, 165 F. Supp. 3d 122 (S.D.N.Y. 2016).......... 69

*Miami Products & Chemical Co. v. Olin Corp.*, 449 F. Supp. 3d 136 (W.D.N.Y. 2020)............ 41

*Mooney v. AXA Advisors, LLC*, 19 F. Supp. 3d 486 (S.D.N.Y. 2014) ...................................... 32

*Morrell v. WW International, Inc.*, 551 F. Supp. 3d 173 (S.D.N.Y. 2021) ................................ 54

*Mosaic Health, Inc. v. Sanofi-Aventis U.S., LLC*, 147 F.4th 183 (2d Cir. 2025)....................... 61

*Mutual Pharmaceutical Co. v. Hoechst Marion Roussel, Inc.*, No. 96–1409,
    1997 WL 805261 (E.D. Pa. Dec. 17, 1997)............................................... 31

*National Bancard Corp. v. VISA U.S.A., Inc.*, 779 F.2d 592 (11th Cir. 1986)........................... 43

*National Collegiate Athletic Association v. Board of Regents of University of Oklahoma*,
    468 U.S. 85 (1984)..................................................................................... 16

*National Football League v. Ninth Inning, Inc.*, 141 S. Ct. 56 (2020) ...................................... 72

*National Organization for Marriage, Inc. v. Walsh*, 714 F.3d 682 (2d Cir. 2013) ..................... 59

*NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145
    (2d Cir. 2012)............................................................................................ 58

- vi -

*New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638 (2d Cir. 2015) ........................... 56

*New York ex rel. Spitzer v. Feldman*, No. 01 CIV.6691 SAS, 2003 WL 21576518
  (S.D.N.Y. July 10, 2003) .................................................................. passim

*NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128 (1998) ................................................ 48

*Nypl v. JPMorgan Chase & Co.*, No. 15-civ-9300, 2017 WL 1133446
  (S.D.N.Y. Mar. 24, 2017) ................................................................... 70

*Ohio v. American Express Co.*, 585 U.S. 529 (2018) ........................................... 15, 38

*Oxford Global Resources, Inc. v. Weekley-Cessnun*, No. 3:04-CV-0330-N,
  2004 WL 2599898 (N.D. Tex. Nov. 12, 2004) ................................................. 48

*Panini America, Inc. v. Fanatics, Inc.*, No. 23-CV-9714-LTS-VF, 2025 WL 753954
  (S.D.N.Y. Mar. 10, 2025) ................................................................. passim

*Paper Systems Inc. v. Nippon Paper Industries Co.*, 281 F.3d 629 (7th Cir. 2002) .................... 71

*Paycom Billing Services, Inc. v. MasterCard International, Inc.,* 467 F.3d 283
  (2d Cir. 2006) ........................................................................... 69

*PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101 (2d Cir. 2002) ................................... passim

*Perma Life Mufflers, Inc. v. International Parts Corp.*, 392 U.S. 134 (1968) ........................ 48

*Race Tires America, Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57 (3d Cir. 2010) ................... 46

*Re-Alco Industries, Inc. v. National Center for Health Education, Inc.*,
  812 F. Supp. 387 (S.D.N.Y. 1993) ..................................................... 46, 48

*Regeneron Pharmaceuticals, Inc. v. Novartis Pharma AG*, 96 F.4th 327 (2d Cir. 2024) ............ 21

*Reiss v. Audible, Inc.*, No. 1:24-cv-05923 (JLR), 2025 WL 1654643
  (S.D.N.Y. June 11, 2025) .................................................................. 68

*Revitalizing Auto Communities Environmental Response Trust v. National Grid USA*,
  10 F.4th 87 (2d Cir. 2021) ................................................................ 60

*Robb v. Connecticut Board of Veterinary Medicine*, 157 F. Supp. 3d 130 (D. Conn. 2016) ....... 60

*Ross v. Bank of America, N.A.*, 524 F.3d 217 (2d Cir. 2008) ..................................... 59

*Roy B. Taylor Sales, Inc. v. Hollymatic Corp.*, 28 F.3d 1379 (5th Cir. 1994) ....................... 15

*Sage Chemical, Inc. v. Supernus Pharmaceuticals, Inc.*, No. 22-1302,
  2024 WL 2832343 (D. Del. June 4, 2024) .................................................. 49

*SAS of Puerto Rico, Inc. v. Puerto Rico Telephone Co.*, 48 F.3d 39 (1st Cir. 1995) ................... 63

*Schwab Short-Term Bond Market Fund v. Lloyds Banking Group PLC*, 22 F.4th 103
  (2d Cir. 2021) ......................................................................... 62, 64

*SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412 (4th Cir. 2022) ............................. 41

*Sell It Social, LLC v. Acumen Brands, Inc.*, No. 14 Civ. 3491(RMB), 2015 WL 1345927
  (S.D.N.Y. Mar. 20, 2015) ................................................................. 61

*Sheet Metal Duct, Inc. v. Lindab, Inc.*, No. 99–6299, 2000 WL 987865
(E.D. Pa. July 18, 2000) ................................................................................ 48

*SM Kids, LLC v. Google LLC*, 963 F.3d 206 (2d Cir. 2020) ................................. 53, 55

*Smith v. United States*, 568 U.S. 106 (2013) ....................................................... 28

*Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447 (1993) .................................... 14, 25

*Spinelli v. National Football League*, 96 F. Supp. 3d 81 (S.D.N.Y. 2015) ............... 31, 35, 52, 65

*Starr v. Sony BMG Music Entertainment*, 592 F.3d 314 (2d Cir. 2010) ................... 13, 42

*Sullivan v. UBS AG*, 149 F.4th 206 (2d Cir. 2025) ............................................... 39, 58, 62, 64

*Texas Industries Inc. v. Radcliff Materials, Inc.,* 451 U.S. 630 (1981) ..................... 27, 37, 50

*Theatre Party Associates, Inc. v. Shubert Organization, Inc.*, 695 F. Supp. 150
(S.D.N.Y. 1988) ........................................................................................... 32

*Thole v. U.S. Bank N.A.*, 590 U.S. 538 (2020) ..................................................... 53

*Todd v. Exxon Corp.*, 275 F.3d 191 (2d Cir. 2001) ............................................... 16, 17, 20, 31

*Tops Markets, Inc. v. Quality Markets, Inc.,* 142 F.3d 90 (2d Cir. 1998) ................... 16

*Travelers Insurance Co. v. 633 Third Associates*, 973 F.2d 82 (2d Cir. 1992) ........... 55

*Trisvan v. Burger King Corp* , No. 19-CV-6396 (MKB), 2021 WL 1193531
(E.D.N.Y. Mar. 30, 2021) .............................................................................. 63

*United Magazines Co. v. Murdoch Magazines Distribution, Inc.¸* 353 F. Supp. 2d 433
(S.D.N.Y. 2004) ........................................................................................... 50

*United States v. Apple, Inc.*, 791 F.3d 290 (2d Cir. 2015) ..................................... 15

*United States v. Bethlehem Steel Corp*, 168 F. Supp. 576 (S.D.N.Y. 1958) ............. 41

*United States v. Broadcast Music, Inc.*, 275 F.3d 168 (2d Cir. 2001) ...................... 60, 61

*United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377 (1956) ................... 14, 16

*United States v. Flaharty*, 295 F.3d 182 (2d Cir. 2002) ......................................... 28

*United States v. Grinnell Corp.*, 384 U.S. 563 (1966) ........................................... 14, 23

*United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001) .............................. 15

*United States v. Microsoft Corp.*, 84 F. Supp. 2d 9 (D.D.C. 1999) ......................... 41

*United States v. United Shoe Machinery Corp.*, 110 F. Supp. 295 (D. Mass. 1953) ... 44

*US Airways, Inc. v. Sabre Holdings Corp.*, 105 F. Supp. 3d 265 (S.D.N.Y. 2015) ..... 37

*Valley Products Co. v. Landmark*, 877 F. Supp. 1087 (W.D. Tenn. 1994) ............... 48

*Virtue v. Creamery Package Manufacturing Co.*, 227 U.S. 8 (1913) ........................ 51

*W.R. Huff Asset Management Co. v. Deloitte & Touche, LLP*, 549 F.3d 100 (2d Cir. 2008) ...... 53

*Waxman v. Cliffs Natural Resources, Inc.*, 222 F. Supp. 3d 281 (S.D.N.Y. 2016) ..... 57

*Xerox Corp. v. Media Sciences International, Inc.*, 511 F. Supp. 2d 372 (S.D.N.Y. 2007).. passim

*Yagoozon, Inc. v. Kids Fly Safe*, No. 14–40, 2014 WL 3109797 (D.R.I. 2014)........................... 48

*Zacchini v. Scripps-Howard Broadcasting Co.,* 433 U.S. 562 (1977) ....................................... 51

*ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254 (3d Cir. 2012)................................................... 36

**Statutes**

15 U.S.C. § 1 ................................................................................................................ 26

15 U.S.C. § 2 ................................................................................................................ 13

**Other Authorities**

Jared Diamond and Andrew Beaton, *The Player-Led Venture that Turned Trading Cards Upside Down*, WALL ST. J., Oct. 6, 2021 ........................................................... passim

Joshua P. Davis & Eric L. Cramer, Antitrust, Class Certification, and the Politics of Procedure, 17 George Mason Law Review 969, 984-85 (2010) ......................................... 39

United States Department of Justice & Federal Trade Commission, *Horizontal Merger Guidelines* (2023)........................................................................................................ 21

**Rules**

Federal Rule of Civil Procedure 12(b)(6) ................................................................... 13

**Treatises**

Phillip Areeda & Herbert Hovenkamp, *Antitrust Law* (2d ed. 2002) .......................................... 36

Wright, Miller, & Kane, Federal Practice and Procedure: Civil 3d............................................. 55

## I.     INTRODUCTION

This case concerns anticompetitive conduct resulting in overcharges paid by direct purchasers of trading cards for MLB, NBA, and NFL players (collectively, Trading Cards). The Trading Card direct purchaser plaintiffs' (Plaintiffs) First Amended Complaint, ECF No.103 (FAC) alleges, beginning in August 2021 and continuing through the present, defendant Fanatics, in conspiracies involving all defendants,[1] engaged in a campaign to monopolize the market for Trading Cards. Fanatics' campaign worked as follows: (1) first inducing those leagues and players associations to join its anticompetitive conspiracies, with each league and its respective players association, some working with OneTeam, agreeing to grant Fanatics a no-bid, long-term exclusive licensing contract for Trading Card rights in exchange for a share of the future Trading Card monopoly profits and then (2) weaponizing its resulting market dominance even before those agreements took effect to coerce market participants in an expansive scheme to systematically exclude from the market its only remaining competitor, Panini, resulting in fewer choices, lower quality, and higher prices for direct purchasers of Trading Cards.

In a case brought by Fanatics' competitor trading card manufacturer Panini and alleging identical misconduct, *Panini Am., Inc. v. Fanatics, Inc.*, No. 23-CV-9714-LTS-VF, 2025 WL 753954 (S.D.N.Y. Mar. 10, 2025) (*Panini*), this Court found sufficient allegations that:

---

[1] Individual defendants are Fanatics, Inc., Fanatics, LLC, Fanatics Collectibles Intermediate Holdco, Inc., Fanatics SPV, LLC, Fanatics Holdings, Inc. (collectively Fanatics); Major League Baseball, Major League Baseball Properties (collectively MLB); Major League Baseball Players Association, MLB Players, Inc. (collectively MLBPA); National Football League, NFL Properties LLC (collectively NFL); National Football League Players Association, NFL Players, Inc. (collectively NFLPA); National Basketball Association, NBA Properties, Inc. (collectively NBA); National Basketball Players Association (NBPA); and OneTeam Partners LLC (OneTeam). Defendants MLB, NFL, and NBA are collectively referred to as the "League Defendants." Defendants MLBPA, NFLPA, and NBPA are collectively referred to as the "Players Association Defendants," and individually are responsible and/or involved in licensing the names, images, and likenesses for their league's respective players. Defendants' respective Memorandum in Support of their individual Motion To Dismiss will be cited as [Defendant]'s Mem.

- Fanatics possessed monopoly power acquired through anticompetitive conduct, in violation of Section 2 of the Sherman Act, id. at *6;

- Fanatics attempted monopolization in violation of Section 2 of the Sherman Act, *id.* at *7;

- Fanatics, MLBPA, and OneTeam conspired to restrain trade in violation of Section 1 of the Sherman Act, *id.* at *9;

- Fanatics, NFLPA, and OneTeam conspired to restrain trade in violation of Section 1 of the Sherman Act, *id.*;

- Fanatics and MLB conspired to restrain trade in violation of Section 1 of the Sherman Act, *id.* at *10;

- Fanatics and NFL conspired to restrain trade in violation of Section 1 of the Sherman Act, *id.*;

- Fanatics and NBA conspired to restrain trade in violation of Section 1 of the Sherman Act, *id.*; and

- Fanatics and NBPA conspired to restrain trade in violation of Section 1 of the Sherman Act, *id.*

Plaintiffs allege the same facts here. This Court's analysis and logic in the *Panini* case should apply and lead to a similar outcome here: denial of each defendant's motion to dismiss.

Given this background, Defendants make limited arguments in support of their motions to dismiss. In substance, the League, Players Association, and OneTeam Defendants channel their inner Dylan and argue, "It Ain't Me,"[2] pointing their fingers at Fanatics as the bad actor. But this argument ignores black letter law that *all* co-conspirators are jointly and severally liable for *all* acts of the conspiracy. Procedurally, Defendants argue that certain plaintiffs lack standing for certain card purchases. These arguments fare no better because all Plaintiffs have purchased at least some of the cards at issue, are injured, and have standing. Plaintiffs respectfully request that this Court deny Defendants' motions to dismiss.

---

[2] Bob Dylan, "It Ain't Me Babe" [Song], *on Another Side of Bob Dylan*, Columbia, 1964.

## II.    SUMMARY OF FACTUAL ALLEGATIONS

### A.    Trading Card Industry

The first sports Trading Cards were printed more than a century ago. FAC ¶ 63. The Trading Card market has grown rapidly in recent years, with sales exceeding an estimated $5 billion in 2024 and projected to nearly triple by 2031. *Id.* ¶ 4.

To produce desirable Trading Cards for a particular major sports league, card manufacturers obtain licenses from both the league (for the league and team logos and trademarks) and its respective players association (for the players' names, images, and likenesses). *Id.* ¶ 5. During the 1980s and 1990s, Trading Card competition increased significantly, with manufacturers like Upper Deck, Fleer, and Donruss entering the market. *Id.* ¶ 65. This period of time also ushered in card design innovations such as holographic images, memorabilia cards, and autographed cards. *Id.* ¶ 65.

Historically, licenses from leagues and players associations were awarded through (1) a public bidding process, (2) resulting in non-exclusive license agreements or in exclusive license agreements typically of 5 years or less, and (3) with staggered terms, wherein no single licensee controlled exclusive rights across all of the leagues and players associations at once. *Id.* ¶¶ 8, 66–67. In 2019, MLBPA and NFLPA created a joint venture called OneTeam, which "specializes in the collective licensing rights of athletes." *Id.* ¶ 76. OneTeam now includes unions representing players from the Women's National Basketball Association, the U.S. women's national soccer team and Major League Soccer. Jared Diamond and Andrew Beaton, *The Player-Led Venture that Turned Trading Cards Upside Down*, WALL ST. J., Oct. 6, 2021 (also attached as Ex. A to G. Gordon Decl. in Supp. of OneTeam Mem., ECF No. 135-2). OneTeam markets and licenses the name, image, and likeness (NIL) rights of the athletes and players associations that it represents. FAC ¶ 48. The MLBPA and NFLPA have acknowledged that their deals with

Fanatics "never would have happened" if their two organizations had not "joined forces" to create OneTeam. *Id.* ¶ 76.

### 1.     Panini entered the U.S. trading card market.

Panini America Inc. (Panini) entered the U.S. trading card market in 2009 after (1) entering into a four-year exclusive deal for NBA Trading Cards; and (2) acquiring Donruss Playoff L.P., which held non-exclusive licenses with the NFL and NFLPA. *Id.* ¶ 68. Panini rapidly gained market share through its licenses, its innovative product lines, quality control, marketing, and distribution. *Id.* ¶ 69. It currently holds exclusive licenses from the NFL (through March 2026) and NFLPA (through February 2026). *Id.*

### 2.     Fanatics entered the Trading Card market and aggressively acted to drive out Panini.

Fanatics started as a sports apparel company. *Id.* ¶ 70. In 2021, Fanatics began expanding aggressively into the Trading Card industry with a strategic plan to eliminate competition through unprecedented long-term exclusive licensing agreements, predatory vertical integration, and coercing market participants to thwart Fanatics' competitors. *Id.*

#### a.     Fanatics obtained long-term exclusive licenses with the three major league sports and their players associations, in exchange for shares of monopoly profits.

In August 2021, Fanatics announced its acquisition of the leading professional sports licenses in North America: exclusive twenty-year licenses with MLB, MLBPA, and NLFPA, and exclusive ten-year minimum term licenses with NBA and NBPA, beginning in 2025 (MLB, MLBPA, NBA, and NBPA) and 2026 (NFLPA). *Id.* ¶ 71, 73. Fanatics obtained these long-term exclusive licenses by providing sports leagues and players associations a share of the future monopoly profits in the form of an equity stake in Fanatics. *Id.* ¶¶ 10, 71–80. These agreements

- 4 -

marked the first time in history that a single card manufacturer secured exclusive licenses across all six major professional sports licensors. *Id.* ¶ 10.

In January 2022, Fanatics acquired The Topps Company, Inc. (Topps) for $500 million. *Id.* ¶¶ 11, 79. At the time of the acquisition, Topps had an exclusive license with MLB that ran until 2025 and a semi-exclusive license with the MLBPA that ran until the end of 2022. *Id.* ¶ 79. The Topps acquisition gave Fanatics control of the market for MLB Trading Cards. *Id.* ¶ 11. By following the acquisition with NFL, NFLPA, NBA, and NBPA license deals, Fanatics has successfully cornered one hundred percent of the market for Trading Card for at least the next decade. *Id.* ¶ 74.

The collective equity stake received in exchange by the leagues and players associations (plus NHL and MLS) in Fanatics is worth approximately $5 to $10 billion. *Id.* ¶ 75.

> **b.    Fanatics acquired GC Packaging, the manufacturer that Panini had relied upon, and then began limiting production of Panini's Trading Cards.**

In March 2022, Fanatics acquired a controlling share of GC Packaging (GCP), an essential card manufacturer used by Fanatics' only remaining professional sports trading card competitor, Panini. *Id.* ¶¶ 12, 81–98. After acquiring this control, Fanatics' CEO, Michael Rubin, told Panini's CEO, Mark Warsop, that Fanatics could now turn off the GCP machines devoted to Panini whenever it wanted. *Id.* ¶ 93. GCP provides highly specialized manufacturing services, and, according to Panini, is the only provider able to meet Panini's technological quality and capacity requirements, handling over 90% of Panini's production needs. *Id.* ¶¶ 12, 82. Between 2019 and 2021, GCP consistently delivered well over ninety percent of Panini's requested production volume requirement: 91% in 2019, 99% in 2020, and 97% in 2021. *Id.* ¶ 94.

In 2022, GCP delivered on Rubin's threats to turn off GCP's machines devoted to Panini. *Id.* ¶ 96. GCP delivered only 58% of Panini's requested production, totaling 181 million packs

for 2022. *Id.*. This represented a shortfall of 116 million packs of trading cards. *Id.*. In 2023,

GCP delivered around 61% of Panini's requested production, a shortfall of 132 million packs.

*Id.*. Fanatics' purposeful disruption of Panini's production led to a significant shortfall of over

100 million packs of trading cards, which resulted in cancellation of orders and reduced sales. *Id.*

¶ 98.

### c. Fanatics raided Panini employees to further hobble Panini's competitive ability.

As part of its efforts to monopolize the Trading Card market, Fanatics raided Panini's

design and marketing staff. *Id.* ¶¶ 99–107. Prior to initiating the raid, Fanatics opened an office

in Dallas, Texas, just miles away from Panini's headquarters. *Id.* ¶ 102. The raid began on or

about April 4, 2023, and Fanatics ultimately succeeded in hiring thirty-six Panini employees. *Id.*

Fanatics used the monopoly power afforded by its future exclusive dealing arrangements to

induce employees to come to Fanatics, threatening them with never working in the industry ever

again once Panini's licenses expired. *Id.* ¶ 103. Fanatics aided and encouraged these Panini

employees to misappropriate Panini's trade secrets, in violation of non-disclosure and

non-solicitation agreements. *Id.* ¶ 106. Fanatics did not need to raid Panini's employees in 2023.

*Id.* ¶ 107. These newly hired employees were not necessary to meet Fanatics' staffing needs until

2025 or 2026, unless Fanatics planned or managed to drive Panini out of the market. *Id.*.

### d. Fanatics signed exclusive deals with star rookie players to prevent Panini from producing their cards.

Original, hand-written autographs on trading cards—particularly those of star rookies—

drive significant demand among collectors and investors. *Id.* ¶ 108. The ability to secure

contracts with individual athletes for the rights to use their autographs is thus a key competitive

element in the trading card market. *Id.* In April 2023, Fanatics began aggressively targeting star

rookie players with exclusive autograph deals as part of its strategy to eliminate Panini as its only

meaningful competitor in the Trading Card market. *Id.* ¶ 108–112. To weaken Panini's position before its licenses with the NBA and NFL ended, Fanatics started paying top rookie athletes to sign exclusive autograph deals—not so that Fanatics could immediately use those autographs on trading cards, but to prevent Panini from doing so. *Id.* ¶ 109.

> e.    **Fanatics sets minimum price requirements and requires big box retailers to enforce higher margins on Trading Cards.**

After announcing its licenses in August 2021, Fanatics then forced market participants to comply with immediate demands (like higher prices to achieve higher margins) by threatening to not supply any cards once Fanatics' exclusive licenses began. *Id.* ¶¶ 131–36. If the distributors refused to comply, Fanatics threatened to cut them off entirely from the supply of licensed trading cards. *Id.* ¶ 132. This pressure forced distributors to compromise on quality of service and terms to big-box retailers. *Id.*

At the same time, Fanatics renegotiated terms directly with big-box retailers, requiring them to carry a more limited range of Trading Cards, specifically only those manufactured or distributed by Fanatics through Topps. *Id.* ¶ 133. By doing so, Fanatics reduced the overall variety of Trading Cards available to consumers at major retail outlets, further limiting consumer choice. Fanatics made clear that, because of its long-term exclusive licenses with the major leagues and players associations, it would soon have total control over the Trading Card supply. *Id.* Retailers and distributors therefore faced the Hobson's choice to either comply with Fanatics' terms or risk losing access to the most popular and profitable Trading Cards. *Id.*

Fanatics also leveraged its monopoly power to impose anticompetitive terms on local card shops. *Id.* ¶ 134. Fanatics' control over the market allowed it to dictate the terms under which these shops could sell its products, even though these shops had previously operated with greater autonomy. *Id.* Fanatics distributed contracts to local card shops with terms that allowed

Fanatics to unilaterally set minimum prices for its trading cards at any time. *Id.* ¶ 135. While Fanatics referred to these price floors as "suggestions," the contracts made clear that failure to comply could result in Fanatics suspending or terminating the shop's account. *Id.* Fanatics' ability to enforce these terms was rooted in its control over the supply of Trading Cards for the NFL, NBA, and MLB—products that, if Fanatics is allowed to monopolize the market, no other manufacturer can legally provide. *Id.* Fanatics also restricted consumer choice by pressuring local card shops not to sell trading cards on business-to-business trading card websites, threatening to cut off their supply of licensed trading cards if they did so. *Id.* ¶ 136. This type of restriction limits the ability of local shops to reach a broader customer base, and it prevents consumers from accessing alternative sources for Trading Cards. *Id.*

### f. Fanatics acted in several other ways to further limit Panini's ability to compete and accelerate Fanatics monopoly.

Fanatics' anticompetitive conduct did not end there. It also began disseminating false and derogatory statements about Panini to three sets of third parties that were critical to Panini's operations under its existing licenses: (1) players, player agents, and player representatives; (2) players associations; and (3) Panini's employees. *Id.* ¶¶ 113–117. In order to harm Panini and drive it out of business, Fanatics informed these third parties that Panini was incapable of performing for them, that it would be out of business soon, and that it lacked the capital necessary to meet its obligations to them. *Id.* ¶ 113. Fanatics' statements induced NFLPA to terminate its license agreement with Panini. *Id.* ¶¶ 121–26.

Panini's Trading Cards were unique because they incorporated a piece of a player's jersey into their premium (and some mass market) cards. *Id.* ¶ 118. Access to players' jerseys was therefore another critical input for Trading Cards. *Id.* For years, Panini obtained most of its supply of official player jerseys from Fanatics. *Id.* In or around May 2023, Fanatics CEO Rubin

- 8 -

approached Panini to advise it that Fanatics would no longer supply Panini with any jerseys for Panini to incorporate into its Trading Cards. *Id.* ¶ 119. Since then, Panini has been unable to submit new orders for jerseys from Fanatics. *Id.* Rubin also added that Fanatics would not stop its campaign against Panini and would continue to sign exclusive deals with players that Panini would have otherwise partnered with to offer licensed, original, handwritten autographed trading cards to consumers. *Id.* ¶ 120.

Fanatics knew that Panini had an exclusive deal with the NFLPA, because their own exclusive deal was set to begin when Panini's expired in 2025. *Id.* ¶ 121. The NFLPA agreement with Fanatics included an acceleration provision which provided that, in the event the NFLPA were to terminate its agreement with Panini, the effective date of the Fanatics deal would automatically accelerate, making Fanatics' agreement effective immediately. *Id.* ¶ 122. Fanatics induced the NFLPA to find a way to claim a breach in its agreement with Panini before its term expired. *Id.* ¶ 123. Fanatics' raiding of Panini for its employees in April 2023 was central to Fanatics and Rubin's plan to pressure Panini to exit the relevant market. *Id.* ¶ 124. That raid provided the pretext for the NFLPA to point (wrongly) to language in its Panini agreement providing for termination if Panini suffered a material change in executive management. *Id.* In August 2023, the NFLPA terminated its licensing agreement with Panini. *Id.* ¶ 125. In an ensuing arbitration proceeding, the panel of arbitrators unanimously found that the NFLPA breached its licensing agreement with Panini and ordered it to pay over $7 million in damages to Panini. *Id.* ¶ 126.

The price effects of Fanatics' monopolization are already evident. Since the onset of the anticompetitive campaign, the price of Topps trading cards has increased by 50% while the price of comparable Panini cards has remained relatively flat or even declined. *Id.* ¶ 17.

**B.**      **The *Panini* Decision Recognized the Following Facts and Settled Certain Issues.**

Assessing in *Panini* the same factual allegations asserted here, this Court denied

Fanatics' motion to dismiss Panini's antitrust claims. *Panini*, at *1. In that ruling, this Court

found that Panini had adequately pled Fanatics' monopolization and attempted monopolization

of the market. *Id.* Panini's Count I is the claim that Fanatics attempted monopolization in

violation of Section 2 of the Sherman Act, *id.* at *7; Panini's Count II is a claim that Fanatics'

pattern of anticompetitive behavior monopolized the market, in violation of Section 2 of the

Sherman Act, *id.* at *5; and Panini's Count III is the claim that Fanatics' deals with *each* of the

six licensors violated Section 1 of the Sherman Act, which prohibits "every contract,

combination . . . or conspiracy" that tends to "unreasonably restrain[ ] trade," *id.* at *9.

Undergirding that finding, this Court concluded the following, which are relevant to Plaintiffs'

claims in this case:

<u>*Monopolization under Section 2 of the Sherman Act (Panini's Count II)*</u>: "Although

Fanatics currently only holds 33% of the licenses in the Relevant Market [Trading Cards for all

three major leagues] on an exclusive basis, Panini has adequately pled facts supporting a

plausible inference that Fanatics currently possesses monopoly power as demonstrated through

its ability to set prices and exclude competitors." *Id.* at *6. The Court found that Panini plausibly

alleged Fanatics exerted its monopoly power by using "threats of future exclusion from the

market to (1) set minimum price requirements, (2) require big box retailers to give Fanatics

higher margins, (3) exclude competitors by requiring retailers to carry only Fanatics' trading card

lines, (4) lock up rookie players (thus excluding Panini from the ability to make and sell cards

using their images even though Fanatics lacks the licenses to produce such cards until at least

September 2025), and (5) pressure Panini's employees into joining Fanatics." *Id.* The Court

found that Fanatics' monopoly power was sufficiently alleged to be "durable," and its "current

- 10 -

market control was allegedly accomplished by utilizing threats of <u>future</u> exclusion from the Relevant Market once Fanatics owns the exclusive rights to all Relevant Licenses." *Id.*

The Court concluded "these allegations are sufficient, at the pleading stage, together with the allegations regarding future licensing rights, to show that Fanatics not only has the current power to set prices and exclude competitors from the Relevant Market, but that its power will only increase with time as Fanatics is able to exploit its decades-long exclusive licenses." *Id.*

*Attempted monopolization under Section 2 of the Sherman Act (Panini's Count I)*: Panini alleged facts adequate to demonstrate that Fanatics has a "dangerous probability of monopolizing the Relevant Market through sheer market control." *Id.* at *7. This Court concluded: "Fanatics possesses exclusive licensing deals which will confer control of 100% of the Relevant Market, starting in early 2026 and lasting for at least a decade." *Id.* "Panini also alleges a pattern of anticompetitive conduct demonstrating the specific intent to obtain such a monopoly." *Id.*

This Court then observed that it also had to decide whether Fanatics' entry into "unprecedented, economically unjustified, decade(s)-long exclusive deals with all six Relevant Licensors" is itself anticompetitive conduct. *Id.*

*Each license unreasonably restrains trade under Section 1 of the Sherman Act (Panini's Count III)*:

*OneTeam conspiracy / MLBPA license / NFLPA license*: This Court found that the allegations of a "horizontal-level agreement" involving OneTeam, NFLPA, and MLBPA "suffice to show that there was a conspiracy between the NFLPA, the MLBPA, and Fanatics to license both players associations' intellectual property on an exclusive basis for twenty years each." *Id.* at *9. Those two licenses combined would result in Fanatics' exclusive control of over one-third of the relevant market licenses for two decades. *Id.* Panini made sufficient allegations about the

market structure such that "the exclusive licensing of the NFLPA and MLBPA licenses also precludes the effective utilization of any IP licensed from either the NFL or the MLB, effectively precluding competitor manufacturers of trading cards from accessing two-thirds of the Relevant Market for that period." *Id.* This Court observed that preclusive effect is "exacerbated by Fanatics' complete market control." *Id.* "[A]t the pleading stage, Panini has alleged plausibly that there are no sufficient justifications apparent for such a significant restraint on the market." *Id.*

*MLB license / NFL license / NBA license / NBPA license*: This Court found that "the alleged effects of each agreement (considered individually), in the context of their significant durations, the complete market concentration, and the significant market share foreclosed by each individual deal, are sufficiently likely to be anticompetitive to frame a viable Section 1 claim for unreasonable restraint of trade with respect to each of the four remaining deals." *Id.* at *10. This Court cited in further support of its finding the previous allegations discussed in its consideration of Counts I and II. *Id.*

## C. Defendants Filed Redundant, Overlapping Briefs in Support of Their Motions to Dismiss.

In response to Plaintiffs' allegations, each Defendant corporate family filed its own motion to dismiss with supporting memorandum of law. ECF Nos. 128–29 (NFL); ECF Nos. 130-–1 (NBA); ECF Nos. 132-–3 (NBPA); ECF Nos. 134–35 (OneTeam); ECF Nos. 136–37 (MLB); ECF Nos. 138, 140 (NFLPA); ECF Nos. 143–44 (Fanatics); ECF Nos. 145, 149 (MLBPA). The overlapping themes of these many memoranda broadly concern (a) failure to allege involvement in the misconduct, especially as to the non-Fanatics Defendants; and (b) Plaintiffs' standing to seek relief, especially as to NBA and NFL cards. To avoid unnecessary duplication, Plaintiffs respond to all these arguments in one memorandum.

To avoid a tangle of cross-references, Plaintiffs cite to the primary Defendant(s) for each argument, with the understanding that the argument applies to equally to the Defendant(s) that incorporate by reference.

## III.    LEGAL STANDARD

On a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court must look to the plaintiff's operative complaint for the controlling facts, accept all factual allegations as true, and "construe all reasonable inferences that can be drawn from the complaint in the light most favorable to the plaintiff." *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012) (quoting *Arar v. Ashcroft*, 585 F.3d 559, 567 (2d Cir. 2009)). To survive a motion to dismiss, a plaintiff need only allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The plausibility standard is not akin to a "probability requirement"; it "simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of [the claim]." *Id.* at 556. A complaint should not be dismissed "on the basis of the court's choice among plausible alternatives." *Anderson News*, 680 F.3d at 190. *See also Starr v. Sony BMG Music Ent.*, 592 F.3d 314, 322 (2d Cir. 2010) ("[O]f course, a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely.") (quoting *Twombly*, 550 U.S. at 556).

## IV.    ARGUMENT

### A.    Plaintiffs Sufficiently Allege Sherman Act Section 2 Monopolization and Attempted Monopolization Claims Against Fanatics.

To show monopolization under Section 2 of the Sherman Act, plaintiffs must allege plausible facts that Fanatics (1) possessed monopoly power and (2) that it willfully acquired or maintained such power through anticompetitive conduct, as opposed to proper desirable means,

- 13 -

or through events beyond Fanatics' control. *See United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966). Monopoly power is defined as (1) "the power to control prices or exclude competition," *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956)*, and (2) persistence in exercising such control "for a significant period without erosion by new entry or expansion," *AD/SAT, Div. of Skylight, Inc. v. Assoc. Press*, 181 F.3d 216, 227 (2d Cir. 1999). A claim of attempted monopolization requires the plaintiff to allege facts supporting a plausible inference that the defendants (1) engaged in predatory or otherwise anticompetitive conduct, and (2) had specific intent to ultimately seize such power in the market, and (3) present a "dangerous probability" of ultimate success. *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993); *Panini*, at *7 (citing the same).

Plaintiffs' claims of monopolization (Count 7) and attempted monopolization (Count 8) are based upon the same factual allegations that this Court found supported Panini's monopolization and attempted monopolization claims. *Compare* FAC ¶¶ 99-139 *with* Am. Compl. ¶¶ 163-209 (PAC), *Panini Am., Inc. v. Fanatics, Inc.*, 1:23-cv-09714-LTS-VF (S.D.N.Y. Oct. 10, 2023), ECF No. 69 (cited by *Panini*, at *6). This Court found that "Panini adequately pleaded facts supporting a plausible inference that *Fanatics currently possesses monopoly power* as demonstrated through its ability to set prices and exclude competitors," even though Fanatics currently only holds 33% of the licenses in the Relevant Market on an exclusive basis. *Panini*, at *6 (emphasis added). This Court found that Panini adequately alleges facts demonstrating that Fanatics has a dangerous probability of monopolizing the relevant market through sheer market control." *Id*. at *7. The only significant change from the facts at the time of the *Panini* ruling is that now Fanatics' control over the market has doubled to 66%, with the licenses over NBA cards effective as of October 2025. FAC ¶ 69.

- 14 -

Fanatics argues that plaintiffs' claims must be dismissed because they "fail to plausibly allege anticompetitive effects resulting from any alleged conduct by Fanatics." Fanatics Mem. at 7. Fanatics' arguments turn essentially on two assertions: (1) applying a higher evidentiary standard than that used to assess a motion to dismiss, this Court's findings in *Panini* do not apply to consumer plaintiffs, because consumer plaintiffs can allege no plausible direct or indirect evidence of anticompetitive effects regarding the NFL and NBA trading cards that Fanatics began selling in October 2025 (NBA) and will begin selling in April 2026 (NFL), *id*. at 9-14, and (2) plaintiffs' allegations regarding higher prices of Fanatics' MLB trading cards do not show anticompetitive effects. *Id.* at 14-18. Fanatics is wrong.

### 1.    Plaintiffs plausibly allege monopolization (Count 7).

Fanatics cites evidentiary standards applied at summary judgment and trial that are inapplicable to weighing a pre-discovery motion to dismiss.[3] Applying the correct legal standard, plaintiffs have plausibly alleged that Fanatics has attempted to obtain (Count 8) and obtained (Count 7) monopoly power through a number of anticompetitive acts.

### a.    Plaintiffs sufficiently allege that Fanatics has monopoly power.

For the monopolization and attempted monopolization claims, plaintiffs must allege that Fanatics had monopoly power. "Monopoly power, also referred to as market power, is 'the

---

[3] Fanatics relies almost exclusively on cases that provide the evidentiary burdens at summary judgment or at trial and thus provide no relevant analysis for considering whether a claim has been plausibly alleged to survive a motion to dismiss. *See, e.g., Ohio v. Am. Express Co.*, 585 U.S. 529 (2018) (reviewing district court's bench trial verdict); *United States v. Apple, Inc.*, 791 F.3d 290 (2d Cir. 2015) (reviewing lower court's bench trial verdict); *United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001) (reviewing lower court's Final Judgment and Order); *Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90 (2d Cir. 1998) (reviewing lower court's grant of summary judgment); *Roy B. Taylor Sales, Inc. v. Hollymatic Corp.*, 28 F.3d 1379 (5th Cir. 1994) (reviewing jury verdict and court's trebling of damages); *MacDermid Printing Sols. LLC v. Cortron Corp.*, 833 F.3d 172 (2d Cir. 2016) (reviewing jury verdict and final judgment). Fanatics' other cases are not within the Second Circuit and inapposite. *See, e.g., Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1198 (9th Cir. 2012) (analyzing an antitrust tying claim regarding cable broadcasting packages); *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 303 (3d Cir. 2007) (considering "whether a patent holder's deceptive conduct before a private standards-determining organization may be condemned under antitrust laws and, if so, what facts must be pled to survive a motion to dismiss").

power to control prices or exclude competition.'" *Tops Mkts.*, 142 F.3d at 97-98 (quoting *E.I. du Pont de Nemours*, 351 U.S. at 391) (other citation omitted). It "is the ability to raise prices above those that would be charged in a competitive market." *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 109 n.38 (1984). As the Second Circuit explains:

> The more competition a company faces, the less it can control prices because competitors will undercut its prices to secure market share. Conversely, a company that can exclude competition can sustain its ability to control prices and thereby maintain its market power. The pertinent inquiry in a monopolization claim, then, is whether the defendant has engaged in improper conduct that has or is likely to have the effect of controlling prices or excluding competition, thus creating or maintaining market power.

*PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 107–108 (2d Cir. 2002).

Monopoly power may be shown through either direct or indirect evidence. *In re Aluminum Warehousing Antitrust Litig.*, 95 F. Supp. 3d 419, 454 (S.D.N.Y. 2015). Direct evidence is "evidence of the control of prices or the exclusion of competition." *Id.* at 453. "If a plaintiff can show that a defendant's conduct exerted an actual adverse effect on competition, this is a strong indicator of market power." *Todd v. Exxon Corp.*, 275 F.3d 191, 206 (2d Cir. 2001). Indirect evidence, or "proof that the defendant has a large share of the relevant market," is a "surrogate for direct proof of market power." *In re Aluminum*, 95 F. Supp. 3d at 454. "To survive a Rule 12(b)(6) motion to dismiss, an alleged product market must bear a rational relation to the methodology courts prescribe to define a market for antitrust purposes—analysis of the interchangeability of use or the cross elasticity of demand." *Todd*, 275 F.3d at 200 (quotation omitted).

Defining a relevant market is "clearly a fact-intensive inquiry." *In re Aggrenox Antitrust Litig.*, 94 F. Supp. 3d 224, 246 (D. Conn. 2015) (observing "for that reason 'courts hesitate to grant motions to dismiss for failure to plead a relevant product market'") (quoting *Todd*, 275

F.3d at 199-200); *see also Hayden Publ'g Co. v. Cox Broad. Corp.*, 730 F.2d 64, 70 n.8 (2d Cir. 1984) ("It frequently has been observed that a pronouncement as to market definition is not one of law, but of fact.") (cleaned up); *Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 502 (2d Cir. 2004) (observing that, where plaintiffs have sufficiently stated a Sherman Act claim, "it is a question for the jury" whether defendant had monopoly power.). "[A]lthough there is not a '*per se* prohibition against dismissal of antitrust claims for failure to plead a relevant market, it remains the exception not the rule.'" *Allen v. Dairy Farmers of Am., Inc.*, 748 F. Supp. 2d 323, 337 (D. Vt. 2010) (collecting cases).

Plaintiffs allege that "Defendants had market power in the market for newly issued Major U.S. Professional Sports Leagues trading cards." FAC ¶ 140. Plaintiffs allege direct evidence of Fanatics' monopoly power—Fanatics has "the power to raise and maintain the price of these trading cards at supracompetitive levels profitably without losing substantial sales." *Id.* Fanatics entered into lengthy exclusive licenses that necessarily would exclude competitors for at least a decade, "resulting in fewer choices, lower quality, and higher prices for direct purchasers" of trading cards. *Id.* ¶ 2. With lengthy licenses, Fanatics used threats of future exclusion from the market to require sellers of trading cards to set minimum price requirements, *i.e.*, direct evidence of supracompetitive pricing. *Id.* ¶ 135. Fanatics also used its monopoly power to pressure big box retailers to agree to higher margins, another act that leads to supracompetitive pricing. *Id.* ¶ 132. In requiring retailers to agree to carry only Fanatics' trading card lines, Fanatics ensured that competition would be excluded from the market, leaving Fanatics free to charge supracompetitive prices without fear of losing sales. *Id.* ¶ 133. Fanatics targeted star rookie players to sign exclusivity agreements even before those rookies' league licenses were in place, and the rookies were left with little choice but to sign with the company that would hold the

- 17 -

rights to their cards for the next decade or more. *Id.* ¶¶ 108-12. These actions excluded other card manufacturers from competing for these rookie deals. *Id.* Fanatics also raided Panini's design and marketing staff, undermining the ability of Panini to compete. *Id.* ¶¶ 99–107. Collectively, Fanatics' actions are evidence of its ability to control prices and exclude competition, comprising direct evidence of monopoly power. *In re Aluminum*, 95 F. Supp. at 454.

Plaintiffs also allege indirect evidence of monopoly power: "[T]he relevant product market is the market for newly issued trading cards created by card producers for NBA, NFL, and MLB players that are fully licensed with league and player association marks," and the relevant geographic market is [] the United States. FAC ¶¶ 141–42. Plaintiffs further allege that, due to fan loyalty and the desirability of newly issued, fully licensed cards, there are no economic substitutes for newly issued, fully licensed trading cards, because purchasers do not regard other products to be reasonable substitutes. *Id.* ¶ 143. Plaintiffs are clear in the FAC that the proposed relevant markets refer to the market for *Trading Cards*, and not any purported market for the intellectual property rights used in production of those cards.[4]

This Court has already concluded in *Panini* that the same allegations suffice to allege monopoly power. There, this Court found that Panini sufficiently pled direct evidence of monopoly power for its antitrust claim, noting that Panini's allegations supported a "plausible inference that Fanatics currently possesses monopoly power as demonstrated through its ability to set prices and exclude competitors." *Panini*, at *6 (citing allegations that "Fanatics has used threats of future exclusion from the market to (1) set minimum price requirements, (2) require big box retailers to give Fanatics higher margins, (3) exclude competitors by requiring retailers

---

[4] Liability for the non-Fanatics defendants relies upon their joint and several liability with Fanatics and is not dependent upon any of the non-Fanatics defendants having monopoly power. *See* § IV.B for discussion of joint and several liability. Plaintiffs also allege alternative relevant markets, one for each league. FAC ¶¶ 144-49.

to carry only Fanatics' trading card lines, (4) lock up rookie players (thus excluding Panini from the ability to make and sell cards using their images even though Fanatics lacks the licenses to produce such cards until at least September 2025), and (5) pressure Panini's employees into joining Fanatics").

Although, at the time of *Panini* opinion, Fanatics held 33% of the relevant market, this Court found that Fanatics' "ability to set prices and exclude competitors" demonstrated that it had market power. *Id.* Further, Fanatics' "monopoly power is sufficiently alleged to be durable." *Id.* This Court noted that the then-in-effect "licensing deals alone would give Fanatics exclusive control over one-third of the licenses making up the Relevant Market for two decades" and "also preclude[] the effective utilization of any IP licensed from either the NFL or the MLB, effectively precluding competitor manufacturers of trading cards from accessing two-thirds of the Relevant Market for that period." *Id.* at *9. That 33% market share has now doubled to 66% with Fanatics' licenses for NBA cards becoming effective in October 2025; by April 2026, Fanatics' market share will be 100% and will remain that way for at least a decade. FAC ¶ 69. The evidence for Fanatics' monopoly power only increases with time.

In sum, this Court concluded that Panini's "allegations are sufficient, at the pleading stage, together with the allegations regarding future licensing rights, to show that Fanatics not only has the current power to set prices and exclude competitors from the Relevant Market, but that its power will only increase with time as Fanatics is able to exploit its decades-long exclusive licenses." *Panini*, at *6. Plaintiffs here allege the same evidence of monopoly power. FAC ¶¶ 140-49.

Given this Court's findings in *Panini*, Defendants' challenges to the sufficiency of the allegations of monopoly power are limited. Defendants do not challenge Plaintiffs' allegations of

direct evidence of monopoly power—raising prices above competitive levels and excluding all competition for over a decade, *PepsiCo*, 315 F.3d at 107-08 (raising prices and excluding competition)—and that alone is sufficient to sustain the FAC. "Where direct evidence of market power is available, [] a plaintiff need not attempt to define the relevant market." *In re Aggrenox Antitrust Litig.*, 199 F. Supp. 3d 662, 669 n.4 (D. Conn. 2016) (citing *In re Nexium (Esomeprazole) Antitrust Litig.*, 968 F. Supp. 2d 367, 388 n.19 (D. Mass. 2013)). The primary argument from Defendants is that the alleged relevant market is insufficiently narrow and fails to include all reasonable alternatives. Fanatics Mem. at 14-16; MLB Mem. at 18-19; MLBPA Mem. at 18-19; NBA Mem. at 14-16; NBPA Mem at 15-16.[5] However, in the paragraphs of the FAC articulating monopoly power, Plaintiffs allege that:

> Because of fan loyalty and the desirability of newly issued player trading cards from the most popular sports leagues that include the league logo, league players association logo, team uniform, team color combinations, and player images, there is no economic substitute for newly issued, fully licensed Major U.S. Professional Sports League trading cards in the United States.

FAC ¶ 143.

Whether a product is in the relevant market depends on whether there is cross-price elasticity of demand between the products, meaning that "consumers would respond to a slight increase in the price of one product by switching to another product." *Todd*, 275 F.3d at 201-02 (internal quotations omitted). The FTC defines a product market as "a group of products . . . [such that] a hypothetical profit-maximizing firm, not prevented by regulation from worsening terms, that was the only present and future seller of a group of products ("hypothetical monopolist") likely would undertake at least a small but significant and non-transitory increase

---

[5] The NFL makes no arguments as to relevant market, instead referencing the NBA and MLB briefs. NFL Mem. at 19. The NFLPA argues only that it does not participate in the relevant market. NFLPA Mem. at 9. OneTeam also claims it does not participate in the market. OneTeam Mem. at 12.

in price." United States DOJ & FTC, *Horizontal Merger Guidelines* (2023) at 41. Plaintiffs allege that a "small but significant non-transitory increase in the price" of the trading cards "would not substantially raise demand for" potential alternatives. FAC ¶ 143. Thus, MLB is incorrect in its claim that "Plaintiffs do not attempt to 'define [their] proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand,'" MLB Mem. at 18. A "small but significant non-transitory increase in the price," or SSNIP, that does not raise demand for alternatives shows a lack of cross-price elasticity and hence the boundary of the relevant market. *Regeneron Pharms., Inc. v. Novartis Pharma AG*, 96 F.4th 327, 339 (2d Cir. 2024). "If the hypothetical monopolist can impose a SSNIP without losing so many sales to other products as to render the SSNIP unprofitable, then the proposed market is the relevant market." *Id.*

Defendants' arguments against Plaintiffs' allegations regarding the lack of substitutes are unpersuasive. First, whether Plaintiffs correctly allege that there are no substitutes for the trading cards in the alleged relevant market is the type of fact-based inquiry that needs to occur during discovery and with expert economic analysis. Economic analysis of cross-price elasticity will inform what products fall within the relevant market. Second, if Fanatics did not have market power, it would not have engaged in anticompetitive conduct to lock up all of the licenses from the other Defendants, as evidence of anticompetitive behavior itself is evidence of market power. *See FTC v. Actavis, Inc.*, 570 U.S. 136, 157 (2013) ("[W]here [an anticompetitive act] threatens to work unjustified anticompetitive harm, the [defendant] likely has the power to bring that harm about in practice.").

Defendants ignore that the impact of market power is already evident via higher prices in Topps trading cards. FAC ¶¶ 17–18 & figures. There has been no discovery yet, and no expert

- 21 -

reports from economists, so the figures presented in the FAC are necessarily limited. However, they do show that price effects from Defendants' anticompetitive conduct can already be seen. Before Defendants' anticompetitive actions, Topps and Panini card prices moved in tandem, but since the execution of the anticompetitive agreements, the price of certain Topps MLB player trading card sets has increased by 50%, while the price of comparable Panini cards has remained relatively flat or even declined. *Id*. ¶ 17. This shows that Fanatics inflated the price of Topps cards so that it could price off a higher reference price once the anticompetitive agreements go into effect. This does not mean that the Topps and Panini cards in the charts are in the same relevant market, as Fanatics tries to argue. Fanatics Mem. at 16. In fact, it shows the opposite: if they were in the same relevant market, Topps would not be able to increase its prices as it has while Panini prices stayed flat or declined. Panini prices staying flat also shows that there was not a price increase in card stock or other inputs that caused Topps to raise its prices.

Defendants also ignore the substantial value of the licenses from the leagues and players associations. Plaintiffs allege that "[t]he collective equity stake of the Leagues and players associations (plus NHL and MLS) in Fanatics is worth approximately $5 to $10 billion." *Id*. ¶ 75. Defendants specifically negotiated equity stakes to share the monopoly profits created by the anticompetitive agreements, and the license terms ensure those monopoly profits will be shared for at least a decade. *See Laumann v. Nat'l Hockey League*, 907 F. Supp. 2d 465, 486-88 (S.D.N.Y. 2012) (finding defendants benefitting from vertical agreements that suggest "a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement" sufficient to allege an agreement among all the defendants involved). Sharing of monopoly profits is indicative of market power. *See Aggrenox*, 199 F. Supp. 3d at 665-66.

Plaintiffs' allegations of monopoly power are sufficient to withstand defendants' motions to dismiss. *Allen*, 748 F. Supp. 2d at 340 ("Dismissals for insufficient pleading of market power are rare pre-discovery and are generally reserved for complaints bereft of factual allegations or which contain market share or market power allegations that are purely conclusory.") (collecting cases).

> **b.    Fanatics' anticompetitive acts were the means by which it attained monopoly power over Trading Cards.**

Plaintiffs have plausibly alleged that Fanatics has willfully acquired and maintained a monopoly in the market for Trading Cards and did not acquire this monopoly through "a superior product, business acumen, or historic accident," *Grinnell,* 384 U.S. at 571, but rather through its anticompetitive conduct. FAC ¶¶ 218-29. Considering the same factual allegations of Fanatics' anticompetitive conduct, this Court concluded that the Section 2 monopolization claim was sufficient and Fanatics currently possesses durable monopoly power obtained by its "threats of future exclusion from the market to (1) set minimum price requirements, (2) require big box retailers to give Fanatics higher margins, (3) exclude competitors by requiring retailers to carry only Fanatics' trading card lines, (4) lock up rookie players (thus excluding Panini from the ability to make and sell cards using their images even though Fanatics lacked the licenses to produce such cards until at least September 2025), and (5) pressure Panini's employees into joining Fanatics." *Panini*, at *6. (citing PAC ¶¶ 157, 166, 194-95, 200). This Court's analysis in *Panini* applies here where the allegations are the same. *Compare* FAC ¶¶ 103-04, 14, 109, 132-35 *with* PAC ¶¶ 157, 166, 194-95, 200.

Fanatics' assertion that there can be no coercion by its exercise of monopoly power, Fanatics Mem. at 11-14, ignores this Court's analysis in *Panini* that Fanatics already has leveraged the power from its long-term exclusive licenses. This Court observed: "these

allegations are sufficient, at the pleading stage, together with the allegations regarding future licensing rights, to show that Fanatics not only has the current power to set prices and exclude competitors from the Relevant Market, but that its power will only increase with time as Fanatics is able to exploit its decades-long exclusive licenses." *Panini*, at *6 (citing *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 889-90 (2007), and observing "where a business uses its dominant market power to 'coerce' market participants into such agreements, it crosses the line into anticompetitive conduct"). Contrary to Fanatics' characterization, Fanatics Mem. at 6, Plaintiffs' allegations are not "vague and disconnected theories" but they are an accounting of Fanatics' onslaught of anticompetitive acts, e.g., obtaining "back-room," long-term exclusive licenses across all six major professional sports licensors for the first time in trading card history, FAC ¶¶ 10, 71-78 (each license included sharing monopoly profits with the licensor), acquiring trading card printer GC Packaging and subsequently limiting its printing of competitor cards, *id.* ¶¶ 12, 81-98; raiding employees of competitor Panini to further hobble competition, *id.* ¶¶ 13, 99-107; signing exclusive deals with rookie players to preclude competitors from producing those cards when Fanatics' licenses were not yet in effect, *id.* ¶¶ 14, 108-12; coercing price minimums and higher margins from big box retailers, *id.* ¶¶ 18, 131-36; disseminating false and derogatory statements about Panini to further damage its competitive ability, *id.* ¶¶ 15, 113-17; and inducing NFLPA to wrongfully attempt to terminate its license agreement with Panini, resulting in a $7 million award against NFLPA, *id.* ¶¶ 121-26. These plausible allegations are sufficient to sustain Plaintiffs' monopolization claim against Fanatics.

### 2.   Plaintiffs plausibly allege Fanatics' attempted monopolization of Trading Cards (Count 8).

To allege a plausible claim of attempted monopolization under Section 2, the plaintiffs must allege facts supporting a plausible inference that the defendant (1) engaged in predatory or

- 24 -

otherwise anticompetitive conduct, (2) had specific intent to ultimately seize such power in the market, and (3) presents a "dangerous probability" of ultimate success. *Spectrum Sports*, 506 U.S. at 456; *Panini*, at *7 ("The requisite intent is commonly inferred from the defendant's predatory or anticompetitive acts."). Plaintiffs allege that Fanatics engaged in a campaign of anticompetitive acts with the specific intent to gain monopoly power with a dangerous probability of success. FAC ¶¶ 230-41. This Court considered the same factual allegations in *Panini* and found plausible that "Fanatics has a dangerous probability of monopolizing the Relevant Market through sheer market control." *Panini*, at *7; *compare* PAC ¶¶ 102, 117, 150-209 (identified as factual allegations supporting Panini's attempted monopolization claim) *with* FAC ¶¶ 71, 151-52, 99-139. This Court stated: "Fanatics possesses exclusive licensing deals which will confer control of 100% of the Relevant Market, starting in early 2026 and lasting for at least a decade." *Panini*, at *7 (citing *McWane, Inc. v. FTC*, 783 F.3d 814, 830 (11th Cir. 2015) (collecting cases discussing monopoly power)).

Plaintiffs' attempted monopolization claim is based on the same factual allegations that the Court found supported the attempted monopolization claim in *Panini*, except that now Fanatics' active licenses cover twice as much of the market (66% now versus 33% when *Panini* was decided) and that that percentage will soon grow to 100% (in April 2026). With Fanatics holding an even greater control over the market, Plaintiffs' allegations of the probability of Fanatics' ultimate success of gaining monopoly power over Trading Cards are even more credible. As described *supra* § IV.A.1.b., Plaintiffs have plausibly alleged Fanatics engaged in a course of anticompetitive acts in its attempt to seize monopoly power. FAC ¶¶ 10, 71-78 (implementing licenses with monopoly profit splits), *id.* ¶¶ 12, 81-98 (strong-arming trading card printer GC Packaging to limit competitor printing; *id.* ¶¶ 13, 99-107 (raiding competitor

employees); *id.* ¶¶ 14, 108-12 (locking up star rookie players prior to Fanatics licenses' effective dates); *id.* ¶¶ 18, 131-36 (coercing price minimums from big box retailers); *id.* ¶¶ 15, 113-17 (disseminating false and derogatory statements about its competitor); and *id.* ¶¶ 121-26 (inducing NFLPA to terminate its license agreement with Panini). The scope of the alleged anticompetitive conduct supports plausible inferences that Fanatics possessed the specific intent to seize monopoly power and there is a dangerous probability that Fanatics will obtain monopoly power. *See Panini*, at *7 (finding plausibly alleged the claim that Fanatics attempted monopolization under Section 2); *In re Tether & Bitfinex Crypto Asset Litig.*, 576 F. Supp.3d 55, 100 (S.D.N.Y. 2021) (inferring specific intent from the defendants' anticompetitive acts, "for the same reasons the Court finds Plaintiffs' allegations regarding willful acquisition [of monopoly power] to be plausible, the Court believes that Plaintiffs have sufficiently pleaded facts to survive a motion to dismiss with respect to the intent element of an attempted monopolization claim").

**B.    Plaintiffs Sufficiently Allege Section 1 Sherman Act Claims Against All Defendants.**

Plaintiffs' Counts 1-6[6] allege that each of Fanatics' licensing agreements with the major league sports organizations, their respective players associations, and OneTeam violated Section 1 of the Sherman Act, which prohibits "every contract, combination . . . or conspiracy" that tends to "unreasonably restrain[] trade." *Geneva*, 386 F.3d at 506. Exclusive licensing arrangements are assessed under the rule of reason. *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 186 (2010) ("We conclude that the NFL's licensing activities constitute concerted action that is not categorically beyond the coverage of § 1" and "legality of that concerted action must be

---

[6] Count 1 is Conspiracy in Restraint of Trade (15 USC § 1) against Fanatics and MLB; Count 2 is Conspiracy in Restraint of Trade (15 USC § 1) against Fanatics, OneTeam, and MLBPA; Count 3 is Conspiracy in Restraint of Trade (15 USC § 1) against Fanatics and NFL; Count 4 is Conspiracy in Restraint of Trade (15 USC § 1) against Fanatics, OneTeam, and NFLPA; Count 5 is Conspiracy in Restraint of Trade (15 USC § 1) against Fanatics and NBA; and Count 6 is Conspiracy in Restraint of Trade (15 USC § 1) against Fanatics and NBPA.

judged under the Rule of Reason."); *Leegin*, 551 U.S. at 585 ("The rule of reason is the accepted standard for testing whether a practice restrains trade in violation of § 1."); *see also Panini*, at *10 ("[V]ertical licensing arrangements may still run afoul of antitrust laws, particularly in a highly concentrated market. To hold otherwise would immunize intellectual property from the antitrust laws altogether, a protection that has no legal basis."). A court may find such a license to be unreasonable after considering (1) the defendants' degree of market power, (2) the extent of market foreclosure resulting from the arrangement, (3) the impact of the arrangement on competitors and consumers, and (4) competitive justifications for use of an exclusive dealing arrangement. *Id*. at *9 (citing *Geneva*, 386 F.3d at 506).

Plaintiffs allege that each license agreement is proof of the respective conspiracy between Fanatics and each of the co-conspirator licensors and, where relevant, OneTeam. *See* FAC § X (Counts 1–6). "A successful conspiracy claim under the Sherman Act requires: '(1) proof of a concerted action deliberately entered into with the specific intent to achieve an unlawful monopoly, and (2) the commission of an overt act in furtherance of the conspiracy.'" *Allen*, 748 F. Supp. 2d at 332 (quoting *AD/SAT*, 181 F.3d at 233)). All conspirators are jointly and severally liable for all acts undertaken by any co-conspirator in furtherance of the conspiracy. *Tex. Indus. Inc. v. Radcliff Materials, Inc.,* 451 U.S. 630 (1981) (affirming appellate court's entry of judgment for joint and several liability for Sherman Act violations against the defendant-appellants); *In re Nasdaq Mkt.–Makers Antitrust Litig.,* 169 F.R.D. 493, 519 (S.D.N.Y. 1996) ("the antitrust law provides for joint and several liability of co-conspirators"); *New York ex rel. Spitzer v. Feldman*, No. 01 CIV.6691 SAS, 2003 WL 21576518, at *3 (S.D.N.Y. July 10, 2003) (observing "liability for antitrust violations is joint and several," even against unnamed co-conspirators). "[I]t is well established that not all defendants need to

- 27 -

participate in all aspects of a conspiracy." *In re Eur. Gov't Bonds Antitrust Litig.*, No. 19 Civ. 2601 (VM), 2020 WL 4273811, at \*19 (S.D.N.Y. July 23, 2020).

None of the League or Players Association or OneTeam Defendants argues that it has withdrawn from any conspiracies, nor could they: their license agreements with monopoly profit splits are still in effect. Consequently, Defendants remain jointly and severally liable for any and all anticompetitive acts by their co-conspirators. *United States v. Flaharty*, 295 F.3d 182, 192 (2d Cir. 2002) (holding a conspiracy is presumed to continue until the last overt act by any of the co-conspirators and co-conspirator must show affirmative steps to withdraw from the conspiracy); *see also In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig.*, No. 05-MD-1720 (MKB), 2024 WL 1014159, at \*20 & n.29 (E.D.N.Y. Mar. 8, 2024) (noting "[c]ourts routinely draw from case law regarding withdrawal from criminal conspiracies when assessing withdrawal from an antitrust conspiracy" and citing *Smith v. United States*, 568 U.S. 106, 112–13 (2013)). As to each conspiracy, Fanatics and the League and Players Association and OneTeam Defendants are liable for any acts of their co-conspirators in furtherance of the respective conspiracy. *See, e.g.*, *Spitzer*, 2003 WL 21576518, at \*3 (co-conspirators are jointly and severally liable for all damages caused by the conspiracy); *In re Nasdaq,* 169 F.R.D. at 519 (same).

In *Panini*, this Court found that "the 'OneTeam' allegations [of a horizontal-level agreement] suffice to show that there was a conspiracy between the NFLPA, the MLBPA, [OneTeam], and Fanatics to license both players associations' intellectual property on an exclusive basis for twenty years each." *Panini*, at \*9 (citing PAC ¶¶ 112–13); *see* FAC ¶¶ 76–78 (the same factual allegations regarding OneTeam, Fanatics, NFLPA and MLBPA). For the four licensing agreements between Fanatics and each of NFL, MLB, NBA, and NBPA, this Court

found that "the alleged effects of each agreement (considered individually), in the context of their significant durations, the complete market concentration, and the significant market share foreclosed by each individual deal, are sufficiently likely to be anticompetitive to frame a viable Section 1 claim for unreasonable restraint of trade with respect to each of the four remaining deals." *Panini* at *10. Given the allegations supporting Plaintiffs' Counts 1 through 6 are the same as in *Panini*,[7] the Court's analysis here should result in denial of Defendants' motions to dismiss.

### 1. Plaintiffs sufficiently allege market power.

Market power requires a lesser showing than monopoly power, so Plaintiff's allegations of monopoly power, *supra* § IV.A.1.a, suffice to allege market power. *In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig.*, 729 F. Supp. 3d 298, 322 (E.D.N.Y. 2024) ("[M]onopoly power under Section 2 requires 'something greater' than market power under Section 1."). The League and Players Association Defendants argue that Plaintiffs' allegations of market power are insufficient with respect to them. These arguments fail. First, Plaintiffs allege direct evidence of market power—"the power to raise and maintain the price of [Major U.S. Professional Sports Leagues trading cards] at supracompetitive levels profitably without losing substantial sales" (FAC ¶ 140)—that is not dependent on defining a relevant market. *See In re Aggrenox*, 199 F. Supp. 3d at 669 n.4. None of the League or Players Association Defendants offers any argument that Plaintiffs' allegations of direct evidence of market power (higher prices and reduced output, FAC ¶¶ 2, 132–36, 140) are insufficient. This alone is enough to sustain the complaint.

---

[7] *Compare* FAC § X Counts 1 through 6 *with* PAC § VIII Count Three.

But even concerning indirect evidence, the League and Players Association Defendants misunderstand Plaintiffs' allegations of market power and the relevant market. Their arguments are premised on the idea that only the *alternative* market definitions are relevant to them.[8] However, Plaintiffs allege in their primary market definition that Fanatics has market power over the entire market for Trading Cards (and shares the supracompetitive profits with the League and Players Association and OneTeam co-conspirators). FAC ¶ 140. The League and Players Association Defendants do not attack the Plaintiffs' primary definition of the relevant market, and those allegations too are sufficient to sustain the complaint.

Instead, the League and Players Association Defendants limit their attacks to the alternative, single-league markets. Even if the alternative single-league relevant markets were Plaintiffs' *only* allegations of market power, they are properly pled. The League and Players Association Defendants' primary argument against the single-league relevant markets is that single-product markets are improper. MLB Mem. at 18; MLBPA Mem. at 17–18; NBA Mem. at 14–15; NBPA Mem. at 14–15.[9] Numerous cases recognize single-brand markets.[10] Defendants

---

[8] NFL Mem. at 6 ("The NFL has nothing to do with the harm alleged in the MLB Trading Card market, NBA Trading Card market, or 'market for newly issued Major U.S. Professional Sports Leagues trading cards.'"); NFLPA Mem. at 6 (FAC alleges "separate . . . relevant markets for fully licensed MLB, NBA, and NFL trading cards"); MLB Mem. at 17 ("Although Plaintiffs generally discuss a primary market consisting of cards from all three of the accused leagues, their claim against MLB is based on an 'alternative' market."); MLBPI/A Mem. at 16 ("As to MLBPI/A, Plaintiffs have alleged only one relevant market: 'newly issued' and 'fully licensed' MLB Trading Cards."); NBA Mem. at 14 ("Plaintiffs predicate their claim against the NBA on the narrowest possible product market—what they call 'the NBA Trading Card market.'"); NBPA Mem. at 14 ("Plaintiffs improperly allege a single-brand market for NBA Player Trading cards.").

[9] The NFL makes no arguments as to relevant market, instead referencing the NBA and MLB briefs. NFL Mem. at 19. The NFLPA argues only that it does not participate in the relevant market. NFLPA Mem. at 9.

[10] Pharmaceutical generic-delay cases are particularly strong examples of single-product relevant markets. *See, e.g., Geneva*, 386 F.3d at 496–99 (relevant market was limited to generic versions of warfarin sodium, excluding even chemically identical branded version of warfarin sodium); *Andrx Pharms., Inc. v. Elan Corp.*, 421 F.3d 1227, 1235–36 (11th Cir. 2005) (relevant market limited to controlled release naproxen); *La. Wholesale Drug Co. v. Sanofi-Aventis*, No. 07–7343, 2008 WL 169362, at *7 (S.D.N.Y. Jan. 18, 2008) (product market limited to branded and generic versions of Arava was cognizable); *In re Ciprofloxacin Hydrochloride Antitrust Litig.*, 363 F. Supp. 2d 514, 522–23 (E.D.N.Y. 2005) (relevant market limited to drug product ciprofloxacin, not other fluoroquinolone antibiotics); *In re Loestrin 24 Fe Antitrust Litig.*, 261 F. Supp. 3d 307, 327 (D.R.I. 2017) (citing numerous cases for

cite cases for the proposition that "single-brand markets are disfavored," but there are as many cases in the Second Circuit that caution against granting 12(b)(6) dismissal based on relevant market definition due to the factual nature of the inquiry. *See, e.g., Todd*, 275 F.3d at 199–200 ("Because market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market.") (collecting cases).

Further, many of the "single-brand" cases, including the *Spinelli* case cited by multiple Defendants, are distinguishable because they were monopsony cases where the alleged relevant market was limited to one purchaser of services or goods that could have been sold to other purchasers. In *Spinelli*, the plaintiffs were photographer-contractors who licensed their stock photos to the NFL. *Spinelli v. Nat'l Football League*, 96 F. Supp. 3d 81, 113-14 (S.D.N.Y. 2015). When the NFL contracted exclusively with Getty and AP for stock photos, the photographers brought an action that defined the relevant market as the "market for commercial licensing of NFL-related stock photographs." *Id.* at 111. The photographers had no reason to limit themselves to selling stock photos only to the NFL; they could sell photos to any number of other sport organizations. *Id.* at 112.

Similarly, in *Mathias v. Daily News, L.P.*, newspaper carrier contractors sued the *Daily News* when it announced that it would distribute the paper through other means, including directly to subscribers. 152 F. Supp. 2d 465, 469 (S.D.N.Y. 2001). The carrier contractors

---

the proposition that "[t]here is no strict prohibition on defining a relevant market as a single-drug market"); *In re Lorazepam & Clorazepate Antitrust Litig.*, 467 F. Supp. 2d 74, 81–82 (D.D.C. 2006) (relevant markets were limited to generic versions of lorazepam and clorazepate, respectively); *In re Terazosin Hydrochloride Antitrust Litig.*, 352 F. Supp. 2d 1279, 1319 n.40 (S.D. Fla. 2005) (relevant market limited to branded and generic terazosin hydrochloride); *Knoll Pharms. Co. v. Teva Pharms. USA, Inc.*, No. 01–1646, 2001 WL 1001117, at *3–4 (N.D. Ill. Aug. 24, 2001) (product market limited to hydrocodone bitartrate/ibuprofen was cognizable); *In re Cardizem CD Antitrust Litig.*, 105 F. Supp. 2d 618, 680–81 (E.D. Mich. 2000) (approving a product market definition limited to branded and generic versions of Cardizem CD); *Mutual Pharm. Co. v. Hoechst Marion Roussel, Inc.*, No. 96–1409, 1997 WL 805261, at *2–3 (E.D. Pa. Dec. 17, 1997) (relevant market could be limited to Seldane, and exclude Claritin, because of unique formulations and differences in suitability for particular patients).

alleged the relevant market consisted of just the market for the *Daily News*. The Court rejected this single-newspaper market because the plaintiffs failed to account for interchangeable products, including other newspapers sold by those same contractors. *Id.* at 482–83. Other cases cited by Defendants suffer the same flaw of defining the market from the perspective of the *seller* rather than the *purchaser*. *See Mooney v. AXA Advisors, LLC*, 19 F. Supp. 3d 486, 499–500 (S.D.N.Y. 2014) (plaintiff AXA employee argued the relevant market was "labor market for current and former" AXA employees); *Theatre Party Assocs., Inc. v. Shubert Org., Inc.*, 695 F. Supp. 150, 154–55 (S.D.N.Y. 1988) (plaintiff theatre party agent alleged the market was only advance sales of selected tickets to *The Phantom of the Opera*). The allegations here are different—and closer to cases where single-product markets are regularly recognized[11]—because Plaintiffs *have* alleged that, from the point of view of the purchaser, there are no reasonable substitutes. FAC ¶¶ 143, 148–49. Unlike the professional photographers in *Spinelli*, who are indifferent as to whether they sell photographs of, for example, NBA or NCAA basketball, purchasers of Trading Cards *do* care about which cards they purchase. FAC ¶ 143.

Plaintiffs' undisputed allegations of direct evidence and sufficient allegations of indirect evidence of market power satisfy Plaintiffs' burden at the pleading stage.

2. **Plaintiffs plausibly allege that Defendants' licensing agreements foreclose competition in the Trading Card market at least a decade.**

Applying the rule of reason, courts consider whether the challenged arrangement forecloses competition and the duration of that foreclosure. *Geneva*, 386 F.3d at 509–10 (analyzing whether exclusive dealing arrangement totally foreclosed competition and the length of the foreclosure). Plaintiffs allege that the challenged license agreements entirely foreclosed

---

[11] See note 10, *supra*.

competition in the Trading Card market for at least a decade. FAC ¶ 10. Plaintiffs allege that Fanatics and each of the League and Players Association Defendants entered into partnerships as co-conspirators with their behind--closed-doors licenses. *Id.* ¶ 8 (describing prior process to award licenses and their term lengths), *id.* ¶ 10 (describing Defendants' unique licenses award and terms); *see also id.* ¶¶ 153–63 (MLB license allegations); *id.* ¶¶ 76–78, 164–74 (MLBPA license allegations, including Defendant OneTeam), *id.* ¶¶ 175–84 (NFL license allegations); *id.* ¶¶ 76–78, 185–95 (NFLPA license allegations, including Defendant OneTeam); *id.* ¶¶ 196–206 (NBA license allegations); *id.* ¶¶ 207–17) (NBPA license allegations). Those partnerships were formalized with the anticompetitive exclusive licenses that, combined, gave Fanatics complete control of the market for Trading Cards in exchange for shares of the monopoly profits. *Id.* ¶¶ 10, 75, 159, 170, 180, 191, 202, 213, 227, 239.

Weighing the same factual allegations in *Panini*, this Court found sufficient Panini's allegations that the vertical licensing agreements between Fanatics and the League and Players Association and OneTeam Defendants, and the horizontal conspiracy involving MLBPA, NFLPA, and OneTeam, foreclosed the entire Trading Card market for at least ten years and two-thirds of the market for twenty years. *Panini,* at *9-10; *see also id.* at *2 ("Fanatics will tie up <u>100%</u> of the Relevant Market for <u>at least</u> a decade [which] dramatically decreases the likelihood of any sufficiently procompetitive justification for the deals."). This Court noted the "numerous allegations that the licensors themselves have not historically demanded exclusive deals, and, indeed, that several have recently engaged in nonexclusive deals with Panini, Fanatics, and Topps alike." *Id.* at *8. "[C]onsidering the complete market foreclosure, the unprecedented and significant duration of the deals, and the high barriers this monopoly may create for future competitors to enter the industry," Panini's allegations are plausible that "by

- 33 -

soliciting and entering into these deals, Fanatics engaged in anticompetitive conduct." *Id.* As noted in *Panini*, a single card manufacturer secured exclusive licenses across *all* six major professional sports licensors and cornered the Trading Cards market entirely for at least 10 years. *Id.* at *7. Identical factual allegations yield the same result here.

Plaintiffs allege that the shift from the open bidding among competitors for short term licenses to the "back room," long-term exclusive licenses with Fanatics splitting its monopoly profits with each licensor was the means to establish conspiracies to restrain trade. *See, e,g,*, FAC ¶¶ 8, 10, 19. This Court in *Panini* found that the allegations of separate conspiracies for each league market was plausible and accordingly denied Fanatics' motion to dismiss. *Panini*, at *10. Regarding the NFLPA and MLBPA licenses, "First, the 'OneTeam' allegations suffice to show that there was a conspiracy between the NFLPA, the MLBPA, and Fanatics to license both players associations' intellectual property on an exclusive basis for twenty years each." *Id.* at *9. The League and Players Association Defendants have argued that their individual licenses do not have an impact on competition, but this Court has already considered that argument and found "the alleged effects of each agreement (*considered individually*), in the context of their significant durations, the complete market concentration, and the significant market share foreclosed by each individual deal, are sufficiently likely to be anticompetitive to frame a viable Section 1 claim for unreasonable restraint of trade with respect to each of the four remaining deals." *Id.* at *10 (emphasis added).

Prior to Fanatics' entry, trading card manufacturers participated in open bidding for limited term exclusive licenses and no one manufacturer held a monopoly on the three major league sports. FAC ¶ 10. This manufacturer structure was in line with the potential competitive nature of exclusive licensing agreements as described by the *Spinelli* court. *Spinelli*, 96 F. Supp.

3d at 117; *see also Balaklaw v. Lovell*, 14 F.3d 793, 796 (2d Cir. 1994) (holding the challenged

license was not anticompetitive where it was result of an open bidding process that included

committee review of the bids and interviews of applicants, and the license had an initial term of

three years and a clause for termination without cause by either party upon six-months' notice).

Defendants have upturned that competitive licensing structure with the award of long-term

exclusive licenses absent open bidding and with inclusion of equity stakes so each licensing

partner shares in the monopoly profits. FAC ¶¶ 10, 75. In a *Wall Street Journal* article, the

reporters described OneTeam: "Before the deal that shook the trading card industry, the NFL and

MLB players unions set the stage for change by pooling their market rights in a venture called

OneTeam Partners." Diamond & Beaton, *The Player-Led Venture that Turned Trading Cards

Upside Down*, WALL ST. J. (Oct. 6, 2021), (reporting "The MLBPA, NFLPA and OneTeam

also all own equity in Fanatics Trading Cards, which recently raised money at a $10.4 billion

valuation"). Plaintiffs plausibly allege that the license agreements with extraordinary duration

and consolidation have reduced output and foreclosed competition, and thereby artificially

inflated prices for Trading Cards. FAC ¶¶ 2, 10–21.

The duration of the license terms of ten to twenty years supports the Plaintiffs'

allegations that Defendants intended these licenses to foreclose competition in the market for a

prolonged period. *See Geneva*, 386 F.3d at 509-10 (distinguishing between a "transitory

advantage [that] does not significantly harm competition" and a duration that is a "substantial

impediment to competition"); FAC ¶¶ 153–217 (allegations concerning each of the challenged

licenses). None of the challenged licenses resulted from an open competitive bidding process.

FAC ¶¶ 8, 10. The Second Circuit in *Geneva* held that plaintiff's allegation of a 15-month

exclusivity period was sufficient to meet their burden of showing the "effects of [defendant's]

advantage was substantial and that competition was impaired." 386 F.3d at 501; *see also ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 287 (3d Cir. 2012) ("'The significance of any particular contract duration is a function of both the number of contracts and market share covered by the exclusive-dealing contracts.'") (quoting Phillip Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 1802g, at 98 (2d ed. 2002)). Plaintiffs here sufficiently allege that the challenged licenses are anticompetitive by foreclosing competition for Trading Cards for at least a decade. *See, e.g.*, FAC ¶¶ 8, 10, 19.

> ### 3.      Plaintiffs sufficiently allege Defendants' licenses have negatively impacted consumers.

When assessing challenged conduct, courts consider the impact on consumers. *See Leegin*, 551 U.S. at 886 (explaining that under the rule of reason, courts should consider effects that are harmful to the consumer); *Panini*, at *9 (same). Plaintiffs allege that as purchasers of Trading Cards they have been injured by Defendants' licenses by, *inter alia*, paying higher prices for Trading Cards and having fewer Trading Card sellers (which reduces output). FAC ¶¶ 2, 10, 21, 139, 163, 174, 184, 195, 206, 217, 229, 241. In *Panini*, this Court considered whether "entry into those deals itself constitutes anticompetitive conduct" and concluded that "by soliciting and entering into these deals, Fanatics engaged in anticompetitive conduct." *Panini*, at *8. Each League and Players Association Defendant and OneTeam entered into or facilitated an anticompetitive agreement, each is sharing in the resulting monopoly profits that they generate, and each is liable. *Spitzer*, 2003 WL 21576518, at *3 (finding joint and several liability is imposed against all anti-trust co-conspirators).

This Court found that Panini had plausibly alleged "the likely future effects of these particular restraints in the context of the actual market structure" to be anticompetitive. *Panini*, at *10. Plaintiffs have plausibly alleged that they suffered injury by paying overcharges when they

purchased Trading Cards directly from Fanatics entities. FAC ¶¶ 163, 174, 184, 195, 206, 217.

And all co-conspirators are jointly and severally liable for all damages from antitrust violations

of Section 1 of the Sherman Act. *See In re Nasdaq*, 169 F.R.D. at 519 ("Liability for antitrust

violations is joint and several. Each Class member may therefore recover his or her full loss from

any defendant who can be shown to have participated in the alleged conspiracy.") (citing *inter*

*alia Tex. Indus.*, 451 U.S. at 635).  In *Pa*nini, Fanatics argued that consumers are in a better

position than Panini to seek recovery for their injury. Fanatics claimed that Panini's injuries were

speculative because Fanatics might someday "(a) raise prices for trading cards, (b) reduce outlets

to buy trading cards, and (c) lower card quality." Mem. in Supp. of Defs.' Mot. to Dismiss at 27,

*Panini Am., Inc. v. Fanatics, Inc.*, 1:23-cv-09714-LTS-VF (S.D.N.Y. Dec. 8, 2023), ECF No.

100. Plaintiffs allege precisely that. Plaintiffs have alleged, those price increases have been

realized, and Plaintiffs seek overcharge damages—the prototypical antitrust injury. FAC

¶¶ 17-18 & figures. *See US Airways, Inc. v. Sabre Holdings Corp.*, 105 F. Supp. 3d 265, 285

(S.D.N.Y. 2015) ("Overcharge claims fall squarely within the Sherman Act's purpose—'to

assure customers the benefits of price competition.'") (quoting *Associated Gen. Contractors, Inc.*

*v. Cal. State Council of Carpenters*, 459 U.S. 519, 538 (1983))*.* Plaintiffs have made purchases

of Trading Cards during the proposed class period and have suffered injury. FAC ¶¶ 29-34; *see*

*also* Decl. of Charles Kopel in Opp. to Defs.' Mots. to Dismiss and to Compel Arbitration, Ex. 1

¶ 2 (declaration of Robert Scaturo describing Trading Card purchases), Ex. 2 ¶ 2 (declaration of

Joseph Davidov describing Trading Card purchases), Ex. 3 ¶¶ 2-4 (declaration of Steven

Mardakhaev describing Trading Card purchases, Ex. 4 ¶¶ 2-3 (declaration of Jonathan Madar

describing Trading Card purchases), and Ex. 5 ¶¶ 2-7 (declaration of Scott Bubnick describing

Trading Card purchases).

MLB urges the application of a higher evidentiary standard from *Ohio v. Am. Express Co.*, 585 U.S. 529 (2018), in which the Supreme Court was reviewing the evidence presented at a bench trial. MLB argues that plaintiffs have failed to show harm to consumers without "a showing of *actual* adverse effect on competition market-wide[.]" MLB Mem. at 19-20 (emphasis added). But at the pleading stage, Plaintiffs have alleged "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. 570. Plaintiffs have alleged harm in the increased cost of Trading Cards and reduced output. FAC ¶¶ 107-08 & figures; *see also supra* § IV.A.1.a (discussing market power, the price increases of Trading Cards, and impact of the license agreements on the market). That fewer competitors lead to higher prices is not a novel concept, despite Defendants' protestations. *PepsiCo*, 315 F.3d at 107–08 ("The more competition a company faces, the less it can control prices because competitors will undercut its prices to secure market share. Conversely, a company that can exclude competition can sustain its ability to control prices and thereby maintain its market power."); *Xerox Corp. v. Media Scis. Int'l, Inc.*, 511 F. Supp. 2d 372, 381–82 (S.D.N.Y. 2007) ("One of two producers in the market will have been driven out and no competitors will be able to enter, offering consumers fewer choices and potentially higher prices.").

Defendants argue there cannot be an impact on consumers regarding the purchase of NBA and NFL cards because Fanatics' exclusive licenses do not go into effect until October 2025 and April 2026, respectively, and that Plaintiffs have only purchased MLB Trading Cards.[12] But Plaintiffs allege injury by paying overcharges on Trading Cards throughout the Class Period. FAC ¶ 56. The FAC defines the Class to include "[a]ll persons or entities in the United States that purchased MLB Trading Cards, NFL Trading Cards, _**or**_ NBA Trading Cards

---

[12] NFLPA Mem. at 13; NFL Mem. at 13 (no case cites); NBA Mem. at 7-10; NBPA Mem. at 16-17.

directly from one of the Defendants during the period beginning January 1, 2022 until such time as the anticompetitive conduct alleged herein ceases (the "Class Period")." *Id.* (emphasis added). Thus, the Class includes direct purchasers who paid overcharges on MLB, NFL, *or* NBA Trading Cards. *See In re Nexium Antitrust Litig.*, 777 F.3d 9, 27 (1st Cir. 2015) ("'Paying an overcharge caused by the alleged anticompetitive conduct on a single purchase suffices to show—as a legal and factual matter—impact or fact of damage.'") (quoting Joshua P. Davis & Eric L. Cramer, Antitrust, Class Certification, and the Politics of Procedure, 17 Geo. Mason L. Rev. 969, 984-85 (2010)); *In re Static Random Access (SRAM) Antitrust Litig.*, No. 07-cv-01819, 2008 WL 4447592, at *3 (N.D. Cal. Sept. 29, 2008); *In re Flat Glass Antitrust Litig.*, 191 F.R.D. 472, 480 (W.D. Pa. 1999). Here, *each* plaintiff *already* has been injured on *some* purchase, which is all that is necessary. *See Sullivan v. UBS AG*, 149 F.4th 206, 225 (2d Cir. 2025) (holding when a class is defined to include purchasers of multiple products affected by an anticompetitive conspiracy, a purchaser of one product has suffered a similar enough injury to purchasers of any product, and it therefore has the correct incentives for class standing). For the only licenses not yet in effect (the NFL licenses), Plaintiffs allege that Fanatics already is leveraging its power and increasing prices of other cards (thereby raising the reference price level), no competitors can enter the market, and higher prices necessarily follow. FAC ¶¶ 17, 18, 20, 21, 135, 139. *See also PepsiCo*, 315 F.3d at 107–08; *Xerox*, 511 F. Supp. 2d at 381–82.

Plaintiffs are not required at the pleading stage to provide a detailed damages model to account for their injury. Plaintiffs are required to show that their theory of injury is not highly speculative, and, after discovery, to have a methodology to calculate a reasonable estimate of damages. *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 265-66 (1946) (holding "a just and reasonable estimate of damages based on relevant data" is appropriate when "the defendant by

his own wrong has prevented a more precise computation" based on the "ancient" principle that "the wrongdoer shall bear the risk of the uncertainty which his own wrong has created"); *Bell Semiconductor, LLC v. Broadcom Corp.*, No. 24-CV-156 (ER), 2024 WL 5118494, at *7 (S.D.N.Y. Dec. 16, 2024) ("Bell is not required to calculate damages at the pleadings stage. To sufficiently plead damages, a plaintiff need only 'allege facts from which damages can be properly inferred.' Here, Bell must allege facts from which direct damages can be properly inferred, but it does not need to prove that its damages are readily calculable at this stage."). Plaintiffs here allege Trading Card prices already have been inflated, a factual allegation this Court recognized as plausible. *Panini*, at *6 ("Panini has adequately pleaded facts supporting a plausible inference that Fanatics currently possesses monopoly power as demonstrated through its ability to set prices and exclude competitors.").

### 4. Defendants' procompetitive justifications are not weighed on a motion to dismiss, and would fail even if they were.

 "[A]ny procompetitive justification for [alleged anticompetitive conduct] is not appropriately weighed on a motion to dismiss." *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187, 239 (S.D.N.Y. 2019) ("[T]o survive a motion to dismiss [plaintiffs] must plead plausible allegations that, if true, would show such an adverse effect [on competition]; . . . Defendant will later have the opportunity to show the procompetitive effects of the agreements.").

Although Fanatics and MLBPA assert the prior Trading Card structure was "stagnant" and Fanatics offered innovation, Fanatics Mem. at 4, MLBPA Mem. at 3-4, this assertion runs counter to the generally accepted precept that a competitive market will encourage innovation and keep prices lower due to competition between market participants. *See, e.g., PepsiCo.*, 315 F.3d at 108 ("exclud[ing] competition can . . . control prices"); *Xerox*, 511 F. Supp. 2d at 381

(fewer competitors "offer[] consumers fewer choices and potentially higher prices"); *United States v. Microsoft Corp.*, 84 F. Supp. 2d 9, 112 (D.D.C. 1999) ("The ultimate result [of monopoly] is that some innovations that would truly benefit consumers never occur for the sole reason that they do not coincide with [the monopolist's] self-interest."); *United States v. Bethlehem Steel Corp*, 168 F. Supp. 576, 588 n.25 (S.D.N.Y. 1958) (reducing competition removes "the incentive . . . to innovate and achieve greater efficiency and output at reduced prices"). Fanatics' acquisition of one competitor, its employee raiding of another, and acquisition of the competition's card manufacturer all undermine the assertion that Fanatics offered innovation. *See, e.g.*, FAC ¶¶ 11-13.

Defendants offer varying explanations for their lengthy exclusive licensing agreements that share a rationale of self-interest, rather than an anticompetitive conspiracy, as an alternative explanation for their common behavior.[13] But "[p]lausibility is a standard lower than probability, [and] a given set of actions may well be subject to diverging interpretations, each of which is plausible." *Anderson News*, 680 F.3d at 184. As the Second Circuit has affirmed, "[t]he choice between two plausible inferences that may be drawn from factual allegations is not a choice to be made by the court on a Rule 12(b)(6) motion." *Id*. at 185. [14] Thus, "although an innocuous

---

[13] *See, e.g.*, NFL Mem. at 9-10; NBA Mem. at 17-19.

[14] *See also Miami Prods. & Chem. Co. v. Olin Corp.*, 449 F. Supp. 3d 136, 157 (W.D.N.Y. 2020) ("Skepticism of a conspiracy's existence is insufficient to warrant dismissal; 'a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely.'") (quoting *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 782 (2d Cir. 2016)); *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 425 (4th Cir. 2022) ("[I]t is not our task at the motion-to-dismiss stage to determine 'whether a lawful alternative explanation appear[s] more likely' from the facts of the complaint. Post-*Twombly* appellate courts have often been called upon to correct district courts that mistakenly engaged in this sort of premature weighing exercise in antitrust cases.") (citations omitted). Accordingly, NFL's reliance on *In re EpiPen*, for its consideration of procompetitive benefits is misplaced. NFL Mem. at 7 (citing *In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*, 44 F.4th 959, 983-84 (10th Cir. 2022)). Reviewing summary judgment for the defendant, the Tenth Circuit weighed the factual evidence and affirmed in part because the challenged agreements were of short duration—2 ½ years—and had no-cause termination provisions. *In re EpiPen*, F.4th at 964, 988-89 ("[i]t is axiomatic that short, easily terminable exclusive agreements are of little antitrust concern"). The pre-discovery factual allegations here in no way resemble the evidence considered by the Tenth Circuit.

OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS
Case No. 25-CV-2202-LTS-VF

interpretation of the defendants' conduct may be plausible," it "is not the province of the court to dismiss the complaint on the basis of the court's choice among plausible alternatives." *Id.* at 190; *Sony BMG*, 592 F.3d at 322-24.

5.    **None of Defendants' arguments undermines the plausibility of Plaintiffs' Section 1 allegations.**

a.    **Conspiracy in Restraint of Trade against Fanatics and MLB (Count 1).**

Under the rule of reason, MLB's exclusive license with Fanatics is an anticompetitive restraint of trade and as co-conspirator, MLB is liable for the actions of its fellow co-conspirators. *See supra* § IV.B.1-4. Without citing any legal authority, MLB asserts that "an otherwise lawful business transaction" cannot be "transformed" into an antitrust violation by simply labeling MLB as a "co-conspirator" to the alleged subsequent actions taken by co-conspirators. MLB Mem. at 17 (emphasizing the allegations regarding Fanatics' conduct). This argument ignores the principle of co-conspirator liability. Under co-conspirator liability, MLB is jointly and severally liable for the anticompetitive effects of its license as well as any actions taken by Fanatics to advance that conspiracy. "[I]t is well established that not all defendants need to participate in all aspects of a conspiracy." *In re Eur. Gov't Bonds*, 2020 WL 4273811, at *19; *see also Spitzer*, 2003 WL 21576518, at *3 (agreeing "liability for antitrust violations is joint and several" for all co-conspirators). MLB's argument also disregards that "'a monopolist is [also] not free to take certain actions that a company in a competitive (or even oligopolistic) market may take.'" *In re Payment Card*, 729 F. Supp. 3d at 331 (quoting *LePage's Inc. v. 3M*, 324 F.3d 141, 151–52 (3d Cir. 2003)). Even if MLB's license would be "otherwise lawful"—a disputed fact—it is not lawful here, given the surrounding context, as this Court has already found. *Panini*, at *10; *see also Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 274–75 (2d Cir. 1979) (explaining that "many anticompetitive actions are possible or effective

only if taken by a firm that dominates its smaller rivals" and that certain "conduct is illegal when taken by a monopolist because it tends to destroy competition, although in the hands of a smaller market participant it might be considered harmless").

> **b.    Conspiracy in Restraint of Trade against Fanatics, OneTeam, and MLBPA (Count 2).**

MLBPA and OneTeam argue that Plaintiffs' allegations of a horizontal and vertical conspiracy involving them are insufficient. MLBPA Mem. at 13-15; OneTeam Mem. at 6-7.[15] This Court considered this issue and found the "'OneTeam' allegations suffice to show that there was a conspiracy between the NFLPA, the MLBPA, [OneTeam], and Fanatics to license both players associations' intellectual property on an exclusive basis for twenty years each." *Panini*, at *9. This Court described the impact on competition: "two licensing deals alone would give Fanatics exclusive control over one-third of the licenses making up the Relevant Market for two decades." *Id.* (further finding "the exclusive licensing of the NFLPA and MLBPA licenses also precludes the effective utilization of any IP licensed from either the NFL or the MLB, effectively precluding competitor manufacturers of trading cards from accessing two-thirds of the Relevant Market for that period.").

---

[15] The conspiracy is horizontal as between OneTeam, MLBPA, and NFLPA, and vertical as between that group and Fanatics. Horizontal agreements, such as those between competitors are typically deemed *per se* unlawful while vertical agreements are subject to the rule of reason analysis. *Leegin*, 551 U.S. at 885-86 ("The rule of reason is the accepted standard for testing whether a practice restrains trade in violation of § 1."). Plaintiffs here satisfy the more stringent rule of reason standard as this Court ruled in *Panini*. *Panini*, at *9-10. So Plaintiffs' FAC survives the motions to dismiss. This Court does not need to decide the *per se* issue now, which is preserved until discovery's conclusion. *See Arrington v. Burger King Corp.*, No. 1:18-cv-24128-JEM, ECF No. 111 at 5 (S.D. Fla. April 9, 2025) (denying motion to dismiss because "whether the *per se*, rule of reason, or quick look approach applies is undoubtedly a question of law, it is a question that 'is predicated on a *factual inquiry* into the restraint's competitive effect'") (quoting *Nat'l Bancard Corp. v. VISA U.S.A., Inc.*, 779 F.2d 592, 596 (11th Cir. 1986); *In re Juul Labs, Inc., Antitrust Litig.*, 555 F. Supp. 3d 932, 961-62 (N.D. Cal. 2021) (denying motion to dismiss because whether to apply *per se* or rule of reason analysis is "heavily fact dependent and cannot be resolved on the pleadings"); *In re Delta Dental Antitrust Litig.*, 484 F. Supp. 3d 627, 635 (N.D. Ill. 2020) (denying motion to dismiss "[p]rior to any factual development" as to whether the challenged market allocation arrangement was *per se* unlawful). Plaintiffs have addressed MLBPA's arguments regarding the relevant market, MLBPA Mem. at 16--19, *supra* § IV.B.1.

Despite *Panini*'s clear analysis and findings,[16] MLBPA argues that Plaintiffs' "bald" allegations regarding OneTeam's involvement in the Fanatics-MLBPA license are too conclusory to support the conspiracy claim against MLBPA because OneTeam is not a party to the MLBPA license. MLBPA Mem. at 14-15. OneTeam submitted as an exhibit to its memorandum of law *The Wall Street Journal* article reporting "[b]efore the deal that shook the trading-card industry, the NFL and MLB players unions set the stage for change by pooling their marketing rights in a venture called OneTeam Partners." Diamond & Beaton, *The Player-Led Venture that Turned Trading Cards Upside Down*, WALL ST. J. (Oct. 6, 2021); *see also* FAC ¶¶ 76, 78 (citing multiple statements from the article). This article supports the plausibility of Plaintiffs' allegations about OneTeam's involvement in the anticompetitive scheme in multiple ways: (1) "[w]hen the unions representing MLB, NFL and National Basketball Association players struck an exclusive agreement with a new company controlled by online sports-merchandise retailer Fanatics Inc., the flurry of deals upended the trading card world"; (2) [the licensing deals] "*never would have happened*" if MLBPA and NLFPA "hadn't *joined forces to create OneTeam*"; and (3) "MLBPA, NFLPA and OneTeam also all own equity in Fanatics Trading Cards, which recently raised money at a $10.4 billion valuation." *Id.* (emphases added). Plaintiffs allege that "OneTeam was a key part to MLBPA entering into its exclusive deal with

---

[16] OneTeam attempts to evade this Court's finding of a plausible allegation of a conspiracy between OneTeam, Fanatics and MLBPA by asserting that the Court's cited cases support OneTeam's position. OneTeam Mem. at 11-13. OneTeam asserts "at most, [OneTeam's] position is closer to one of the individual fraternities" in *Balfour*, *id.*, at 12, but in fact it is the individual major league players who are in a similar position to the individual fraternities. *L. G. Balfour Co. v. FTC*, 442 F.2d 1, 15 (7th Cir. 1971). OneTeam distinguishes *1-800 Contacts* and *United Shoe* as addressing horizontal agreements and vertical leasing terms, respectively, rather than the vertical exclusive licenses challenged here, OneTeam Mem. at 12-13, but the common point of *1-800 Contacts*, *Balfour* and *United Shoe* remains that antitrust law does apply to intellectual property licenses. *1-800 Contacts, Inc. v. FTC*, 1 F.4th 102, 113 (2d Cir. 2021) ("But the mere fact that an agreement implicates intellectual property rights does not 'immunize [an] agreement from antitrust attack.'"); *Balfour*, 442 F.2d at 15 ("[N]one of the cases cited by [defendants] stands for the proposition that the accumulation of patents or copyrights may never constitute a violation of the antitrust laws."); *United States v. United Shoe Machinery Corp.*, 110 F. Supp. 295, 297 (D. Mass. 1953) (finding a company's policies with respect to leasing its machinery to be a Section 2 violation).

Fanatics. MLBPA's stake in OneTeam is especially important to MLBPA because it had 'the ability to affect [the 2021-22 contract] negotiations [with MLB] because the players are now buoyed by additional, independent financial means.'" *Id.* ¶ 78. MLBPA argues that the fact that OneTeam was not a party to MLBPA's licensing deal with Fanatics means that OneTeam was not part of the conspiracy, MLBPA Mem. at 14.[17] But OneTeam need not be a party to MLBPA's license with Fanatics to still be an "instrumental" co-conspirator facilitating the deal—a deal that "never would have happened [MLBPA Executive Director Tony] Clark and [NLFPA Executive Director DeMaurice] Smith say, if their organizations had not joined forces to create OneTeam[.]" FAC ¶ 76 (quoting the *Wall Street Journal* article). MLBPA also misstates the record, arguing that "Plaintiffs implicitly acknowledge the truth—OneTeam had no involvement in MLBPI/A's agreement with Fanatics." MLBPA Mem. at 14. Plaintiffs acknowledge no such thing, and the FAC makes clear that OneTeam was "instrumental" and "a key part" in the MLBPA deal that "never would have happened" without OneTeam. FAC ¶¶ 76, 78. And of course, regardless of whether OneTeam was "instrumental" and "a key part" in the MLBPA deal—as alleged, which must be accepted as true at this stage—the agreement between MLBPA and Fanatics is anticompetitive on its own, just like the vertical licenses between the other Leagues and Player Associations and Fanatics. *Panini*, at * 9-10.

The cases cited by MLBPA and OneTeam on this point are inapposite. MLBPA Mem. at 15 (citing *Cinema Vill. Cinemart, Inc. v. Regal Ent. Grp.*, 2016 WL 5719790, at *3 (S.D.N.Y. Sept. 29, 2016) and *Bookhouse of Stuyvesant Plaza, Inc. v. Amazon.com, Inc*., 985 F. Supp. 2d 612, 618 (S.D.N.Y. 2013); *see also* OneTeam Mem. at 4, 6-7 (describing the allegations as

---

[17] In *Panini*, the plaintiffs alleged that OneTeam was a party to MLBPA's licensing deal with Fanatics. PAC ¶¶ 112-13. Plaintiffs here do not make that allegation, and that is the only substantive difference between the allegations here and in *Panini*. But that does not change the outcome because, as discussed above, Plaintiffs here do allege that OneTeam was an "instrumental" and "key part" of the deal getting done. FAC ¶¶ 76, 78.

"threadbare"). The *Cinema* court dismissed the Section 1 claims because none of plaintiff's "allegations . . . plausibly suggests the existence of such agreements." 2016 WL 5719790, at *3-4; *see also Bookhouse*, 985 F. Supp. 2d at 618 (dismissing Section 1 claim when plaintiffs did "not allege an unlawful agreement"). Here, in contrast, the allegations explicitly describe the existence of anticompetitive agreements, FAC ¶¶ 2, 10, 71 (describing Fanatics' announcement of the League and Players Association exclusive licenses), and no Defendant contests the existence of, nor the alleged anticompetitive terms of, the agreements.

MLBPA asserts that its license is "routine and lawful." MLBPA Mem. at 19-20. But as discussed *supra* § IV.B.2, MLBPA's license differs from the past licenses by its lack of competitive bidding, term length, and monopoly profit-sharing. None of the cases cited by MLBPA stands for the proposition that similar licenses are immune from antitrust review. In *E & L Consulting, Ltd. v. Doman Industries Ltd.*, 472 F.3d 23, 31 (2d Cir. 2006), the Second Circuit reviewed a "run-of-the-mill exclusive distributorship controversy, where a former exclusive distributor is attempting to protect its competitive position vis a vis its supplier." The Second Circuit observed, "[t]o be sure, we have never held that all exclusive arrangements are reasonable as a matter of law." *Id.* at 30. *See also Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 76 (3d Cir. 2010) ("On the other hand, we agree with [plaintiff] that such exclusive agreements are not exempt from antitrust scrutiny.").[18]

---

[18] MLBPA relies on other readily distinguishable from the facts presented here. In *Re-Alco Industries, Inc. v. National Center for Health Education, Inc.*, 812 F. Supp. 387, 391–92 (S.D.N.Y. 1993), while the court did state that a manufacture has a monopoly on the sale of its own products, the court's prior analysis was focused on the plaintiff's alleged relevant market. The *Re-Alco* plaintiff limited the relevant market to defendant's copyrighted health education materials without explanation of why the market did not include all health education materials for elementary schools. *Id.* ("Plaintiff's Amended Complaint fails to discuss the existence or nonexistence of other health education materials and any relevant differences in demand, and therefore fails to state a claim."). In *Fleer Corp. v. Topps Chewing Gum, Inc.*, the Third Circuit acknowledged that the antitrust claims regarding MLBPA's licenses *were* cognizable under Sections 1 and 2 and properly analyzed under the rule of reason, but disagreed with the lower court that the competitor's claims had been proven. 658 F.2d 139, 140-41 (3d Cir. 1981) (reviewing and

MLBPA is wrong when it asserts it has merely exchanged one exclusive licensee for another and there can be no harm where "nothing about the market has changed." MLBPA Mem. at 22 (citing *Balaklaw*, 14 F.3d at 798). The license and its negotiation differed significantly from the past license and as a result the Trading Card market has changed. MLBPA negotiated terms in a no-bid process that gave Fanatics a lengthy term of exclusivity in exchange for a share of the resulting monopoly profits.

MLPBA's cases do not support its argument. Reviewing the district court's grant of summary judgment, the Second Circuit in *Balaklaw* considered the appellant—anesthesiologist's antitrust claim alleging that the exclusive contract between the hospital and a group of anesthesiologists was a "group boycott" and unreasonable restraint of trade. 14 F.3d at 796. The Second Circuit noted that, unlike here, the challenged contract was the result of an open bidding process, was awarded after committee review and interviews, *id.*, at 796, and had an initial term of three years, but either party could terminate the contract without cause upon six-months' notice. *Id.* at 799. The Second Circuit agreed with the district court that the appellant's "claimed injury came as a result of his losing out in the competition for an exclusive anesthesiology contract at CMH, and nothing more." *Id.* at 798. If anything, *Balaklaw*'s analysis supports Plaintiffs' allegations that MLBPA's license is anticompetitive.

---

reversing the lower court's judgment for the plaintiff). MLBPA's other two cases are not antitrust cases. In *Idaho Potato Commission v. M & M Produce Farm & Sales*, 335 F.3d 130, 138 (2d Cir. 2003), the Second Circuit considered the rights of a trademark holder to license a trademark in comparison to a certification mark in a counterfeiting suit. In *Haelan Laboratories, Inc. v. Topps Chewing Gum, Inc.*, 202 F.2d 866 (2d Cir. 1953), the Second Circuit reviewed the trial judge's verdict of a breach of contract concerning a player's right of publicity under New York law.

c.    **Conspiracy in Restraint of Trade against Fanatics and NFL (Count 3).**

NFL makes similar arguments and relies on many of the same cases as MLBPA regarding the "presumptive legality" of vertical license agreements, NFL Mem. at 7-9 which have been addressed *supra* §§ IV.B.2 and 5.b.[19] NFL asserts that it has substituted one licensee for another and nothing has changed from the consumer' point of view, NFL Mem. at 17-18. As discussed in *supra* §§ IV.B.2-3 & 5.b, the licenses have substantively changed from Panini to Fanatics.[20] NFL argues that its license considered individually is not anticompetitive, notwithstanding the twenty-year term and monopoly profit split. NFL Mem. at 9-12. Courts consider the agreement terms and their effects as well as the other anticompetitive acts. *In re*

---

[19] The license in question in *American Needle* is more analogous to those presented here than NFL's reliance upon dicta in *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128 (1998). Unlike *American Needle* in which the Court considered an intellectual property license, *Discon* involved a supplier of telephone equipment removal services who claimed an antitrust violation against the purchasing agent, buyer, and others when the purchasing agent decided to switch its purchases to supplier's competitor. *Id.* at 131-32. The Court's limited holding was that a *per se* group boycott analysis did not apply to the claim. *Id.* at 135. *See also supra* n.18 (distinguishing *Idaho Potato*, 335 F.3d 130 (2d Cir. 2003); *Re-Alco*, 812 F. Supp. 387 (S.D.N.Y. 1993); and *Fleer Corp.*, 658 F.2d 139 (3d Cir. 1981)). NFL's other cases are also inapposite. *Valley Prods. Co. v. Landmark*, 877 F. Supp. 1087, 1090 (W.D. Tenn. 1994) (challenged agreements were *non*-exclusive licenses with 60-day termination notice) *Yagoozon, Inc. v. Kids Fly Safe*, No. 14–40, 2014 WL 3109797, at *9 (D.R.I. 2014) (finding plaintiff's complaint " describes a market characterized by vibrant intrabrand competition, where consumers can buy CARES from a wide array of sellers just through the Amazon.com website"); *Sheet Metal Duct, Inc. v. Lindab, Inc.*, No. 99–6299, 2000 WL 987865, at *6 (E.D. Pa. July 18, 2000) (analyzing the agreement strictly through patent law because "the actions defendants allegedly did here are exactly of the type allowed to a patent holder"); *Casey's Distrib., Inc. v. NFL*, No. 22-3934, 2025 WL 1928544, at *2, 4 (S.D.N.Y. July 14, 2025) (where plaintiff challenged policy that only approved retailers could sell licensed goods on third party online marketplaces, court finds no harm to competition and no antitrust injury).

[20] As this Court noted, "there is no *in pari delicto* defense under the Sherman Act." *Panini*, at *8 n.11 (citing *Perma Life Mufflers, Inc. v. Int'l Parts Corp.*, 392 U.S. 134, 140 (1968)). Because of the significant differences between the licenses with Fanatics and Panini, NFL's cited cases do not support its position and are not factually analogous. *Balaklaw*, 14 F.3d at 796 (three-year license with six-month no-cause termination clause and awarded by open bid and after committee review); *Coffey v. Healthtrust, Inc.*, 955 F.2d 1388, 1393 (10th Cir. 1992) (affirming dismissal of Section 1 claim where plaintiff failed to show competitive harm when defendant hospital changed its contract from plaintiff radiology practice to another radiology practice when plaintiff began competing with defendant for some services); *Brunswick Corp. v. Riegel Textile Corp.*, 752 F.2d 261, 266-67 (7th Cir. 1984) (considering competitor's antitrust claims based upon alleged fraud on the patent office and discussing the monopoly rights of a patent holder in the context of competitors); *Oxford Glob. Res., Inc. v. Weekley-Cessnun*, No. 3:04-CV-0330-N, 2004 WL 2599898, at *2-3 (N.D. Tex. Nov. 12, 2004) (finding plaintiff failed to allege Section 2 where plaintiff staffing firm accuses defendant staffing firm of predatorily hiring its employees in violation of Section 2 without plausible allegations of intent to harm plaintiff or defendant had dangerous probability to monopolize any market); *Alpern v. Cavarocchi*, No. 98-3105, 1999 WL 257695, at *6 (E.D. Pa. 1999) (finding plaintiff-physician had not sufficiently alleged an antitrust injury to give rise to standing where "what was one practice (Cavarocchi's) with three doctors became two practices (Cavarocchi's and Alpern and Erdelyan's) with three or more doctors").

- 48 -

*Commodity Exch., Inc., Gold Futures & Options Trading Litig.*, 213 F. Supp. 3d 631, 661 (S.D.N.Y. 2016) (considering allegations of conspiracy are to be "viewed as a whole" rather than taken individually). The combination of "the complete market foreclosure, the unprecedented and significant duration of the deals, and the high barriers this monopoly may create for future competitors to enter the industry" are reasons the license is anticompetitive. *Panini*, at *8-10. *See Geneva*, 386 F.3d at 501 (holding 15-month exclusivity period showed "effects of [defendant's] advantage were substantial and that competition was impaired")*; see also In re Epi-Pen*, 44 F.4th at 988 (explaining that exclusive agreements that "were short [2 ½ years or less] and easily terminable" were of little antitrust concern).[21] Under the rule of reason, this Court found sufficient the same allegations about the NFL license. *Panini*, at *10.

### d.    Conspiracy in Restraint of Trade against Fanatics, OneTeam, and NFLPA (Count 4).

OneTeam and NFLPA argue that OneTeam merely acted as an agent for NFLPA and cannot be held liable as a member of the conspiracy. OneTeam Mem. at 7-9; NFLPA Mem. at 18. They are wrong. In *American Needle*, the Supreme Court considered whether an unincorporated association of professional football teams, team owners, and a corporation established by association and its member teams to license their intellectual property was a separate entity for a Section 1 claim under the Sherman Act. 560 U.S. at 186-87. "The question is whether the agreement joins together 'independent centers of decisionmaking'" and [i]f it does, the entities are capable of conspiring under § 1." *Id*. at 196. OneTeam is a separate corporate entity that includes unions representing players from the MLBPA, NFLPA, Women's

---

[21] NFL misleadingly cites *Sage Chemical, Inc. v. Supernus Pharmaceuticals, Inc.*, No. 22-1302, 2024 WL 2832343 (D. Del. June 4, 2024), in support of its assertion that receiving monopoly profits is not sufficient to plead anticompetitive conduct. NFL Mem. at 12. Unlike the facts presented here, the *Sage* court considered a motion to dismiss by a group of defendants formed by a reorganization *after* the alleged anticompetitive conduct and plaintiffs did not allege any "post-sale wrongful conduct" by those reorganized entities. *Sage*, 2024 WL 2832343, at *2-4.

National Basketball Association, the U.S. women's national soccer team and Major League

Soccer. Diamond & Beaton, *The Player-Led Venture that Turned Trading Cards Upside Down*,

WALL ST. J. (Oct. 6, 2021). Like the NFL licensing entity in *American Needle*, OneTeam's

interests do not match those of its individual members. *American Needle*, 560 at 198 ("Although

NFL teams have common interests such as promoting the NFL brand, they are still separate,

profit-maximizing entities, and their interests in licensing team trademarks are not necessarily

aligned."). As a separate entity with its own *independent* share of the monopoly profits,

OneTeam is a co-conspirator that is jointly and severally liable for injuries resulting from the

conspiracy with NFLPA and Fanatics. *Texas Indus.*, 451 U.S. at 639, 646-47 (affirming appellate

court's entry of judgment for joint and several liability for Sherman Act violations against the

defendant-appellants); *In re Nasdaq*, 169 F.R.D. at 519 ("the antitrust law provides for joint and

several liability of co-conspirators"); *Spitzer*, 2003 WL 21576518, at *3 (same).

OneTeam argues that Plaintiffs' allegations about OneTeam's involvement in the NFLPA

license are insufficient. OneTeam Mem. at 8. OneTeam relies on *United Magazines*, to

distinguish plaintiffs' *allegations* from the *facts* presented in that case at summary judgment.

OneTeam Mem. at 8 ("[T]here are no facts showing that the agent had any independent control

over the terms and conditions of that agreement") (citing *United Mags. Co. v. Murdoch Mags.

Distrib., Inc.*, 353 F. Supp. 2d 433, 441 (S.D.N.Y. 2004)). Given that *United Magazines* court

was considering summary judgment, it is unsurprising that pre-discovery allegations do not have

the same factual content as a summary judgment record. *Id.* at 442-48. Nonetheless, Plaintiffs'

allegations include *The Wall Street Journal* report that OneTeam was "instrumental in

transforming an entire industry: trading cards" and plausibly allege that OneTeam played a key

part in facilitating the agreements and those agreements "never would have happened" without

OneTeam. FAC ¶¶ 76-78; Diamond & Beaton, *The Player-Led Venture that Turned Trading Cards Upside Down*, WALL ST. J. (Oct. 6, 2021).

OneTeam and NFLPA make similar arguments as MLBPA regarding the "presumptive legality" of vertical agreements, specifically NIL licenses, OneTeam Mem. at 9-10 and NFLPA Mem. at 20-22, which have been addressed *supra* § IV.B.5.b. Relying on pre-*American Needle* cases,[22] OneTeam is simply wrong to assert "where the rights being exercised are merely those inherent in intellectual property, like the right to exclude others from use of such property, there is no place for antitrust enforcement." OneTeam Mem. at 11. The Supreme Court in *American Needle* held the rights to license intellectual property fall under the purview of Section 1 of the Sherman Act. 560 U.S. at 186.[23] As this Court acknowledged, to "immunize intellectual property from the antitrust laws altogether [is] a protection that has no legal basis." *Panini*, at *10.

### e. Conspiracy in Restraint of Trade against Fanatics and NBA (Count 5).

Like MLBPA, NBA argues that its agreement is "presumptively legal." NBA Mem. at 17-18 (citing many of the same cases as MLBPA). But as discussed *supra* §§ IV.B.2-3 & 5.b, Plaintiffs have alleged these licenses to have anticompetitive attributes.[24] Like NFL, NBA asserts

---

[22] OneTeam's cases do not support its proposition that NIL licenses are not subject to antitrust review. *Haelan*, 202 F.2d 866 (reviewing the jury verdict of a breach of contract concerning plaintiff's right of publicity); *Zacchini v. Scripps-Howard Broad. Co.*, 433 U.S. 562 (1977) (considering human cannonball's right to publicity in the context of a televised broadcast); *Virtue v. Creamery Package Mfg. Co.*, 227 U.S. 8 (1913) (reviewing trial verdict of patent infringement of butter worker patents and declining to recognize the plaintiffs' argument of malicious prosecution in restraint of trade when that argument had not been made at the trial or lower appellate court).

[23] OneTeam and NFLPA's reliance on *Fleer Corp.* is misplaced, as the antitrust claims regarding MLBPA's licenses *were* cognizable under Sections 1 and 2 and subject to the rule of reason. 658 F.2d at 140-41, 148 (reviewing and reversing the lower court's judgment for the plaintiff-competitor). Many of OneTeam's cited cases merely stand for the unchallenged proposition that NIL is an intellectual property right like copyright, the right of publicity and trademarks that may be exclusively licensed. OneTeam Mem. at 10 & n.7. For example, *Bi-Rite Enterprises, Inc. v. Button Master*, 555 F. Supp. 1188, 1201 (S.D.N.Y. 1983), the court found that the performer-plaintiffs and the licensee-plaintiff had proven violations of the right of publicity by defendants use of non-licensed performer images on their buttons. None of these cases stand for the proposition that the intellectual property right licenses are outside the purview of the Sherman Act.

[24] *See also supra* § IV.B.1 (addressing NBA's relevant market arguments, NBA Mem. at 14-16).

that it has substituted one licensee for another and nothing has changed from the consumer' point of view, NBA Mem. at 18-19. As discussed in *supra* §§ IV.B.2-3 & 5.b, Plaintiffs have plausibly alleged that "[f]rom the consumers' point of view," something *has* changed about the market and one of those changes is higher prices from Fanatics' market power.[25] *See also* FAC ¶¶ 17-18 & figures; *supra* § IV.B.1 (discussing the change since Fanatics gained market power).[26] This is one of the reasons that this Court found sufficient allegations that the NBA's agreement with Fanatics is anticompetitive. *Panini*, at *10.

### f.    Conspiracy in Restraint of Trade against Fanatics and NBPA (Count 6).

NBPA asserts that plaintiffs have alleged no "exceptional circumstances" to show that the license unreasonably restrains trade. NBPA Mem. at 13 (relying on *Spinelli*, 96 F. Supp. 3d at 118). But as discussed *supra* §§ IV.B.2-3 & 5.b, Plaintiffs have alleged these licenses *do* have anticompetitive attributes.[27]

NBPA seems to suggest that Plaintiffs invoke a horizontal conspiracy because Plaintiffs allege that the relevant market as a whole is impacted by the six license agreements. NBPA Mem. at 14 (citing FAC ¶¶ 10, 71-75). This is a red herring. Plaintiffs clearly allege Fanatics obtained the six licenses, FAC ¶¶ 10 (alleging it was "the first time in history that a single card manufacturer secured exclusive licenses across all six major professional sports licensors"), *id.* ¶ 71 (same), *id.* ¶ 73 (same), and the market was impacted by Fanatics holding those six licenses,

---

[25] "[T]here is no *in pari delicto* defense under the Sherman Act." *Panini*, at *8 n.11.

[26] NBA asserts that accepting Plaintiffs' position would require NBA to sign a license with Panini or sign a non-exclusive license. NBA Mem. at 18. But what NBA can do depends on the context. *Panini*, at *10 ("Under the rule of reason, the Court must examine the likely future effects of these particular restraints in the context of the actual market structure.") (citing *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 768 (1984). "'[A] monopolist is [also] not free to take certain actions that a company in a competitive (or even oligopolistic) market may take.'" *In re Payment Card*, 729 F. Supp. 3d at 331 (quoting *LePage's*, 324 F.3d at 151–52).

[27] *See also supra* § IV.B.1 (addressing NBPA's relevant market arguments, NBPA Mem. at 14-17).

*id*. ¶¶ 74-75 (alleging "Fanatics has successfully foreclosed one hundred percent of the market for Major U.S. Professional Sports Leagues trading cards for the next decade at least" and each licensor received an equity stake in Fanatics to share monopoly profits). Analyzing the individual licenses, this Court in *Panini* found "the alleged effects of each agreement (considered individually), in the context of their significant durations, the complete market concentration, and the significant market share foreclosed by each individual deal, are sufficiently likely to be anticompetitive to frame a viable Section 1 claim for unreasonable restraint of trade with respect to each of the four remaining deals." *Panini*, at *9-10 (finding the alleged effects of two other license agreements also to be sufficiently alleged to be anticompetitive for a Section 1 claim).

As this Court found on the same facts in *Panini*, each of the licensing agreements is plausibly alleged to be anticompetitive conspiracy, *id*., and the same outcome follows here.

**C.    Plaintiffs Have Standing for Each of Their Claims.**

**1.    Plaintiffs meet the requirements for Article III standing.**

"[T]o establish Article III standing, a plaintiff must show (1) an injury in fact that is 'concrete, particularized, and actual or imminent,' (2) that the injury was caused by the defendant, and (3) that the injury would likely be redressable by the court." *Bohnak v. Marsh & McLennan Cos.*, 79 F.4th 276, 283 (2d Cir. 2023) (quoting *Thole v. U.S. Bank N.A.*, 590 U.S. 538, 540 (2020)). On a motion to dismiss for a lack of subject matter jurisdiction, the Court accepts all material allegations as true and construes the complaint favorably to plaintiffs. *W.R. Huff Asset Mgmt. Co. v. Deloitte & Touche, LLP*, 549 F.3d 100, 106 (2d Cir. 2008). When a defendant relies on evidence beyond the pleadings in support of a Rule 12(b)(1) motion, "the plaintiff may respond with evidence of its own." *SM Kids, LLC v. Google LLC*, 963 F.3d 206, 210 (2d Cir. 2020).

Each Plaintiff satisfies the Article III standing requirements. All of them purchased Trading Cards directly from Fanatics at prices artificially inflated by Defendants' anticompetitive conduct. *See* FAC ¶¶ 29-34 (alleging Plaintiffs' purchases); Ex. 1, Decl. of Robert Scaturo at ¶ 2 (detailing his purchases); Ex. 2, Decl. of Joseph Davidov at ¶ 2 (same); Ex. 3, Decl. of Steven Mardakhaev at ¶¶ 2-4 (same); Ex. 4, Decl. of Jonathan Madar at ¶¶ 2-3 (same); Ex. 5, Decl. of Scott Bubnick at ¶¶ 2-7 (same); FAC ¶ 17 (alleging that Defendants' conduct has already inflated Trading Card prices). Allegations that a plaintiff "paid more for a product than [he] otherwise would have paid" in the absence of the alleged conduct suffice to demonstrate a (1) concrete injury in fact (2) caused by the defendant. *Morrell v. WW Int'l, Inc.*, 551 F. Supp. 3d 173, 181 (S.D.N.Y. 2021). Payment of money damages satisfies the third Article III factor by redressing the overcharge injuries already caused, and injunctive relief avoids payment of overcharges going forward. *See* FAC ¶ 22 (requesting treble damages and injunction); *Am. Fed'n of Gov't Emps. v. United States Office of Personnel Mgmt.*, 786 F. Supp. 3d 647, 682-83 (S.D.N.Y. 2025) (ruling that plaintiffs have Article III standing because the ongoing harm they allege "is redressable through an injunction").

Defendants' arguments fail to displace this straightforward basis for Article III standing. Fanatics and NBA argue that Plaintiffs lack standing to seek relief for their purchases of fully licensed, newly issued NBA cards, because Fanatics' license in that market began only in October 2025. Fanatics Mem. at 18-19; NBA Mem. at 7-10 & n.1. Because of the timeline, these Defendants maintain, Plaintiffs have yet to suffer any injury traceable to Defendants' conduct, and any claim regarding future injuries post-October 2025 is overly speculative. Fanatics Mem. at 18-19; NBA Mem. at 7-9. Fanatics, NFL, and NFLPA make the same arguments as to newly

issued, fully licensed NFL cards, for which Fanatics' fully executed license is set to begin in April 2026. Fanatics Mem. at 18-19; NFL Mem. at 14-16; NFLPA Mem. at 15-16.

As to NBA cards, this point fails to get off the ground because Plaintiff Mardakhaev purchased newly issued, fully licensed NBA cards under the Fanatics license in October 2025. *See* Ex. 3, Decl. of Steven Mardakhaev at ¶ 4 *See also SM Kids*, 963 F.3d at 210 (allowing consideration of external evidence on a Rule 12(b)(1) motion). Any argument for dismissal on the ground that these purchases were made following the initiation of the action would improperly elevate form over substance. *See Fund Liquidation Holdings LLC v. Bank of Am. Corp.*, 991 F.3d 370, 390 (2d Cir. 2021) ("[I]n certain instances, subject-matter jurisdiction can even be obtained after a case's initiation and given retroactive effect through procedural rules."). If the Court deems it necessary for Plaintiffs to amend their pleading to allege the occurrence of Plaintiff Mardakhaev's purchase in the past tense, Plaintiffs request the right to do so and to avoid "the needless formality and expense of instituting a new action when events occurring after the original filing indicated a right to relief." Wright, Miller, & Kane, Federal Practice and Procedure: Civil 3d § 1505. *See also Travelers Ins. Co. v. 633 Third Assocs.*, 973 F.2d 82, 87-88 (2d Cir. 1992) ("To the extent plaintiff seeks to incorporate 'transactions or occurrences or events which have happened since the date of the pleading sought to be supplemented,' the district court may grant leave to amend.").[28]

For the same reason, Fanatics, MLB, and MLBPA are incorrect to argue that "Scaturo, Mardakhaev, and Madar did not purchase any newly issued, fully licensed cards." Fanatics Mem. at 20. *See also* MLB Mem. at 9; MLBPA Mem. at 6-7. As Fanatics' own records will show:

---

[28] This Court has similarly recognized that "where a complaint is dismissed for lack of Article III standing, the dismissal must be without prejudice[.]" *Panini*, at *15 (quoting *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 54 (2d Cir. 2016)).

Scaturo purchased newly issued, fully licensed MLB cards from Topps.com on September 5, 2025 (Ex. 1 ¶ 2); Mardakhaev purchased newly issued, fully licensed MLB cards from Topps.com on July 23, 2025 and newly issued, fully licensed NBA cards on October 3, 2025 (Ex. 3 ¶¶ 2-4); and Madar purchased newly issued, fully licensed MLB cards from Topps.com on September 18, 2025 (Ex. 4 ¶ 3).[29]

As to NFL card purchases, Plaintiffs have appropriately requested injunctive relief. FAC ¶ 22. Plaintiffs allege that Defendants' anticompetitive conduct has already inflated Trading Card prices and will continue to do so as Defendants continue to cement the Fanatics monopoly. *See id.* ¶¶ 17, 19 ("The anticompetitive effects of this conduct will continue, and will only intensify, once Fanatics' monopolistic takeover is complete. And because of high barriers to entry and the capital-intensive nature of the business, there is little chance that Panini or any other competitor will survive."). Inflation of current card prices is important because it allows Fanatics to set the prices of the NFL cards off a higher reference price for existing cards. *See id.* ¶ 135 (alleging that Fanatics coerces retailers to accept its "minimum price" thresholds). Allegations that consumers face imminent economic harm on account of conduct violating the Sherman Act is "plainly sufficient to authorize injunctive relief." *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 661 (2d Cir. 2015) (quoting *Cal. v. Am. Stores Co.*, 495 U.S. 271, 283 (1990)).

Plaintiffs and members of the Class will continue purchasing Trading Cards. *See* Exs. 1 ¶ 4 ("I have purchased sports trading cards in the past, and I intend to continue to do so."); 2 ¶ 5

---

[29] MLB and MLBPA also appear to argue that Plaintiffs do not establish Article III standing as to MLB cards because the FAC does not spell out the details of any purchased of newly issued, fully licensed MLB cards. *See* MLB Mem. at 9; MLBPA Mem. at 6-7. However, these same Defendants join Fanatics' motion to compel arbitration, which identifies an MLB card purchase by Plaintiff Bubnick, ECF No. 141, at 4, and which demonstrates that Defendants have access to Plaintiffs' purchase records. They should not be permitted to use these records selectively. Regardless, whether or not MLB and MLBPA are correct about the level of pleading detail required for Article III, their argument fails in light of Plaintiffs' declarations. Indeed, *every* Plaintiff purchased newly issued, fully licensed MLB cards.

(same); 3 ¶ 6 (same); 4 ¶ 6 (same); 5 ¶ 9 (same). Trading Cards are purchased by fans, *i.e.*, "devoted followers" (FAC ¶ 149) of the MLB, NBA, and NFL who seek to obtain each year's new releases, as new rookies begin their careers, veterans retire, and players change teams. *See Feldman v. Pro Football, Inc.*, 579 F. Supp. 2d 697, 705 (D. Md. 2008) (finding that "Redskins fans" had standing to request injunctive relief under the ADA because "likely to suffer harm in the future, as they planned to attend future Redskins games"); *Am. Bird Conservancy v. Harvey*, 232 F. Supp. 3d 292, 304-05 (E.D.N.Y. 2017) (concluding that bird enthusiast plaintiffs had standing to sue for protection of a species on account of their "expectation of continuing to" visit and study the species).[30]

Defendants' cases on standing to pursue injunctive relief are inapposite. In *Xerox*, plaintiff failed to provide "any factual allegations to support" the theory that defendant's conduct was driving it out of business. 511 F. Supp. 2d at 382. Here, in contrast, Plaintiffs allege how Defendants' conduct has already succeeded in eliminating competition, FAC ¶¶ 10, 225, and how this harm to competition is already impacting consumer prices. *See id.* ¶ 17. In *Waxman v. Cliffs Natural Resources, Inc.*, plaintiffs' allegations of injury were contingent on a company's "potential future bankruptcy," and they made "no allegation a bankruptcy is imminent." 222 F. Supp. 3d 281, 288 (S.D.N.Y. 2016). Finally in *In re DDAVP Indirect Purchaser Antitrust Litigation*, plaintiffs *conceded* that "there is no threat of future injury" from the challenged conduct, but nonetheless sought an injunction "to assure that similar anticompetitive conduct does not occur in the future." 903 F. Supp. 2d 198, 210 (S.D.N.Y. 2012). Plaintiffs here make no comparable concessions, and their claim of injury is not contingent on any uncertain future

---

[30] To the extent that the Court holds that Plaintiffs' expectation to continue purchasing affected Trading Cards must be pleaded to factor into the standing analysis, Plaintiffs request leave to amend the pleading accordingly.

events. To the contrary, the anticompetitive agreements at issue in this case are fully executed, and it is only a matter of months before the NFL licenses, too, become fully operational.

### 2. Plaintiffs meet the requirements for class standing.

Even if the Court were to rule that Plaintiffs lack Article III standing to seek relief as to NBA and/or NFL cards, it would not require dismissing any portion of the case. Rather, a plaintiff's "class standing," *i.e.*, his power to prosecute claims on behalf of the full class, is often broader than his individual Article III standing. *See NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145 (2d Cir. 2012) ("But whether NECA has 'class standing'—that is, standing to assert claims *on behalf of* purchasers of Certificates from other Offerings, or from different tranches of the same Offering—does not turn on whether NECA would have statutory or Article III standing to seek recovery for misleading statements in those Certificates' Offering Documents."). To demonstrate class standing, a plaintiff must "plausibly allege[] (1) that he 'personally has suffered some actual . . . injury as a result of the putatively illegal conduct of the defendant,'" and "(2) that such conduct implicates 'the same set of concerns' as the conduct alleged to have caused injury to other members of the putative class by the same defendants." *Id.* at 162.

As the Second Circuit recently explained, when a class is defined to include purchasers of multiple products affected by an anticompetitive conspiracy, a purchaser of one product has suffered a similar enough injury to purchasers of the other products, and it therefore has the correct incentives for class standing. *See Sullivan*, 149 F.4th at 225 (holding that, "even though CalSTRS and FPA may have suffered injuries distinct from those suffered by [purchasers of one affected derivative], we have made clear that 'non-identical injuries of the same general character can [still] support standing.'") (quoting *Langan v. Johnson & Johnson Consumer Cos.*, 897 F.3d 88, 94 (2d Cir. 2018)).

- 58 -

The difference between class standing and Article III standing, which Defendants fail to acknowledge, undermines all of their standing arguments. Fanatics and NFL cite *In re Frito-Lay N. Am., Inc. All Natural Litigation* for the proposition that "plaintiffs lack Article III standing to assert claims arising out of products that they themselves did not purchase." No. 12–MD–2413 (RRM)(RLM), 2013 WL 4647512, at *11 (E.D.N.Y. Aug. 29, 2013). However, the *next line* of *Frito-Lay* clarifies that, once the case is found to include Plaintiffs with Article III standing as to some product, "then will the inquiry shift to a class action analysis." *Id*. The *Frito-Lay* court concluded, in line with what the Second Circuit later reaffirmed in *Sullivan*, that "because the plaintiffs have Article III standing, at this stage, they may press claims, on behalf of putative class members, arising out of products that the plaintiffs did not themselves purchase. Whether the plaintiffs' injuries are sufficiently similar to those of the putative class members who purchased other products—and whether plaintiffs will therefore adequately represent the interests of the class—is a question the Court will consider on a Rule 23 certification motion." *Id.* at *13.

### 3. Plaintiffs' claims are ripe.

The constitutional "ripeness" doctrine is just a "specific application of the actual injury aspect of Article III standing." *Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 688 (2d Cir. 2013). Because of this overlap between ripeness and standing, a holding that "antitrust harms asserted by the [plaintiffs] are sufficiently 'actual and imminent' to constitute Article III injury in fact" suffices to establish "that judicial review of the [plaintiffs'] claims at this time is appropriate." *Ross v. Bank of Am., N.A.*, 524 F.3d 217, 226 (2d Cir. 2008). Plaintiffs' claims against the NFL are ripe for the same reason that Plaintiffs have standing to seek injunctive relief: as fans who plan to purchase NFL cards, they face an imminent threat of injury on account of Defendants' unlawful restraint of the market for newly issued, fully licensed NFL cards. *See*

*PepsiCo*, 315 F.3d at 108 ("a company that can exclude competition can sustain its ability to control prices"); *Xerox*, 511 F. Supp. 2d at 381–82 (observing when one of two competitors is driven out of the market, higher prices will likely follow); *see also supra* § IV.C.2.

NFL's argument that Plaintiffs cannot yet answer questions like "Will prices of NFL Trading Cards increase when the NFL--Fanatics license takes effect? (NFL Mem. at 18-19), and "Will Plaintiffs purchase such Fanatics-manufactured NFL Trading Cards?" (*id.* at 19), therefore amounts to a position that injunctive relief for antitrust violations is never possible. Here, Plaintiffs have articulated a plausible basis for the conclusion that Defendants have restrained the market for Trading Cards, that such restraint has inflated and will continue to inflate prices, and that Plaintiffs face a threat of imminent harm from these inflated prices. *See supra* § IV.C.1.

More basically, NFL cannot credibly argue that the time has not yet arrived to adjudicate the legality of an agreement that has already been signed and publicized, especially when Plaintiffs and class members have already suffered financial harm caused by its companion agreements. *See Robb v. Conn. Bd. of Veterinary Med.*, 157 F. Supp. 3d 130, 142 (D. Conn. 2016) ("Dr. Robb alleges that competition has already been inhibited by Defendants' illegal agreement to remove certain competitors from the market in light of the proceedings against him. His claim is thereby ripe for review[.]"); *Revitalizing Auto Communities Env'l Response Trust v. Nat'l Grid USA*, 10 F.4th 87, 100 (2d Cir. 2021) (holding that a claim was ripe because the plaintiff "has already spent money that it is entitled to attempt to recover"). The claims at issue here do not depend on any "contingent future event," such as in the case relied on by NFL, *United States v. Broadcast Music, Inc.*, 275 F.3d 168, 178 (2d Cir. 2001) (*BMI*). In *BMI*, the import of the claim was that a broadcast license applicant "fac[ed] the possibility that the

copyright holder *might* [] attempt, and be permitted, to veto the outcome of a [rate setting] proceeding." *Id.* (emphasis added). Here, Plaintiffs' claims are not contingent on any "might."[31]

Finally, the question of when damages accrue as a result of Defendants' unlawful conduct is subject to expert testimony after discovery, when class definition and damages models can be modified. *See In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, No. 14-MD-2542 (VSB), 2025 WL 1802952, at *4 (S.D.N.Y. June 30, 2025) ("[E]xpert testimony is critical to establishing damages in an antitrust case."). To the extent that answering this question involves imprecision, that is Defendants' own doing, and they are not permitted to benefit from it now by casting Plaintiffs' claims as speculative. "Any other rule would enable the wrongdoer to profit by his wrongdoing at the expense of his victim. It would be an inducement to make wrongdoing so effective and complete in every case as to preclude any recovery, by rendering the measure of damages uncertain." *Bigelow*, 327 U.S. at 264.

### 4.    Plaintiffs have antitrust standing.

"Antitrust standing, at least at the pleading stage, is quite broad." *Mosaic Health, Inc. v. Sanofi-Aventis U.S., LLC*, 147 F.4th 183, 194 (2d Cir. 2025). "[P]recedent advises that the Court not dismiss otherwise viable antitrust claims through overly restrictive applications of standing—particularly if the result would be to allow antitrust violators to go unpunished." *Panini*, at *7 (citing *Blue Shield of Va. v. McCready*, 457 U.S. 465, 473 n.10 (1982)). "'To establish antitrust standing, a plaintiff must show (1) antitrust injury, which is injury of the type the antitrust laws

---

[31] Fanatics, NFL, and NBA also rely on *Arcesium, LLC v. Advent Software, Inc.*, No. 20-cv-04389, 2021 WL 1225446 (S.D.N.Y. Mar. 31, 2021). In *Arcesium*, however, plaintiffs alleged only in the future tense that "Defendants' actions *will cause* severe harm to competition." *Id.* at *7 (emphasis added). Similarly, NFL and NBA rely on *Sell It Social, LLC v. Acumen Brands, Inc.*, No. 14 Civ. 3491(RMB), 2015 WL 1345927 (S.D.N.Y. Mar. 20, 2015). In that case, too, the plaintiff affirmatively alleged only that defendant's actions will "*likely* lead[ ] to increased prices and reduced innovation and consumer choice." *Id.* at *4 (emphasis added). Here, in contrast, Plaintiffs point to evidence that "the price effects of Defendants' anticompetitive conduct can already be seen in the market." FAC ¶ 17.

were intended to prevent and that flows from that which makes defendants' acts unlawful, and (2) that he is a proper plaintiff in light of four efficient enforcer factors.'" *In re Platinum & Palladium Antitrust Litig.*, 61 F.4th 242, 258 (2d Cir. 2023) (quoting *Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. PLC*, 22 F.4th 103, 115 (2d Cir. 2021)). Plaintiffs here satisfy each factor.

### a.    Plaintiffs have suffered an antitrust injury.

The injury in fact described above in connection with Plaintiffs' Article III standing also suffices to establish their antitrust injury. *See supra* at § IV.C.1; *Sullivan*, 149 F.4th at 223 ("'Generally, when consumers, because of a conspiracy, must pay prices that no longer reflect ordinary market conditions, they suffer' an antitrust injury.") (quoting *Gelboim*, 823 F.3d at 772). This overcharge injury "flows from that which makes defendants' acts unlawful," *Platinum*, 61 F.4th at 258, because inflated Trading Card prices were the purpose and effect of reducing competition in, and ultimately monopolizing, the market for Trading Cards. *See IQ Dental Supply v. Henry Schein, Inc.*, 924 F.3d 57, 64-65 (2d Cir. 2019) (finding the antitrust injury requirement satisfied based on plausible allegations that "the Defendants' anticompetitive behavior caused the injury").

MLBPA argues that Plaintiffs' alleged injuries do not "flow from" its conduct on the basis of the Second Circuit's explanation that, "[g]enerally, only those that are participants in the defendants' market can be said to have suffered antitrust injury." *In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 158 (2d Cir. 2016). It appears, however, that MLBPA stopped reading too early. The same decision proceeds to note that, following the Supreme Court's *McCready* decision defining antitrust standing, "[t]he universe of potential plaintiffs is not strictly limited to participants in the defendants' market." *Id*. In other words, "the thrust of *McCready*" is to extend standing beyond the universe of participants in the same market in

which defendants participate to the universe of participants in the "market directly distorted by the antitrust violation." *Id.* at 160 (quoting *SAS of P.R., Inc. v. P.R. Tel. Co.*, 48 F.3d 39, 46 (1st Cir. 1995)).[32]

It therefore does not matter whether "MLBPI/A does not participate in the market that Plaintiffs allege has been restrained," MLBPA Mem. at 9. In fact, this formulation gets it backwards. The question is whether *Plaintiffs* participate in the market that they allege has been restrained by the co-conspirators, and they unquestionably do. *See* FAC ¶ 76 ("When the unions representing MLB, NFL, and National Basketball Association players struck an exclusive agreement with a new company controlled by online sports-merchandise retailer Fanatics, Inc., the flurry of deals upended the trading card world"), *id*. ¶ 158 ("Fanatics, MLB, and MLBP violated 15 U.S.C. § 1 by entering into an anticompetitive agreement to unreasonably restrain trade in the market for MLB Trading Cards."), *id*. ¶ 56 (defining class to include "persons or entities in the United States that purchased MLB Trading Cards").[33]

### b.    Plaintiffs are efficient enforcers.

The "efficient enforcer" inquiry turns on four factors:

> (1) the directness or indirectness of the asserted injury; (2) the existence of more direct victims or the existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement; (3) the extent to which the claim is highly speculative; and (4) the importance of avoiding either

---

[32] NBPA uses this quote from *Aluminum Warehousing*, and the "same market" vs. "different market" dichotomy it suggests, in connection with the first efficient enforcer factor. *See* NBPA Mem. at 9. MLBPA also reuses it in the connection with the third efficient enforcer factor. MLBPA Mem. at 12. Both Defendants misread *Aluminum Warehousing* as described here, and all the arguments they rest on this reading therefore fail.

[33] In *In re Google Digital Advertising Antitrust Litigation*, relied on by NBA and NFLPA, the plaintiffs themselves affirmatively alleged a distinction between the Google DV360 market that was restrained and the Google Ads and direct broker markets in which they participated. 721 F. Supp. 3d 230, 243, 246 (S.D.N.Y. 2024). Here, as explained above, Plaintiffs participated in the very MLB Trading Cards market alleged to have been restrained. Remarkably, NBA also cites to *Trisvan v. Burger King Corp.*, a *pro se* action in which the plaintiff alleged that defendants "were involved in bad monopolistic conduct, leaving such business transaction ob[t]ained under fraud in violation of the Sherman/Clayton Act." No. 19-CV-6396 (MKB), 2021 WL 1193531, at *2-3 (E.D.N.Y. Mar. 30, 2021) (alleging products were contaminated with pork). Unsurprisingly the court found his allegations insufficient.

the risk of duplicate recoveries on the one hand, or the danger of complex apportionment of damages on the other.

*Sullivan*, 149 F.4th at 224 (internal quotations omitted). "'[T]he weight to be given the various factors will necessarily vary with the circumstances of particular cases.'" *Platinum*, 61 F.4th at 259 (quoting *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 443 (2d Cir. 2005)). Although not necessary, Plaintiffs satisfy each factor.

### (1) Directness of asserted injury factor.

The purpose of this factor is to "'draw[] a line between those whose injuries resulted from their direct transactions with the [defendants] and those whose injuries stemmed from their deals with third parties.' The former suffices while the latter does not." *Sullivan*, 149 F.4th at 224 (quoting *Schwab*, 22 F.4th at 116). Plaintiffs here reside on the correct side of the line, because each purchased Trading Cards directly from Fanatics, a member of the alleged conspiracy. FAC ¶¶ 29-34 & Exs. 1-5 to Kopel Decl. (describing Trading Card purchases of the Plaintiffs). They are accordingly efficient enforcers as to all members of that conspiracy (and as to Fanatics for Count Seven—Monopolization and Count Eight—Attempted Monopolization). *See Sullivan*, 149 F.4th at 224 (distinguishing between those that engaged in "direct transactions with UBS and RBS" and those affected by "the decision of a third party . . . made without any connection to the actions of the [b]anks").

Although they use different formulations, NBA, NFLPA, and MLBPA all purport to identify a disconnect between their participation in the conspiracy and Plaintiffs' injuries that would render such injuries indirect as to them. NBA speaks of "multiple steps between the NBA's signing of [an] agreement to license its intellectual property to Fanatics and Plaintiffs allegedly buying NBA trading cards produced by Fanatics at higher prices in a downstream market," NBA Mem. at 12, and NFLPA similarly gestures to a "chain of causation" with

- 64 -

"vaguely defined links." NFLPA Mem. at 11. But the FAC is not as complicated as these Defendants portray it to be. Fanatics entered into a partnership with Defendant Leagues, Player Associations, and OneTeam, enabling it to monopolize the market for Trading Cards. FAC ¶¶ 71-78. Plaintiffs purchased Trading Cards at inflated prices (*id.* ¶¶ 29-34), and Defendants share the monopoly profits. *Id.* ¶ 75. *See In re Propranolol Antitrust Litig.*, 249 F. Supp. 3d 712, 725 (S.D.N.Y. 2017) (describing a three-link "chain of distribution" as "short, direct, and well-understood" for efficient enforcer purposes).

NBA also relies heavily on the *Spinelli* decision, which found the first efficient enforcer factor unmet on the basis of a "critical disjunction" between the injuries and the alleged conduct. NBA Mem. at 12 (quoting *Spinelli*, 96 F. Supp. 3d at 120). In *Spinelli*, however, plaintiffs' failure to plead proximate causation stemmed from a basic confusion in their allegations. Although they nominally identified a conspiracy involving the NFL, its clubs, and photography agency AP, the plaintiffs simultaneously described the AP as a victim of the NFL's pre-existing market power. *See id.* at 95 (quoting plaintiffs' allegation that the AP entered into the offending agreement under "threats and coercive pressure by the NFL"). The court accordingly recognized that "the fact that NFLP gave an exclusive license to AP is irrelevant to Plaintiffs' alleged anticompetitive injury. . . . As such, there is a critical disjunction . . . ." *Id.* at 119-20. Here, Plaintiffs makes absolutely clear that the League and Players Association and OneTeam Defendants are not victims *of* but co-conspirators and profit-sharing partners *with* Fanatics, and that the agreements that they reached with Fanatics led to the monopoly power at issue. *See* FAC ¶¶ 71-78 (describing the agreements and their consequences).

MLBPA challenges this factor differently, asserting that Plaintiffs allege only an "'intent' to monopolize the relevant market but fail to specify any direct impact of that agreement on

- 65 -

prices for MLB Trading Cards." MLBPA Mem. at 12. On the contrary, Plaintiffs allege that the agreement between MLBPA and Fanatics "g[a]ve Fanatics long-term monopoly control of the market for MLB Trading Cards" (FAC ¶ 160), resulting in Fanatics' "power to raise and maintain the price of these trading cards at supracompetitive levels profitably without losing substantial sales." *Id.* ¶ 145. The *Digital Music* case on which MLBPA relies bears no resemblance to the facts alleged here. The *Digital Music* allegations concerned a scheme to restrain the market for internet music, and lacked any "contractual, historical, or correlative" linkage between internet music prices and CD prices. *In re Digital Music Antitrust Litig.*, 812 F. Supp. 2d 390, 402 (S.D.N.Y. 2011). The court therefore found no proximate basis for CD purchasers to claim antitrust standing. *Id.* at 405. Here, the conspiracy targets the precise consumer products that Plaintiffs purchased: Trading Cards.[34]

### (2)      Existence of more direct victims factor.

Because they purchased directly from Fanatics with no intermediary, Plaintiffs are the most direct possible victim of the misconduct. Five Defendants challenge this point, arguing that Panini, Fanatics' competitor, is more direct for purposes of the second efficient enforcer factor. *See* NFLPA Mem. at 12-13; MLB Mem. at 15-16; MLBPA Mem. at 11 n.6; NBPA Mem. at 10-11; NBA Mem. at 12. Panini, however, is seeking relief for an entirely different injury. Panini's claims concern its own lost profits as a manufacturer of Trading Cards, while Plaintiffs' claims concern overcharges to direct purchasers of Trading Cards. "Lost profits are the difference between the competitive price and what the competitors' costs would have been, while overcharges are the difference between the defendants' supra-competitive price and the

---

[34] MLB and MLBPA substantially meld together their arguments regarding the first efficient enforcer factor with their arguments regarding the *Illinois Brick* indirect purchaser bar. *See* MLB Mem. at 15-16; MLBPA Mem. at 11-12. The latter point will be addressed below. *See infra* at § IV.C.5.

competitive price." *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 689 (2d Cir. 2009) (holding that purchaser plaintiffs are efficient enforcers). *Compare Panini*, at *10 ("Panini has antitrust standing to bring a claim regarding the market foreclosure caused by each of these restrictions"), *with* FAC ¶ 229 ("The injury to Plaintiffs and the Class consists of having paid higher prices for Major U.S. Professional Sports Leagues trading cards than they would have paid in the absence of those violations.").

As illustrated in Figure 1 below, Plaintiffs' damages here are measured by the difference between the competitive price for Trading Cards and the monopoly price actually charged, while Panini's alleged damages are measured by the difference between the cost of producing Trading Cards and the competitive price of its lost sales. Assume that the marginal cost for a card is $1.00, the competitive price is $1.10, and the monopoly price actually paid is $2.00. In that scenario, Plaintiffs suffered overcharge damages (OC) of 90 cents ($2.00 monopoly price paid minus $1.10 competitive price), while Panini suffered lost profits (LP) of 10 cents ($1.10 competitive price minus $1.00 marginal cost). These damages do not overlap in any way.

### FIGURE 1



- 67 -

### (3)      Highly speculative claims factor.

Plaintiffs allege that their damages result from "having paid higher prices . . . than they would have paid in the absence of [Defendants'] violations." FAC ¶ 229. Modeling the difference between actual world price and but-for world prices is not overly speculative but rather "standard fare for antitrust litigation." *Reiss v. Audible, Inc.*, No. 1:24-cv-05923 (JLR), 2025 WL 1654643, at *14 (S.D.N.Y. June 11, 2025).

To challenge Plaintiffs' satisfaction of this factor, Defendants rehash arguments made in other contexts in their motions. NFLPA, NBPA, and NBA argue that Plaintiffs' claims are speculative because Plaintiffs have not yet purchased NFL and NBA cards from Fanatics. NFLPA Mem. at 13; NBPA Mem. at 9; NBA Mem. at 13. These arguments fail for the reasons explained above: Plaintiff Mardakhaev has purchased newly issued, fully licensed NBA cards from Fanatics, Ex. 3 ¶ 4, and Plaintiffs face imminent harm in the market for NFL cards. *See supra* at § IV.C.1.[35]

MLB and MLBPA fault Plaintiffs for failing to "identify or quantify what amount, if any, of their alleged damages stems from [their] conduct." MLB Mem. at 16.[36] *See also* MLBPA Mem. at 12 ("Plaintiffs make no attempt to specify what amount, if any, of their alleged overcharge was caused by the terms of MLBPI/A's licensing agreement."). This, however, is not required of Plaintiffs at this stage. *See Merced Irrigation Dist. v. Barclays Bank PLC*, 165 F.

---

[35] In *American Medical Association v. United Healthcare Corp.*, relied on by NFLPA, counterclaim plaintiffs alleged an antitrust injury consisting of litigation costs and future "ongoing risks" from counterclaim defendant's hypothetical future submission of improper reimbursement requests. No. 00-civ-2800, 2007 WL 683974, at *2 (S.D.N.Y. Mar. 5, 2007). The court appropriately recognized that these claims failed to articulate any antitrust injury, and, "in the interest of thoroughness," noted that even a charitable reading of the claim would require speculation. *Id.* at *5. As explained in detail above, Plaintiffs here assert concrete, non-contingent harms flowing from Defendants' antitrust violations. *See supra* at § IV.C.1.

[36] MLB applies the same argument to the fourth efficient enforcer factor, regarding "complex apportionment of damages." MLB Mem. at 16. It fails for the same reason outlined here. Apportionment of damages for a joint and several liability claim does not require a calculation of each Defendant's relative liability, and, regardless, precise accounting of damages is appropriately conducted later on the basis of expert testimony.

Supp. 3d 122, 134 (S.D.N.Y. 2016) ("An exact accounting of damages is not required at this stage of the proceedings, 'especially . . . when the most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created.'") (quoting *DDAVP Direct Purchaser*, 585 F.3d at 689).[37] As explained above (*supra* at §§ IV.A.1.a at 22 & C.4.b.(2)), the calculation Defendants complain about will be done following fact discovery, on the basis of expert testimony.

MLBPA further challenges the third factor on the ground that it "plays [no] role in setting prices." MLBPA Mem. at 12. It makes no attempt to link this non-sequitur to the question of speculativeness. Rather, "it is well established that not all defendants need to participate in all aspects of a conspiracy." *In re Eur. Gov't Bonds*, 2020 WL 4273811, at *19.

### (4)    Duplicate recovery or complex apportionment of damages factor.

No element of Plaintiffs' claims calls for duplication of recovery from Defendants or for any apportionment out of the ordinary. NFLPA and NBPA point again to Panini's separate suit asserting that the possibility of both Panini and direct purchasers recovering somehow creates a risk of duplication. *See* NFLPA Mem. at 12-13; NBPA Mem. at 10-11. Once again, however, Panini seeks recovery of *different damages*. *See supra* at § IV.C.4.b.2 and Figure 1; *In re Keurig*, 383 F. Supp. 3d at 222-23 ("[L]ost profits—sought by Keurig's competitors—are separate from the overcharges the DPPs seek to recover.") (citing *DDAVP Direct Purchaser*, 585 F.3d at 689).

---

[37] None of the cases that MLBPA cites in support of this point says otherwise. Rather, each one finds the claim to be overly speculative for reasons entirely irrelevant here. *See Laydon v. Mizuho Bank, Ltd.*, No. 12–cv–3419 (GBD), 2014 WL 1280464, at *10 (S.D.N.Y. Mar. 28, 2014) (unpredictability of the derivatives market, accounting for "what the interest rate is and where it will be in the future, compounded with consumers own beliefs of where they expect the interest will be in the future"); *DIRECTV, LLC v. Nexstar Media Grp., Inc.*, 724 F. Supp. 3d 268, 280 (S.D.N.Y. 2024) (claim relied on plaintiff's assumptions as to the television subscription choices of third party consumers); *Paycom Billing Servs., Inc. v. MasterCard Int'l, Inc.,* 467 F.3d 283, 294 (2d Cir. 2006) (claim relied on plaintiff's assumptions as to how defendant's competitors would have acted in the absence of the challenged conduct).

The same is not true of any of the cases NFLPA relies on. *See Arcesium*, 2021 WL 1225446, at

\*10 (both cases were filed by competitors); *Nypl v. JPMorgan Chase & Co.*, No. 15-civ-9300,

2017 WL 1133446, at \*5 (S.D.N.Y. Mar. 24, 2017) (both cases by consumers); *Contant v. Bank*

*of Am. Corp.*, No. 17-civ-3139, 2018 WL 1353290, at \*6 (S.D.N.Y. Mar. 15, 2018) (same).

MLBPA and NBPA also argue that Plaintiffs' lack of "direct dealings" with them makes

the fourth efficient enforcer factor weigh against Plaintiffs, relying on *Laydon v. Coöperatieve*

*Rabobank U.A.*, 55 F.4th 86, 100 (2d Cir. 2022). *See* MLBPA Mem. at 11 n.6; NBPA Mem. at

10-11. In *Coöperatieve Rabobank*, however, plaintiff had no direct dealings with *any defendants*.

*Id.* at 100. Here, as explained above, Plaintiffs transacted directly with Defendant Fanatics.[38]

### 5.    None of Plaintiffs' claims is barred by *Illinois Brick*.

The Supreme Court's decision in *Illinois Brick Co. v. Illinois*, established that recovery of

damages under federal antitrust law is limited to plaintiffs that purchase directly from the cartel.

431 U.S. 720, 745-46 (1977). This poses no problem for Plaintiffs, who all purchased Trading

Cards directly from Fanatics.

NFLPA, MLB, MLBPA, and NBPA nonetheless seek to invoke the *Illinois Brick* bar by

engaging in artful re-pleading, asserting that Plaintiffs are indirect purchasers of the intellectual

property which they licensed to Fanatics, and which was incorporated into the Trading Cards at

issue. NFLPA Mem. at 13-15; MLB Mem. at 13-15; MLBPA Mem. at 8-9; NBPA Mem. at

11-12. This conception is detached from the reality of this case. Plaintiffs make no pretense of

participation in a market for league and/or player association intellectual property rights. Put

differently, Plaintiffs do not purchase, directly or indirectly, IP rights from anyone. They do not

now own, and never have owned, those IP rights. Arguing otherwise would be akin to saying that

---

[38] NBA affirmatively concedes that the fourth factor does not weigh against Plaintiffs. NBA Mem. at 11 n.2.

a purchaser of Trading Cards has the right to reproduce and sell any card they purchase from Fanatics. One suspects that Defendants would not find that acceptable. In reality, the only product market at issue is the market for Trading Cards—that is the market restrained by Defendants, and the one in which Plaintiffs participated. Defendants cite no cases that apply *Illinois Brick* to intellectual property incorporated within a product sold for supracompetitive profits which are split among the co-conspirators, including the licensor of the IP, and Plaintiffs are aware of no such cases.[39]

      NFLPA attempts to develop the argument slightly more, analogizing this case to one in which a purchaser of a finished product brings antitrust claims against the manufacturer of a component of that product. *See* NFLPA Mem. at 14-15 (collecting cases). But every single one of those cases concerns allegations that a *price-fixed component* was incorporated into a product that plaintiffs purchased. *See In re Dynamic Access Memory (DRAM) Antitrust Litig.*, 516 F. Supp. 2d 1072, 1083 (N.D. Cal. 2007)*; In re Refrigerant Compressors Antitrust Litig.*, No. 09-md-02042, 2013 WL 1431756, at *11 (E.D. Mich. Apr. 9, 2013); *Lorenzo v. Qualcomm Inc.*, 603 F. Supp. 2d 1291, 1299 (S.D. Cal. 2009). Here, the inflated price is not the price for the "component" intellectual property, but the price for the card itself, the finished product. *See* FAC ¶ 228 ("[The conduct] has raised the price of Major U.S. Professional Sports Leagues trading

---

[39] Defendants seek to head off Plaintiffs' use of the so-called "co-conspirator exception" to *Illinois Brick*, pursuant to which, "where intermediate purchasers in the chain of distribution . . . are alleged to be participants in the conspiracy, the first purchasers who are not part of the conspiracy 'are entitled to collect damages from both the manufacturers and their intermediaries if conspiracy and overcharges can be established.'" *Laumann*, 907 F. Supp. 2d at 482 (quoting *Paper Sys. Inc. v. Nippon Paper Indus. Co.*, 281 F.3d 629, 632 (7th Cir. 2002)). NFLPA, MLB, and NBPA note that the Second Circuit has yet to endorse this exception, but not that it has rejected it. NFLPA Mem. at 15 n.6; MLB Mem. at 14-15; NBPA Mem. at 12 n.3. The status of this exception does not matter to Plaintiffs however, because its concern is indirect purchasers, and Plaintiffs are direct purchasers. This is not a market in which "manufacturers" are alleged to have conspired with "intermediaries," because the cards at issue were not sold to Plaintiffs through intermediaries.

cards.") As to that product, Trading Cards—the focus of this action—Plaintiffs all are direct purchasers.[40]

Ultimately, despite many attempts to reinvent it, the market dynamic at the heart of this action is simple: a monopolistic seller and its co-conspirators on one side, and the Plaintiff buyers on the other. Defendants' standing, ripeness, and *Illinois Brick* arguments fail.

## V.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' motions to dismiss. If the Court is inclined to grant any or all of Defendants' motions to dismiss, Plaintiffs request leave to amend any claims the Court finds deficient.

---

[40] NFLPA also cites Justice Kavanaugh's opinion regarding denial of certiorari in *National Football League v. Ninth Inning, Inc.*, 141 S. Ct. 56 (2020). NFLPA Mem. at 15. In that case, "plaintiffs challenged the National Football League's contract with DirecTV for the television rights to out-of-market games," and Justice Kavanaugh expressed that plaintiffs (football watchers) "may not have antitrust standing to sue the NFL and the individual teams" because they "did not purchase a product from the NFL or any team, and may therefore be barred from bringing suit against the NFL and its teams under [*Illinois Brick*]." *Id.* at 56-57. Even to the extent this statement provides useful guidance, the facts in *Ninth Inning* do not resemble those here. In that case, the NFL sold an actual product—viewable video content—to DirectTV, which then sold access to that content to plaintiffs. Here, the intellectual property was never transferred beyond Fanatics. Plaintiffs have received no rights or license to it.

DATED: October 10, 2025                    Respectfully submitted,

                                           */s/John Radice*
                                           John Radice
                                           Clark Craddock
                                           Kenneth Pickle
                                           Daniel Rubenstein
                                           A. Luke Smith
                                           Kenneth Walsh
                                           **RADICE LAW FIRM, PC**
                                           475 Wall Street
                                           Princeton, NJ 08540
                                           Telephone: (646) 245-8502
                                           Facsimile: (609) 385-0745
                                           jradice@radicelawfirm.com
                                           ccraddock@radicelawfirm.com
                                           kpickle@radicelawfirm.com
                                           drubenstein@radicelawfirm.com
                                           lsmith@radicelawfirm.com
                                           kwalsh@radicelawfirm.com


                                           *Attorneys for Plaintiffs and the Proposed Class*

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that the number of words in the foregoing memorandum of law complies with the word limit of 35,000 words per the Joint Stipulation and Order Regarding Motion to Dismiss Briefing, ECF No. 161. The memorandum of law contains 25,314 words, excluding the case caption, table of contents, table of authorities, signature blocks, and this certification, as counted by Microsoft Word.

Dated: October 10, 2025                                  */s/ John Radice*
                                                          John Radice

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on October 10, 2025.


Dated: October 10, 2025                                    */s/ John Radice*
                                                          John Radice