UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ROBERT SCATURO, SCOTT BUBNICK, JOSEPH DAVIDOV, STEVEN MARDAKHAEV, AND JONATHAN MADAR, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>FANATICS, INC.; FANATICS, LLC; FANATICS COLLECTIBLES INTERMEDIATE HOLDCO, INC.; FANATICS SPV, LLC; MAJOR LEAGUE BASEBALL; MAJOR LEAGUE BASEBALL PROPERTIES, INC.; MAJOR LEAGUE BASEBALL PLAYERS ASSOCIATION; MLB PLAYERS, INC.; NATIONAL FOOTBALL LEAGUE; NFL PROPERTIES LLC; NATIONAL FOOTBALL LEAGUE PLAYERS ASSOCIATION; NFL PLAYERS, INC.; NATIONAL BASKETBALL ASSOCIATION; NBA PROPERTIES, INC.; NATIONAL BASKETBALL ASSOCIATION PLAYERS ASSOCIATION; AND ONETEAM PARTNERS LLC,<br><br>Defendants. | Case No. 25-cv-02202-LTS-VF<br><br>(Oral Argument Requested) |

**DEFENDANTS NATIONAL BASKETBALL ASSOCIATION AND
NBA PROPERTIES, INC.'S REPLY MEMORANDUM IN FURTHER SUPPORT
OF THEIR MOTION TO DISMISS THE CLAIM AGAINST THEM IN
<u>COUNT FIVE OF THE FIRST AMENDED CLASS ACTION COMPLAINT</u>**

Richard C. Pepperman II
Benjamin R. Walker
Sheeva L. Nesva
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
(212) 558-4000

*Counsel for Defendants National Basketball Association and NBA Properties, Inc.*

Dated:  November 10, 2025

## TABLE OF CONTENTS

Page

INTRODUCTION ..................................................................................................................1

ARGUMENT ..........................................................................................................................3

I.   Plaintiffs Lack Antitrust Standing to Pursue Their Claim Against the NBA .......................3

     A.   The Complaint Does Not Plead That Anyone Has Paid an Overcharge for NBA Trading Cards ..................................................................................................3

     B.   Plaintiffs Are Not Efficient Enforcers ....................................................................6

II.  Plaintiffs Fail to Plead That the NBA's License Is an Unreasonable Restraint of Trade ........................................................................................................................7

     A.   Plaintiffs Do Not Adequately Allege a Distinct Market for NBA Trading Cards ....7

     B.   Plaintiffs Do Not Plausibly Plead That Replacing One Exclusive Licensee with Another Unreasonably Restrains Trade ..........................................................8

CONCLUSION ......................................................................................................................11

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*American Needle, Inc.* v. *Nat'l Football League*,
560 U.S. 183 (2010) ......................................................................................................... 9

*Cent. States Se. & Sw. Areas Health & Welfare Fund* v. *Merck–Medco Managed Care, L.L.C.*, 504 F.3d 229 (2d Cir. 2007) ........................................................................ 6

*Collins* v. *Ne. Grocery, Inc.*,
149 F.4th 163 (2d Cir. 2025) ............................................................................................ 5

*Dickson* v. *Microsoft Corp.*,
309 F.3d 193 (4th Cir. 2002) ............................................................................................ 2

*In re Frito-Lay N. Am., Inc. All Nat. Litig.*,
2013 WL 4647512 (E.D.N.Y. Aug. 29, 2013) .................................................................. 6

*Gelboim* v. *Bank of Am. Corp.*,
823 F.3d 759 (2d Cir. 2016) ............................................................................................. 6

*Integrated Sys. & Power, Inc.* v. *Honeywell Int'l, Inc.*,
713 F. Supp. 2d 286 (S.D.N.Y. 2010) .............................................................................. 8

*IQ Dental Supply, Inc.* v. *Henry Schlein, Inc.*,
924 F.3d 57 (2d Cir. 2019) ............................................................................................... 6

*Laumann* v. *Nat'l Hockey League*,
907 F. Supp. 2d 465 (S.D.N.Y. 2012) ............................................................................ 11

*Panini Am., Inc.* v. *Fanatics, Inc.*,
2025 WL 753954 (S.D.N.Y. Mar. 10, 2025) ................................................................ 3, 6

*Paycom Billing Servs., Inc.* v. *Mastercard Int'l, Inc.*,
467 F.3d 283 (2d Cir. 2006) ............................................................................................. 7

*Spinelli* v. *Nat'l Football League*,
96 F. Supp. 3d 81 (S.D.N.Y. 2015) .............................................................................. 2, 9

*Tanaka* v. *Univ. of S. Cal.*,
252 F.3d 1059 (9th Cir. 2001) .......................................................................................... 8

**INTRODUCTION**

Like their Complaint, Plaintiffs' opposition treats their single claim against the NBA as an afterthought. Plaintiffs devote just one paragraph of their 72-page brief—five sentences in total—to that claim. (Dkt. No. 163 ("Opp'n") 51-52.) Plaintiffs' sparse response does not come close to establishing that any Plaintiff has antitrust standing to pursue a Section 1 claim against the NBA or that Plaintiffs have plausibly alleged that the NBA's agreement to replace one longtime exclusive licensee with another unreasonably restrains trade.

To the contrary, Plaintiffs' arguments undermine their claim against the NBA. For example, Plaintiffs argue that they have antitrust standing because the Complaint alleges that they "suffered injury by paying overcharges when they purchased Trading Cards directly from Fanatics." (Opp'n 36-37.) But that allegation could not possibly apply to *NBA* trading cards sold by Fanatics for the simple reason that, when the Complaint was filed, Fanatics *did not sell* NBA trading cards. Plaintiffs concede that the NBA's agreement with Fanatics did not take effect until October 1, 2025 (months after the Complaint was filed), and their opposition and accompanying declaration say nothing about the price of NBA trading cards sold by Fanatics since October 1.

Plaintiffs attempt to obscure this and other defects in their claim against the NBA by blurring the lines between Defendants. Plaintiffs' sole claim against the NBA—Count Five—is narrow in scope: it is limited to an allegation that the NBA unreasonably restrained trade in the alleged market for NBA trading cards by agreeing in 2021 to license its intellectual property exclusively to Fanatics after the NBA's exclusive agreement with Panini expired. The Complaint does *not* allege that the NBA conspired with Fanatics to monopolize the overall market for trading cards or that the NBA participated with the other leagues or players' associations in some broader conspiracy.

While acknowledging that they "allege Fanatics obtained the six licenses" as part of six separate alleged conspiracies (Opp'n 52), Plaintiffs nonetheless try to paint all Defendants with the same broad brush by repeatedly asserting that "Defendants" are jointly and severally liable for Fanatics' alleged conduct. As Plaintiffs concede, however, an alleged co-conspirator is jointly and severally liable for the conduct of another co-conspirator *only* if the conduct was *in furtherance of their conspiracy*. (Opp'n 28.) Because the only "conspiracy" alleged in Count Five is the NBA's "10-year exclusive" license agreement with Fanatics to produce NBA trading cards (AC ¶ 199), Plaintiffs cannot rely on joint-and-several liability to state a claim against the NBA based on Fanatics' alleged conduct beyond the scope of that narrow agreement. "[E]ach licensing agreement must be treated as a separate conspiracy, and only acts taken in furtherance" of the particular agreement alleged in Count Five may be considered in assessing the claim against the NBA, "not acts of one conspirator taken in furtherance of other possible, distinct conspiracies." *Dickson* v. *Microsoft Corp.*, 309 F.3d 193, 211 (4th Cir. 2002).

The opposition hardly even tries to rehabilitate Plaintiffs' failed attempt to plead that the NBA's license agreement with Fanatics violates Section 1 of the Sherman Act under the rule of reason. Plaintiffs do not dispute that vertical exclusive licenses like the NBA's agreement are "presumptively legal" absent allegations of "facts showing *exceptional circumstances*, such as evidence of predatory practices or a 'unique' opportunity to leverage two distinct monopolies." *Spinelli* v. *Nat'l Football League*, 96 F. Supp. 3d 81, 118 (S.D.N.Y. 2015) (emphasis added). The Complaint fails to plead "exceptional circumstances" here. Rather than identifying "predatory practices" or an effort "to leverage two distinct monopolies," Plaintiffs merely point to what they call "anticompetitive attributes" of the license: (i) the ten-year term, (ii) the lack of a public auction for the NBA's intellectual property, and (iii) the NBA's receipt of an equity interest in Fanatics as

part of its consideration for the deal. (Opp'n 33-35, 51-52.) Contrary to Plaintiffs' suggestion, the ten-year term of the NBA's agreement with Fanatics is hardly "unprecedented." (Opp'n 4.) "Panini's current exclusive license with the NFLPA … [likewise has] a term of ten years." (AC ¶ 69.) And Plaintiffs cite no support for their suggestions that the lack of a public bidding process (which the antitrust laws do not require) or the NBA's receipt of equity can constitute the "exceptional circumstances" required to overcome the presumptive legality of a vertical exclusive license.

Lacking any real response to these points, Plaintiffs repeatedly seek refuge in this Court's denial of Fanatics' motion to dismiss the *Panini* case, citing the same sentence from the Court's opinion time and again. (Opp'n 2, 12, 29, 34, 36, 42, 49, 52 (citing *Panini Am., Inc.* v. *Fanatics, Inc.*, 2025 WL 753954, at *10 (S.D.N.Y. Mar. 10, 2025)).) For Plaintiffs' claim against the NBA, however, the *Panini* decision offers no such refuge. In that case, brought by a Fanatics competitor, this Court had no reason to consider the core issues raised by the NBA's motion: the lack of any alleged overcharge for NBA trading cards or the presumptive legality of the NBA's intellectual-property license.

## ARGUMENT

**I.      Plaintiffs Lack Antitrust Standing to Pursue Their Claim Against the NBA.**

> **A.      The Complaint Does Not Plead That Anyone Has Paid an Overcharge for NBA Trading Cards.**

Count Five asserts that Plaintiffs "hav[e] paid higher prices for NBA Trading Cards than they would have paid in the absence of" the NBA's agreement with Fanatics. (AC ¶ 206.) That assertion is undeniably false. Plaintiffs' opposition concedes as much by acknowledging that their claim against the NBA is based on "NBA trading cards that Fanatics *began selling* in

-3-

October 2025." (Opp'n 15.) When the Complaint was filed in May 2025, Fanatics had not sold a single NBA trading card to anyone, much less at artificially inflated prices.

In addition, neither Plaintiffs' Complaint nor their opposition alleges anything about Fanatics' post-October 1 prices for NBA trading cards. While Plaintiffs point to their allegation of an increase in the price of "certain MLB player trading card sets" after Fanatics acquired Topps in 2022 (AC ¶ 17; *see* Opp'n 9, 21-22), they say nothing about the price of NBA trading cards after Fanatics' license became effective. Plaintiffs' suggestion that increased prices of another sport's trading cards may "rais[e] the reference price level" for NBA trading cards in the future (Opp'n 39, 56) is pure speculation. It is also inconsistent with Plaintiffs' allegation that "[t]he relevant product market" for purposes of Count Five is "NBA Trading Card[s]." (AC ¶ 197.) If NBA cards and other cards do not compete in the same market, there is no reason to assume that an increase in the price of "certain MLB player trading card sets" will lead to an increase in the price of NBA trading cards.

Plaintiffs' general assertion that "fewer competitors lead to higher prices" (Opp'n 38) is of no help either. That sweeping generalization, whether true or not, has no bearing on Plaintiffs' claim against the NBA. Plaintiffs concede that there has been only *one* producer of NBA trading cards since 2009—Panini. (AC ¶¶ 68-69.) The NBA's agreement with Fanatics thus simply substitutes one exclusive licensee (Panini) for another (Fanatics). As such, it does not result in "fewer competitors" selling NBA trading cards to consumers in the relevant market that Plaintiffs define for their claim against the NBA—there has been only one NBA licensee for more than fifteen years.

Plaintiffs purport to fill the antitrust-injury hole in their claim against the NBA by submitting a declaration from one Plaintiff, Steven Markdakhaev, stating that he purchased a box

of NBA trading cards from Fanatics on October 3, 2025. (Dkt. No. 164-3 ¶ 4.) Plaintiffs state that "[i]f the Court deems it necessary for Plaintiffs to amend their pleading to allege the occurrence of [this] purchase in the past tense, Plaintiffs request the right to do so." (Opp'n 55.) What Plaintiffs try to portray as a "needless formality" (*id.*) is actually a substantive defect. Mr. Markdakhaev's declaration cannot cure the Complaint's false allegation that Plaintiffs "ha[d] paid" (already in the past tense) higher prices for NBA trading cards from Fanatics. (AC ¶ 206.) Moreover, Mr. Markdakhaev's declaration does *not* assert that he paid an overcharge for NBA trading cards on October 3. In fact, his declaration does not say a word about the price he paid, and Plaintiffs do not request leave to plead that the price of NBA cards has increased since Fanatics began selling them. Because Plaintiffs do not plead any facts regarding the price of NBA trading cards since October 1, the Complaint does not plead antitrust injury for the claim against the NBA.

In a last-ditch attempt to sidestep their inability to plead injury-in-fact caused by the NBA, Plaintiffs argue that that they have "class standing" to pursue their claims against all Defendants so long as "a purchaser of one product has suffered a similar enough injury to purchasers of the other products." (Opp'n 58.) Plaintiffs assert that "the Class includes direct purchasers who paid overcharges on MLB, NFL, *or* NBA Trading Cards" and that "*each* plaintiff *already* has been injured on *some* purchase." (Opp'n 39.) But this argument does not help Plaintiffs plead injury-in-fact for their claim against the NBA because Plaintiffs do not allege that *anyone*, much less a named Plaintiff, has paid an overcharge for NBA trading cards since Fanatics began selling them in October. *See Collins* v. *Ne. Grocery, Inc.*, 149 F.4th 163, 174 (2d Cir. 2025) (rejecting "Plaintiffs' erroneous contention that the fact that they have standing as to some of their claims means that they have standing to bring all of their claims"). Plaintiffs must establish individual standing as a threshold matter, "'and only then will the inquiry shift to a class action analysis.'"

-5-

*In re Frito-Lay N. Am., Inc. All Nat. Litig.*, 2013 WL 4647512, at *11 (E.D.N.Y. Aug. 29, 2013) (quoting *Cent. States Se. & Sw. Areas Health & Welfare Fund* v. *Merck–Medco Managed Care, L.L.C.*, 504 F.3d 229, 241 (2d Cir. 2007)).  Because *no* Plaintiff can assert a claim against the NBA, constitutional and antitrust standing are lacking, and class standing never comes into play.

The absence of any injury-in-fact here easily distinguishes this case from *Panini*.  There, the Court held that "Panini allege[d] that it has been injured by the loss of business opportunities, sales, and exclusion from the market because of Fanatics' anticompetitive, coercive acts," without ever alleging that consumers have paid an overcharge for NBA trading cards. 2025 WL 753954, at *6.

**B.    Plaintiffs Are Not Efficient Enforcers.**

Plaintiffs also are not "efficient enforcers" of the antitrust laws with respect to their claim against the NBA.  Three of the four relevant factors favor dismissal.  *See Gelboim* v. *Bank of Am. Corp.*, 823 F.3d 759, 778-80 (2d Cir. 2016).

The first factor—the directness of the alleged injury—favors dismissal because Plaintiffs do not allege *any* injury caused by the NBA's agreement, let alone a direct injury.  Plaintiffs argue that they "each purchased Trading Cards directly from Fanatics, a member of the alleged conspiracy" (Opp'n 64), but neither the Complaint nor Plaintiffs' opposition asserts that any Plaintiff has paid an overcharge for NBA trading cards since October 1.

As for the second factor—the existence of more direct victims of the alleged conspiracy—Panini is clearly a more direct alleged victim "whose self-interest would normally motivate [it] to vindicate the public interest in antitrust enforcement." *IQ Dental Supply, Inc.* v. *Henry Schlein, Inc.*, 924 F.3d 57, 66 (2d Cir. 2019) (quotation omitted).  Although Plaintiffs assert that Panini "seek[s] relief for an entirely different injury" (Opp'n 66), "[t]he justification for permitting [Plaintiffs] to perform the office of a private attorney general is greatly diminished because

[d]enying [Plaintiffs] a remedy on the basis of [their] allegations in this case is not likely to leave a significant antitrust violation undetected or unremedied." *Paycom Billing Servs., Inc.* v. *Mastercard Int'l, Inc.*, 467 F.3d 283, 294 (2d Cir. 2006) (quotation omitted). The vast majority of Plaintiffs' allegations describe Fanatics' conduct targeted at Panini (AC ¶¶ 11-16, 79-139), which is unsurprising given that the Complaint simply repeats Panini's allegations.

The third factor—the extent to which the damages claim against the NBA is highly speculative—weighs heavily against standing. When they filed this lawsuit, Plaintiffs' damages claim against the NBA was based entirely on speculation that Fanatics might charge "artificially inflated" prices for NBA trading cards in the future when its license agreement became effective. The NBA has never contended that Plaintiffs are "required at the pleading stage to provide a detailed damages model." (Opp'n 39.) The defect here is more fundamental: Plaintiffs have not alleged *any* damages caused by the NBA's license. Plaintiffs' statement that "Mardakhaev has purchased newly issued, fully licensed NBA cards from Fanatics" (Opp'n 68) is insufficient to plead a nonspeculative injury because Mr. Mardakhaev is silent about the price he paid.

## II. Plaintiffs Fail to Plead That the NBA's License Is an Unreasonable Restraint of Trade.

Plaintiffs admit that "[e]xclusive licensing arrangements are assessed under the rule of reason." (Opp'n 26.) Their rule-of-reason claim against the NBA fails for two separate reasons.

### A. Plaintiffs Do Not Adequately Allege a Distinct Market for NBA Trading Cards.

Plaintiffs accuse the NBA of "misunderstand[ing]" their allegations of the relevant market. (Opp'n 30.) According to Plaintiffs, the NBA's arguments are incorrectly "premised on the idea that only the *alternative* market definition[] [is] relevant" even though Plaintiffs' "primary market definition" is "the entire market for Trading Cards." (*Id*.) The NBA "premised" its arguments on Plaintiffs' "alternative" market definition because that is the *only* market that is relevant to their

claim against the NBA. Count Five expressly states that "[t]he relevant product market" for purposes of that claim "*is the NBA Trading Card market*." (AC ¶ 197 (emphasis added).) Plaintiffs' "primary market definition" (Opp'n 30)—the "overall" market for trading cards—is irrelevant to Plaintiffs' claim against the NBA.

Plaintiffs make little effort to defend the narrow market definition relevant to Count Five. In arguing that they have adequately alleged a product market, Plaintiffs hang their hat on Paragraph 143 of the Complaint. (Opp'n 18, 20-21, 32.) But that paragraph relates to the *overall* trading-card market, not the narrower market for *NBA* trading cards. The opposition makes only passing reference to the Complaint's two paragraphs that purport to support Plaintiffs' "alternative" markets. (Opp'n 32 (citing AC ¶¶ 148-149).) Those two highly conclusory paragraphs—which are not specific to NBA trading cards—fall well short of pleading facts sufficient to establish that NBA trading cards are not reasonably interchangeable with any other product, including other NBA collectibles and other trading cards. *See Tanaka* v. *Univ. of S. Cal.*, 252 F.3d 1059, 1063 (9th Cir. 2001) ("conclusory assertion" that product "is 'unique' and hence 'not interchangeable with any other [product]' is insufficient"). Absent supporting factual allegations, a "single brand name product"—like NBA trading cards—"cannot define a relevant market." *Integrated Sys. & Power, Inc.* v. *Honeywell Int'l, Inc.*, 713 F. Supp. 2d 286, 298 (S.D.N.Y. 2010).

> **B.  Plaintiffs Do Not Plausibly Plead That Replacing One Exclusive Licensee with Another Unreasonably Restrains Trade.**

The NBA's agreement with Fanatics is a vertical arrangement whereby the NBA exclusively licenses its intellectual property to Fanatics for use in producing NBA trading cards. "An exclusive license, which merely confers upon the licensee the ability to exploit the licensor's exclusive intellectual property rights, does not violate the antitrust laws"; to the contrary,

"[e]xclusive vertical arrangements of this nature are presumptively legal under the antitrust laws." *Spinelli*, 96 F. Supp. 3d at 118. "To overcome that presumption at the pleading stage, a plaintiff must allege facts showing *exceptional circumstances*, such as evidence of predatory practices or a 'unique' opportunity to leverage two distinct monopolies." *Id*. (emphasis added). "A plaintiff that fails to allege such exceptional circumstances fails to state a Section 1 claim … and its complaint must be dismissed." *Id.* Plaintiffs here fail to allege "exceptional circumstances" insofar as the NBA's license is concerned.

Plaintiffs attempt to distinguish *Spinelli* on the ground that it is a "monopsony case[]." (Opp'n 31.) But that has no relevance to *Spinelli*'s holding that a plaintiff must plead "exceptional circumstances" to overcome the presumption that an exclusive vertical license agreement is lawful. 96 F. Supp. 3d at 118. Plaintiffs identify no reason why the pleading burden should be different when the defendant is a purchaser of services rather than a seller of goods.

Plaintiffs' reliance (Opp'n 48 n.19, 49-51) on *American Needle, Inc*. v. *National Football League*, 560 U.S. 183 (2010), also is misplaced. The issue in that case was whether NFL teams were capable of "concerted action" with one another under the antitrust laws. *Id*. at 186. That is not the issue here. Nor is the NBA claiming, as Plaintiffs suggest, that intellectual property licenses are not subject to antitrust review at all. (Opp'n 51 & n.22.) The NBA's argument is that such agreements are "presumptively legal" and that a plaintiff must plead "exceptional circumstances" to overcome that presumption.

Plaintiffs have no answer to the fact that the NBA's agreement simply replaces one exclusive licensee with another, maintaining the same competitive dynamic that has existed in the alleged relevant market since Panini became the exclusive producer of NBA trading cards in 2009. Plaintiffs contend that "'[f]rom the consumers' point of view,' something *has* changed about the

market and one of those changes is higher prices from Fanatics' market power." (Opp'n 52.) But Plaintiffs cannot point to any allegations of an increase in the price of NBA trading cards since Fanatics' license took effect on October 1.

The opposition nowhere claims that Plaintiffs have alleged the type of "exceptional circumstances"—akin to "predatory practices" or "leverag[ing] two distinct monopolies"—necessary to overcome the presumption of legality at the pleading stage. Plaintiffs instead argue that they have alleged three "anticompetitive attributes" of the NBA's agreement. (Opp'n 51.) Those allegations fall far short of pleading the required exceptional circumstances.

First, Plaintiffs note the agreement's ten-year duration. (Opp'n 35.) But a ten-year license is not, as Plaintiffs suggest, "unprecedented." (Opp'n 4.) Plaintiffs concede that "Panini's current exclusive license with the NFLPA is … for a term of ten years." (AC ¶ 69.) Plaintiffs note that this is "the first time in history that a single card manufacturer [has] secured exclusive licenses across all six major professional sports licensors" (Opp'n 5), but this is another example of Plaintiffs inappropriately conflating their allegations about other Defendants and other markets with the limited allegations that form the basis for their claim against the NBA. Plaintiffs do not allege that Fanatics' licenses with other leagues and players' associations are the result of any alleged agreement with the NBA.

Second, Plaintiffs complain that there was no "open bidding" for the NBA's intellectual property. (Opp'n 34-35, 46-47.) But Plaintiffs cite no authority for the notion that the antitrust laws require a licensor to conduct an "open bidding process" before granting an exclusive license or that the absence of "a public bidding process" (Opp'n 3) is an exceptional circumstance akin to a predatory practice. The Complaint nowhere explains why the process by which the NBA licensed its intellectual property is likely to result in higher prices for consumers. In a public

-10-

bidding process, potential licensees would have competed to provide better terms and a higher licensing fee *to the NBA*, not to provide lower prices to consumers.

Third, Plaintiffs point to their allegation that the consideration Fanatics agreed to pay for the NBA's intellectual property includes an "equity stake" in Fanatics. (Opp'n 4, 22, 35.) Again, Plaintiffs cite nothing suggesting that this term of the NBA's license constitutes an "exceptional circumstance" under *Spinelli*. The one case Plaintiffs do cite (Opp'n 22), *Laumann* v. *National Hockey League*, 907 F. Supp. 2d 465 (S.D.N.Y. 2012), is not on point. Although *Laumann* makes passing reference to allegations that certain licensors and distributors in that case "share ownership," *id.* at 474, the court did not suggest that this factored into its analysis, much less that it constituted an "exceptional circumstance" sufficient to rebut the presumption that a vertical intellectual-property license is lawful. Plaintiffs' rhetoric about sharing "monopoly profits" (Opp'n 22) ignores that there is no functional difference under the "exceptional circumstances" analysis between granting an equity interest and agreeing to pay a higher licensing fee over the duration of the agreement.

Rather than addressing these issues head on, Plaintiffs fall back on this Court's denial of Fanatics' motion to dismiss in *Panini*, citing over and over again the same sentence of the Court's opinion. (*E.g.*, Opp'n 2, 12, 29, 36-37, 49, 52.) But that was a different case brought by a Fanatics competitor involving different parties and issues. The Court did not have occasion in that case to decide whether consumer plaintiffs had adequately alleged that the NBA violated the antitrust laws, and the Court certainly did not say anything that forecloses it from considering the NBA's arguments now.

## CONCLUSION

Plaintiffs' claim against the NBA in Count Five should be dismissed with prejudice.

Dated: November 10, 2025
      New York, New York

                                    Respectfully submitted,

                                    */s/ Richard C. Pepperman II*
                                    Richard C. Pepperman II
                                    Benjamin R. Walker
                                    Sheeva L. Nesva
                                    SULLIVAN & CROMWELL LLP
                                    125 Broad Street
                                    New York, New York  10004
                                    Telephone:  (212) 558-4000
                                    Facsimile:  (212) 558-3588
                                    peppermanr@sullcrom.com
                                    walkerb@sullcrom.com
                                    nesvas@sullcrom.com

                                    *Counsel for Defendants National Basketball Association and NBA Properties, Inc.*

-13-

## CERTIFICATE OF COMPLIANCE

I hereby certify that this reply memorandum contains 3,499 words in compliance with Local Civil Rule 7.1(c) and Rule A(2)(h) of the Individual Practices of the Honorable Judge Laura Taylor Swain dated March 14, 2025.

<i>/s/ Richard C. Pepperman II</i><br>
Richard C. Pepperman II