UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ROBERT SCATURO, SCOTT BUBNICK, JOSEPH DAVIDOV, STEVEN MARDAKHAEV, AND JONATHAN MADAR, individually and on behalf of all others similarly situated,

                    Plaintiffs,

      v.

FANATICS, INC.; FANATICS, LLC; FANATICS COLLECTIBLES INTERMEDIATE HOLDCO, INC.; FANATICS SPV, LLC; FANATICS HOLDINGS, INC.; MAJOR LEAGUE BASEBALL; MAJOR LEAGUE BASEBALL PROPERTIES, INC.; MAJOR LEAGUE BASEBALL PLAYERS ASSOCIATION; MLB PLAYERS, INC.; NATIONAL FOOTBALL LEAGUE; NFL PROPERTIES LLC; NATIONAL FOOTBALL LEAGUE PLAYERS ASSOCIATION; NFL PLAYERS, INC.; NATIONAL BASKETBALL ASSOCIATION; NBA PROPERTIES, INC.; NATIONAL BASKETBALL ASSOCIATION PLAYERS ASSOCIATION; AND ONETEAM PARTNERS LLC,

                    Defendants.

1:25-CV-02202-LTS

---

MEMORANDUM OPINION AND ORDER

Named Plaintiffs Robert Scaturo, Scott Bubnick, Joseph Davidov, Steven Mardakhaev, and Jonathan Madar bring an eight-count putative class action complaint against major U.S. professional sports players associations and leagues—Major League Baseball ("MLB"), Major League Baseball Properties, Inc. ("MLBP"), Major League Baseball Players Association ("MLBPA"), MLB Players, Inc. ("MLBPI"), National Football League ("NFL"),

NFL Properties LLC ("NFLP"), NFL Players Association ("NFLPA"), NFL Players, Inc. ("NFLPI"), National Basketball Association ("NBA"), NBA Properties, Inc. ("NBAP"), and National Basketball Players Association ("NBAPA")—as well as Fanatics, Inc., Fanatics, LLC, Fanatics Collectibles Intermediate Holdco, Inc., Fanatics SPV, LCC, and Fanatics Holdings, Inc. (collectively, "Fanatics") and OneTeam Partners LLC ("OneTeam") (all of the foregoing defendants will be referred collectively to as "Defendants").  Counts One through Six are conspiracy in restraint of trade claims under Section 1 of the Sherman Act, 15 U.S.C. § 1, against various groups of Defendants.[1]  (Docket entry no. 103 ("First Am. Compl." or "FAC") ¶¶ 153-217.)  Count Seven is a monopolization claim under Section 2 of the Sherman Act, 15 U.S.C. § 2, against Fanatics; and Count Eight is an attempted monopolization claim under Section 2 of the Sherman Act, 15 U.S.C. § 2, against Fanatics.  (Id. ¶¶ 218-41.)

Each Defendant has moved to dismiss the FAC under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  (Docket entry nos. 128, 130, 132, 134, 136, 138, 143, 145.) Defendants Fanatics, MLB, MLBP, MLBPA, and MLBPI also move to compel arbitration. (Docket entry nos. 136, 139, 145.)  The Court has considered carefully the parties' submissions. (Docket entry nos. 129, 131, 133, 135, 137, 140, 141, 144, 150, 152, 162 ("Pls. Opp. to Arbitration"), 163 ("Pls. Opp. to MTD"), 173, 174, 175, 176, 177, 178, 179, 180, 181.)  For the reasons set forth below, all of the Defendants' motions to dismiss are granted in their entirety and, because Plaintiffs have failed to demonstrate that they have standing to invoke the Court's

---

[1]    Specifically, Count One is asserted against Fanatics, MLB, and MLBP; Count Two is asserted against Fanatics, MLBPA, MLBPI, and OneTeam; Count Three is asserted against Fanatics, NFL, and NFLP; Count Four is asserted against Fanatics, NFLPA, NLFPI, and OneTeam; Count Five is asserted against Fanatics, NBA, and NBPA; and Count Six is asserted against Fanatics and NBAPA.

jurisdiction, all of the Defendants' motions to compel arbitration are denied as moot.[2]  The FAC is dismissed in its entirety, without prejudice to Plaintiffs' filing of a motion for leave to file an amended complaint within three weeks of the date of this Memorandum Opinion Order.

I.    BACKGROUND[3]

The following background is drawn from the First Amended Class Action Complaint (docket entry no. 103), the well-pleaded factual allegations of which are taken as true for the purposes of this motion to dismiss practice.  The Court also considers the factual proffers made by Defendants in the Declarations of Nigel Ponds (docket entry nos. 142, 146), Vadim Ivanis (docket entry no. 147), and Tracy Reeves (docket entry no. 148), as well as the factual proffers made by Plaintiffs in the Declarations of Robert Scaturo (docket entry no. 164-1), Joseph Davidov (docket entry no. 164-2), Steven Mardakhaev (docket entry no. 164-3), Jonathan Madar (docket entry no. 164-4), and Scott Bubnick (docket entry no. 164-5).  See Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000) ("In resolving a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), a district court, as it did here, may refer to evidence outside the pleadings."); Amidax Trading Grp. v. S.W.I.F.T. SCRL, 671 F.3d 140, 145 (2d Cir. 2011) ("In reviewing a facial attack to the court's jurisdiction, we draw all facts—which we assume to be true unless contradicted by more specific allegations or documentary evidence—from the complaint and from the exhibits attached thereto.").

---

[2]    Plaintiffs also move for leave to file a sur-reply in opposition to the motions to compel arbitration.  (Docket entry no. 182; see also docket entry no. 183.)  That motion is denied as moot.

[3]    All pincites to materials on the docket refer to ECF-designated pages.

A.  The Sports Trading Card Industry

The sports trading card industry has become a fixture in American culture and is a multibillion-dollar industry today.  (FAC ¶¶ 4, 63.)  To produce fully licensed sports trading cards that include player likenesses, team logos, and images of uniforms, a manufacturer must obtain licenses from professional sports players associations to use the names, images, and likenesses ("NILs") of players, and licenses from professional sports leagues to use the intellectual property of the players' teams (e.g., names, logos, and uniforms).  (Id. ¶ 5.)  As to professional baseball trading cards ("MLB Trading Cards"), MLB and MLBP are responsible for licensing the intellectual property of each of the MLB's teams, and MLBPA and MLBPI are responsible for licensing the NIL rights of players.  (Id. ¶¶ 35-38.)  As to professional football trading cards ("NFL Trading Cards"), NFL and NFLP are responsible for licensing the intellectual property of each of the NFL's teams, and NFLPA and NFLPI are responsible for licensing the NIL rights of players.  (Id. ¶¶ 39-42.)  Finally, as to professional basketball trading cards ("NBA Trading Cards"), NBA and NBAP are responsible for licensing the intellectual property of each of the NBA's teams, and NBAPA is responsible for licensing the NIL rights of players.  (Id. ¶¶ 43-45.)  Plaintiffs do not allege that the players associations and leagues manufacture or sell trading cards.  (See id. ¶¶ 26, 34-45.)  Rather, trading card companies like Fanatics, Panini America Inc. ("Panini"), and The Topps Company, Inc. ("Topps") make and sell trading cards.  (See id. ¶¶ 9-12.)

In addition to licensing the intellectual property rights owned by players associations and leagues, trading card companies must obtain other rights and services to produce certain types of cards.  For example, trading card companies "must also obtain professional athletes' official jerseys to embed a piece of a jersey in certain high value specialty cards, and must enter contracts with individual players to obtain rights to a player's hand-signed

autograph[.]" (Id. ¶ 6; see also id. ¶ 67.) Trading card companies must also rely on "highly skilled employees to design and market professional sports trading cards" (id. ¶ 7), as well as "highly specialized manufacturers" that possess "print and finishing technologies that are unique to the production of many types of trading cards that are . . . valued by consumers" (id. ¶¶ 7, 83).

After securing all of the necessary rights and inputs, and after the design and manufacturing process, trading card companies sell their cards through several different channels. Trading card companies may sell to "distributors who supply trading cards to major retailers," who then sell the cards to consumers. (Id. ¶ 132.) Trading card companies may also sell directly to "big-box retailers" who sell to consumers; to "local card shops" who sell cards "on business-to-business trading card websites" or to consumers; and to "case breakers," which are individuals or entities that permit consumers to "'buy into the break' and receive specific cards based on predetermined rules." (Id. ¶¶ 133-37.) Trading card companies also sell cards directly to consumers at times. (See docket entry nos. 164-1, 164-2, 164-3, 164-4, 164-5.)

B.  Fanatics' Licenses

Fanatics started as a sports apparel company and recently began to expand into the sports trading card industry. (FAC ¶ 70.) In August 2021, Fanatics announced that it had acquired exclusive trading card licenses with the MLB, MLBPA, NFLPA, NBA, and NBAPA (i.e., all of the major sports leagues and players associations except the NFL). (Id. ¶ 71.) After the August 2021 announcement, Fanatics acquired an exclusive trading card license with the NFL. (Id.) Fanatics' licenses with the MLB, MLBPA, NFL, and NFLPA each have a 20-year term, and its licenses with the NBA and NBAPA each have a 10-year term. (Id. ¶ 73.)

Fanatics' licenses, however, were not immediately effective. As of the time the FAC was filed on May 8, 2025, Panini held exclusive licenses from the NFL, NFLPA, NBA, and NBAPA, which were set to expire in March 2026, February 2026, September 2025, and

September 2025, respectively.[4]  (Id. ¶ 69.)  Fanatics' exclusive licenses could not go into effect until Panini's exclusive licenses ended.  (Id. ¶ 152.)  Consequently, prior to the expiration of Panini's licenses, Fanatics could not sell fully licensed NFL Trading Cards or fully licensed NBA Trading Cards.  (Id. ¶¶ 110, 114, 152.)

Plaintiffs allege that, historically, licenses have been awarded through a public bidding process; licenses have been non-exclusive, or exclusive licenses have provided for terms of no more than five years; and license terms have been staggered.  (Id. ¶ 8.)  Thus, in the past, no single licensee controlled exclusive rights across all of the major sports leagues and players associations at one time.  (Id.)  Now, for the first time, a single licensee—Fanatics—holds all of the licenses in professional basketball, football, and baseball, and Fanatics obtained these licenses through a non-public, "back room" process.  (Id. ¶¶ 10, 73.)

The FAC alleges that Fanatics "induce[d] these agreements" by "enter[ing] into equity arrangements whereby the Leagues and players associations obtained equity interest in Fanatics in exchange for granting Fanatics exclusive license."  (Id. ¶ 75.)  According to the FAC, Fanatics "offered equity stakes and other considerations premised on the monopoly profits

---

4    In August 2021, when Fanatics announced that it had entered into an exclusive license with the NFLPA, Panini held an exclusive license with the NFLPA that would last until February 2026.  (FAC ¶ 69.)  The NFLPA terminated Panini's license early, in August 2023, allegedly as a result of Fanatics' wrongful inducement.  (Id. ¶¶ 121-26.)  Confusingly, however, neither Plaintiffs nor Defendants seem to consider or acknowledge this early termination in the briefing on these motions, and all of the parties appear to consider February 2026 as the end date of Panini's exclusive license with the NFLPA.  (E.g., id. ¶ 69; docket entry no. 140 ("NFLPA Mem.") at 7, 11-12; docket entry no. 144 ("Fanatics Mem.") at 14-15.)  Because the parties adopt the February 2026 end date, the Court does so as well for purposes of its analysis.

Even if the Panini/NFLPA license in fact terminated on August 2023, the Court's conclusions herein would not change because Fanatics needs a license from both the NFL and NFLPA to produce the fully licensed NFL Trading Cards that are the subject of the claims in this action, and Panini's license with the NFL did not expire until March 2026.  (FAC ¶¶ 5, 141.)

Fanatics expected to earn when it locked up the trading card market." (Id.) The collective equity stake in Fanatics that is owned by the leagues and players associations is worth approximately $5 to $10 billion.[5] (Id.)

The FAC also alleges that OneTeam, which is a joint venture formed between MLBPA and NFLPA to market and license the NIL rights of athletes and players associations, "facilitated" and played a "key part" in MLBPA's license with Fanatics and that "NFLPA worked with and agreed on the deals with Fanatics through OneTeam." (Id. ¶¶ 48, 76-78, 172.) MLBPA and NFLPA have stated that the agreements with Fanatics "would have never happened . . . if their organizations had not joined forces to create OneTeam." (Id. ¶ 76.) OneTeam licenses the NIL rights of NFL players under an agreement with the NFLPA and has licensed those rights to Fanatics. (Id. ¶ 48.) The FAC does not specifically allege that OneTeam was involved in the agreement for the Fanatics/MLBPA license.[6] (Pls. Opp. to MTD at 55 n.17 (conceding that Plaintiffs "do not make th[e] allegation" "that OneTeam was a party to MLBPA's licensing deal with Fanatics").) Instead, the FAC alleges that "OneTeam was a key

---

[5]    This collective figure includes the equity stakes owned by National Hockey League and Major League Soccer. (FAC ¶ 75.)

[6]    The original Class Action Complaint alleged that "[b]oth the NFL Players Association and the MLB Players Association worked together and jointly agreed on the deals with Fanatics through OneTeam." (Docket entry no. 1 ¶ 72.) The FAC only alleges that "[t]he NFL Players Association worked with and agreed on the deals with Fanatics through OneTeam." (FAC ¶ 77.) The FAC's allegations as to OneTeam are different from the allegations made in the related case Panini Am., Inc. v. Fanatics, Inc., No. 23-CV-9714-LTS-VF, 2025 WL 753954, at *9 (S.D.N.Y. Mar. 10, 2025). In Panini, the Court held that Panini adequately alleged a "horizontal-level agreement between the two licensors comprising 'OneTeam' (the NFLPA and MLBPA)," id., based on allegations that "both the NFL Players Association and the MLB Players Association worked together to agree jointly on deals with Fanatics through OneTeam" (Panini, 23-CV-9714-LTS-VF, Docket entry no. 69 (Amended Complaint) ¶¶ 112-13 (S.D.N.Y. Oct. 10, 2023)). (See also FAC ¶¶ 164-74, 185-95 (alleging that the Fanatics, OneTeam, MLBPA, and MLBPI conspiracy is separate and apart from the Fanatics, OneTeam, NFLPA, and NFLPI conspiracy).)

---

part to MLBPA entering into its exclusive deal with Fanatics," explaining that "MLBPA's stake in OneTeam is especially important to MLBPA because [OneTeam] had 'the ability to affect [the 2021-22 contract] negotiations [with MLB] because the players are now buoyed by additional, independent financial means.'"  (FAC ¶ 78.)  According to the FAC, "MLBPA could 'spread that money around during a potential lockout and even borrow against its stake in OneTeam.'"  (Id.) "That is 'the type of security [MLBPA] believe[s] can give them additional leverage in the [] labor talks,'" especially given that the Collective Bargaining Agreement reached by MLB and MLBPA in 2022 is set to expire in December 2026.  (Id.)

C.  Fanatics' Acquisition of Topps and the Start of Fanatics' Baseball Licenses

On January 4, 2022, Fanatics acquired Topps, a competing trading card manufacturer, for approximately $500 million.  (Id. ¶ 79.)  At the time, Topps had an exclusive license with the MLB (which expired in 2025) and a semi-exclusive license with the MLBPA (which expired in 2022).  (Id.)  By acquiring Topps, Fanatics acquired these two licenses and was able to produce fully licensed MLB Trading Cards starting in 2022.  (Id. ¶¶ 79, 155, 166.)

D.  Named Plaintiffs' Purchases of Trading Cards

The FAC alleges that the named Plaintiffs each "purchased MLB, NFL, and NBA Trading Cards directly from one or more of the Defendants."  (Id. ¶¶ 29-34.)  In response to Defendants' argument that the FAC's allegations are too conclusory, Plaintiffs proffer declarations from each of the named Plaintiffs describing their purchases of trading cards in greater detail.  The following table summarizes these purchases:

| Named Plaintiff | Date | Product | Product Type | Seller | Record Cite |
|---|---|---|---|---|---|
| Robert Scaturo | September 5, 2025 | "2025 Topps Chrome Baseball – Mega Box" | MLB Trading Card | Topps.com | (Docket entry no. 164-1 ¶ 2) |

| Named Plaintiff | Date | Product | Product Type | Seller | Record Cite |
|---|---|---|---|---|---|
| Joseph Davidov | April 2, 2025 | "2025 Topps Heritage Baseball" | MLB Trading Card | Topps.com | (Docket entry no. 164-2 ¶ 2) |
| Steven Mardakhaev | July 23, 2025 | "Topps Chrome Baseball Value Box" | MLB Trading Card | Topps.com | (Docket entry no. 164-3 ¶ 3) |
| | October 3, 2025 | "2025-26 Topps Basketball – Mega Box" | NBA Trading Card | Topps.com | (Docket entry no. 164-3 ¶ 4) |
| Jonathan Madar | April 2, 2025 | "New York Yankees Trading Card 50-Count Set"[7] | MLB Trading Card | Third-party seller on Fanatics.com[8] | (Docket entry no. 164-4 ¶ 2) |
| | September 18, 2025 | "Topps card Shohei Ohtani – 2025 MLB Topps NOW®" | MLB Trading Card | Topps.com | (Docket entry no. 164-4 ¶ 3) |
| Scott Bubnick | May 28, 2024 | "2023 Topps Chrome Platinum 1954 Baseball Factory Sealed Value Box" | MLB Trading Card | Fanatics.com | (Docket entry no. 164-5 ¶ 2) |
| | June 14, 2024 | "2024 Topps Baseball Series 2" | MLB Trading Card | Topps.com | (Docket entry no. 164-5 ¶ 3) |
| | July 22, 2024 | "Topps Yoshibonu [sic] Yamamoto card" | MLB Trading Card | Topps.com | (Docket entry no. 164-5 ¶ 4) |

---

[7]    According to Fanatics, the "New York Yankees Trading Card 50-Count Set" "[i]ncludes 50 cards of past and present players from different manufacturers and years." (Docket entry no. 146 ("Ponds Decl.") ¶ 7.) Thus, the product was a "repack" and was "not a set of newly issued cards created by a card producer" (id.), which appears to place this product outside the relevant product market (FAC ¶ 141 (defining the relevant product market as "the market for newly issued trading cards created by card producers for NBA, NFL, and MLB players that are fully licensed with league and player association marks" (emphasis added))).

[8]    Madar did not purchase these cards directly from Defendants, which places him outside of the definition of the putative class. (FAC ¶ 56 (defining the putative class as "All persons or entities in the United States that purchased MLB Trading Cards, NFL Trading Cards, or NBA Trading Cards directly from one of the Defendants . . ." (emphasis added)).)

| Named Plaintiff | Date | Product | Product Type | Seller | Record Cite |
|---|---|---|---|---|---|
| Scott Bubnick | September 15, 2024 | "Topps Luis Angel Acuna and Jackson Holliday cards" | MLB Trading Card | Topps.com | (Docket entry no. 164-5 ¶ 5) |
| | October 8, 2024 | "2024 Topps 206 Baseball" | MLB Trading Card | Topps.com | (Docket entry no. 164-5 ¶ 6) |
| | October 19, 2024 | "Topps Jhonkensy Noel card" | MLB Trading Card | Topps.com | (Docket entry no. 164-5 ¶ 7) |

Each named Plaintiff also attests that he intends to purchase additional sports trading cards in the future.  (Docket entry nos. 164-1 ¶ 4; 164-2 ¶ 5; 164-3 ¶ 6; 164-4 ¶ 6; 164-5 ¶ 9.)

E.    The Price of MLB Trading Cards

Plaintiffs claim that their "injury . . . consists of having paid higher prices for [MLB, NBA, and NFL] Trading Cards than they would have paid in the absence of [Defendants'] violations [of antitrust law]."  (FAC ¶¶ 163, 174, 184, 195, 206, 217, 229, 241.) In support of this contention, Plaintiffs proffer two graphs comparing the prices of Fanatics' MLB Trading Cards with the prices of Panini's MLB Trading Cards.  (Id. ¶ 17.)

The first graph, which is displayed below, compares the price of Fanatics' "Topps Series 1 Baseball Hobby Box" with the price of Panini's "Panini Donruss Baseball Hobby Box." (Id.)  Since 2022, the price of Fanatics' product has increased by approximately 49% (from 100

to 149), while the price of Panini's product has increased by approximately 24% (from 89 to 110).[9] (Id.)



The second graph, which follows, compares the price of Fanatics' "Topps Chrome Blaster" with the price of Panini's "Panini Prizm Blaster." (Id.) Since 2022, the price

---

9    Defendants complain that "the prices in the graphs are indexed to 2021, but Fanatics did not even begin making and selling fully licensed MLB trading cards until 2022 (through its acquisition of Topps), which means the graphs say nothing about any purported effect of Fanatics' conduct." (Docket entry no. 144 ("Fanatics Mem.") at 21.) That objection is meritless because the "index" is merely a normalization factor, and the Court can compare the relative price changes by reading values from the graphs.

of Fanatics' product has increased by approximately 31% (from 116 to 152), while the price of

Panini's product has decreased by approximately 14% (from 106 to 91).  (Id.)



## II.    DISCUSSION

Defendants move to dismiss the complaint under Federal Rules of Civil Procedure

12(b)(1) (for lack of standing) and 12(b)(6) (for failure to state a claim).  (Docket entry nos. 128,

130, 132, 134, 136, 138, 143, 145.)  Defendants Fanatics, MLB, MLBP, MLBPA, and MLBPI

also move to compel arbitration.  (Docket entry nos. 136, 139, 145.)  Finally, Plaintiffs move for

leave to file a sur-reply in opposition to the motions to compel arbitration.  (Docket entry no.

182.)

Under Rule 12(b)(1), a claim must be dismissed for lack of subject matter

jurisdiction "when the district court lacks the statutory or constitutional power to adjudicate it."

Makarova, 201 F.3d at 113 (citation omitted).  On a Rule 12(b)(1) motion, the Court "must take

all uncontroverted facts in the complaint (or petition) as true, and draw all reasonable inferences

in favor of the party asserting jurisdiction." Tandon v. Captain's Cove Marina of Bridgeport, Inc., 752 F.3d 239, 243 (2d Cir. 2014).  That said, the Court "need not credit 'a legal conclusion couched as a factual allegation' or a 'naked assertion devoid of further factual enhancement.'" Calcano v. Swarovski N. Am. Ltd., 36 F.4th 68, 75 (2d Cir. 2022) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)).  "Instead, [the Court] must refer to a complaint's 'factual context' to discern whether to accept 'a complaint's conclusory statements.'" Id. (quoting Iqbal, 556 U.S. at 686).

As here, "'[w]here jurisdictional facts are placed in dispute, the court has the power and obligation to decide issues of fact by reference to evidence outside the pleadings, such as affidavits.'" Tandon, 752 F.3d at 243 (quoting APWU v. Potter, 343 F.3d 619, 627 (2d Cir. 2003)); see also Makarova, 201 F.3d at 113; Amidax, 671 F.3d at 145.  Ultimately, "[a] plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." Makarova, 201 F.3d at 113.

Furthermore, "[w]hen a defendant moves to dismiss under Rule 12(b)(1) for lack of subject matter jurisdiction, and also moves to dismiss on other grounds, . . . the Court must consider the Rule 12(b)(1) motion first." Bobrowsky v. Yonkers Courthouse, 777 F. Supp. 2d 692, 703 (S.D.N.Y. 2011) (citing Rhulen Agency, Inc. v. Ala. Ins. Guar. Ass'n, 896 F.2d 674, 678 (2d Cir. 1990)).  Similarly, subject matter jurisdiction must be addressed prior to considering a motion to compel arbitration.  See Branch of Citibank, N.A. v. De Nevares, 74 F.4th 8, 21-22 (2d Cir. 2023) (reversing order on motion to compel arbitration and remanding with instructions to dismiss for lack of jurisdiction in light of plaintiff's failure to establish Article III standing).

A.  Whether Named Plaintiffs Have Standing

Defendants raise various arguments in their motion papers, but the dispositive issue is whether any of the five named Plaintiffs have Article III standing to bring this litigation.

The requirement of standing ensures that the power of federal courts remains limited "to the resolution of 'Cases' and 'Controversies,'" as required under Article III of the Constitution. TransUnion LLC v. Ramirez, 594 U.S. 413, 423 (2021).  "[W]hether the plaintiff has made out a 'case or controversy' between himself and the defendant . . . is the threshold question in every federal case, determining the power of the court to entertain the suit."  Mahon v. Ticor Title Ins. Co., 683 F.3d 59, 62 (2d Cir. 2012) (quoting Warth v. Seldin, 422 U.S. 490, 498 (1975)).  To satisfy the "irreducible constitutional minimum" of standing, a plaintiff must meet three requirements with respect to their claim: (1) an "'injury in fact'—a harm that is both 'concrete' and 'actual or imminent, not conjectural or hypothetical'"; (2) "causation—a 'fairly . . . trace[able]' connection between the alleged injury in fact and the alleged conduct of the defendant"; and (3) "redressability—a 'substantial likelihood' that the requested relief will remedy the alleged injury in fact."  Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens, 529 U.S. 765, 771 (2000) (citations omitted).  These three prongs are assessed as of the time of filing of the FAC—here, May 8, 2025.  See Davis v. Fed. Election Comm'n, 554 U.S. 724, 734 (2008) ("[T]he standing inquiry remains focused on whether the party invoking jurisdiction had the requisite stake in the outcome when the suit was filed."); Lujan, 504 U.S. at 571 n.4 (explaining that standing is "assessed under the facts existing when the complaint is filed"); Access 4 All, Inc. v. Trump Int'l Hotel & Tower Condo., 458 F. Supp. 2d 160, 167 (S.D.N.Y. 2006) ("A plaintiff's standing is evaluated at the time the complaint is filed." (citing Robidoux v. Celani, 987 F.2d 931, 938 (2d Cir. 1993))).

The requirements of Article III standing are no less demanding in the class action context than they are for individual plaintiffs.  "[T]o establish Article III standing in a class action . . . for every named defendant there must be at least one named plaintiff who can assert a

claim directly against that defendant[.]"  NECA-IBEW Health & Welfare Fund v. Goldman

Sachs & Co., 693 F.3d 145, 159 (2d Cir. 2012) (quoting Cent. States Se. & Sw. Areas Health &

Welfare Fund v. Merck-Medco Managed Care, L.L.C., 504 F.3d 229, 241 (2d Cir. 2007)).

Furthermore, "'named plaintiffs who represent a class must allege and show that they personally

have been injured, not that injury has been suffered by other, unidentified members of the class

to which they belong and which they purport to represent.'"  Lewis v. Casey, 518 U.S. 343, 357

(1996) (internal quotation marks omitted) (quoting Simon v. E. Ky. Welfare Rights Org., 426

U.S. 26, 40 n.20 (1976)).

The named Plaintiffs claim that they "paid higher prices for" fully licensed NBA,

NFL, and MLB Trading Cards as a result of Defendants' anticompetitive practices.[10]  (FAC

¶¶ 163, 174, 184, 195, 206, 217, 229, 241; see also id. ¶¶ 140-49 (limiting the allegedly relevant

market to "fully licensed" sports trading cards).)  While "overpaying for a product results in a

financial loss constituting a particularized and concrete injury in fact," John v. Whole Foods

Mkt. Grp., Inc., 858 F.3d 732, 736 (2d Cir. 2017), none of the named Plaintiffs adequately allege

---

[10]    The FAC alludes to other injuries in the form of "reduced competition," "reduced product
choice," and "lower quality" (e.g., FAC ¶¶ 2, 18, 132-139), but Plaintiffs fail to fully
develop these potential theories (Pls. Opp. to MTD at 63-68; see also id. at 46-50).  In
any event, these allegations are not sufficient to establish standing.  "Reduced
competition," in and of itself, is not a cognizable "injury-in-fact" suffered by consumers.
See Mathias v. Daily News, L.P., 152 F. Supp. 2d 465, 479 (S.D.N.Y. 2001)
("[A]llegations of injury to competitors alone, no matter how numerous or conclusory,
are insufficient to state antitrust injury."); Rebel Oil Co. v. Atl. Richfield Co., 51 F.3d
1421, 1433 (9th Cir. 1995) ("Of course, conduct that eliminates rivals reduces
competition.  But reduction of competition does not invoke the Sherman Act until it
harms consumer welfare.").  As to "reduced product choice" and "lower quality," the
FAC fails to make any specific factual allegations to support these theories of harm, nor
is there any allegation that any of the named Plaintiffs personally experienced "reduced
product choice" or "lower quality."

that they have overpaid or will imminently overpay for trading cards sold by Defendants.[11]

Accordingly, as explained in further detail below, the named Plaintiffs lack standing, and the

First Amended Class Action Complaint must be dismissed.

### 1.  NBA Trading Cards and NFL Trading Cards

First, the Court considers whether named Plaintiffs have standing to pursue their

NBA and NFL Trading Card claims (Counts Three through Eight).[12]  This analysis hinges on

two issues: whether named Plaintiffs have suffered a past injury and whether they will

imminently suffer a future injury.  As to the first issue, no named Plaintiff suffered an injury

because there is no allegation that any named Plaintiff purchased, or was even able to purchase, a

fully licensed NBA Trading Card or a fully licensed NFL Trading Card at the time the FAC was

filed on May 8, 2025.  As to the second issue, the FAC's allegations of future price increases are

too conclusory and speculative to support standing.

### a.  Failure to Adequately Plead a Past Injury

As of the filing of the FAC on May 8, 2025, none of the named Plaintiffs had

purchased a fully licensed NBA or NFL Trading Card from a Defendant.  (Docket entry nos.

164-1, 164-2, 164-3, 164-4, 164-5.)  Indeed, Fanatics' licenses did not begin until October 2025

---

[11]    The FAC generally refers to "Defendants," although only Fanatics is alleged to make and sell sports trading cards.  (See FAC ¶¶ 26, 34-45, 48; see also Pls. Opp. to MTD at 46-47, 64, 74, 80 (Each named Plaintiff "purchased Trading Cards directly from Fanatics[.]"); FAC ¶ 57 (same).)  The league and player association defendants, as well as OneTeam, are alleged to have entered into anticompetitive agreements with Fanatics to restrain trade.  (Id. ¶¶ 153-217.)  Like the FAC, the Court generally uses the term "Defendants" in reciting Plaintiffs' allegations.

[12]    As used in this section, the term "Defendants" refers to all the Defendants involved with the NBA Trading Card and NFL Trading Card claims (Counts Three through Eight): NFL, NFLP, NFLPA, NFLPI, NBA, NBAP, NBAPA, Fanatics, and OneTeam.  See also supra note 11 (explaining the term "Defendants").

at the earliest,[13] and prior to the commencement of these licenses, Defendants could not sell fully licensed NBA Trading Cards or fully licensed NFL Trading Cards. (FAC ¶¶ 110, 114, 152.) Thus, not only did no named Plaintiff purchase such a trading card from Defendants prior to the filing of the FAC, but it was actually impossible for any consumer to do so.

Because named Plaintiffs "did not . . . purchase" any NBA Trading Cards or NFL Trading Cards when they filed the FAC, they "lack individual Article III standing to raise claims with respect to th[ose]" cards. Afriyie v. NBCUniversal Media, LLC, 775 F. Supp. 3d 791, 799 (S.D.N.Y. 2025); see Akridge v. Whole Foods Mkt. Grp., Inc., No. 20-CV-10900-ER, 2022 WL 955945, at *7 (S.D.N.Y. Mar. 30, 2022) ("It remains undisputed that plaintiffs lack Article III standing to assert claims arising out of products that they themselves did not purchase."); Finkelman v. NFL, 810 F.3d 187, 195 (3d Cir. 2016) (holding that "[plaintiff] lacks Article III standing because he never purchased a ticket to the Super Bowl, meaning that he suffered no out-of-pocket loss and . . . no injury-in-fact").

In their opposition papers, Plaintiffs point to evidence that one of the named Plaintiffs, Mardakhaev, purchased an NBA Trading Card on October 3, 2025. (Pls. Opp. to MTD at 65-66 (citing docket entry no. 164-3 ¶ 4).) The law is clear, however, that standing is assessed at the time of the filing of the complaint, which was May 8, 2025. See supra p. 14 (citing Davis, 554 U.S. at 734; Lujan, 504 U.S. at 571 n.4; Access 4 All, 458 F. Supp. 2d at 167). If Plaintiffs want the Court to consider new factual allegations postdating the FAC, Plaintiffs must move to supplement their complaint under Rule 15(d) by amending it further to incorporate

---

13    Fanatics' exclusive licenses were not effective until Panini's exclusive licenses with the NFL, NFLPA, NBA, and NBAPA ended in March 2026, February 2026, September 2025, and September 2025, respectively. (FAC ¶¶ 69, 152).

the subsequent events.[14]  See Aktiebolag v. Andrx Pharms., Inc., 695 F. Supp. 2d 21, 28 n.2 (S.D.N.Y. 2010).  Plaintiffs conclusorily assert that requiring supplementation "improperly elevate[s] form over substance" (Pls. Opp. to MTD at 65),[15] but the Court may not dispense with the requirements of Article III under the guise of efficiency.

Finally, even if the Court were to consider Plaintiffs' proffer that Mardakhaev purchased an NBA Trading Card on October 3, 2025, that evidentiary proffer is insufficient to establish standing because there is nothing in the FAC or Plaintiffs' proffer about the price that Mardakhaev paid.  For that matter, there is nothing in the FAC or Plaintiffs' proffer about any price of any NBA Trading Card.  Without any factual allegations about price, Plaintiffs' claim that Mardakhaev was harmed by paying supracompetitive prices is wholly conclusory and implausible.

### b.  Failure to Adequately Plead a Future Injury

Next, the Court turns to whether Plaintiffs adequately plead a future injury.  "An alleged future injury is sufficiently actual or imminent if it is 'certainly impending' or there is 'substantial risk' of harm."  Frey v. City of New York, 157 F.4th 118, 137 (2d Cir. 2025) (quoting Clapper v. Amnesty Int'l USA, 568 U.S. 398, 409, 414 n.5 (2013)).  Plaintiffs contend

---

[14]    Whether a supplementation under Rule 15(d) can cure an ab initio defect in subject matter jurisdiction is an uncertain question.  See Scahill v. District of Columbia, 909 F.3d 1177, 1183 (D.C. Cir. 2018) (noting a Circuit split on "whether events subsequent to the filing of the original complaint can cure a jurisdictional defect" and citing cases); infra note 22.

[15]    Plaintiffs cite Fund Liquidation Holdings LLC v. Bank of America Corp. for the proposition that, "in certain instances, subject-matter jurisdiction can even be obtained after a case's initiation and given retroactive effect through procedural rules."  991 F.3d 370, 390 (2d Cir. 2021).  That case, however, has no application here because it involved Rule 17(a) and the issue of whether the real party in interest could substitute into an action for a plaintiff that was found to lack standing.  Id. at 386.

that injury is imminent because, they allege, "Defendants' anticompetitive conduct has already inflated Trading Card prices and will continue to do so as Defendants continue to cement the Fanatics monopoly." (Pls. Opp to MTD at 66; see also id. at 69-71.) Plaintiffs, however, fail to allege any concrete facts to support this theory.[16]

Instead, they proffer only conclusory allegations. Plaintiffs allege that Fanatics engaged in anticompetitive conduct towards third-party distributors, causing prices to increase. (See FAC ¶ 18 (alleging that "Fanatics has required local card shops to accept Fanatics' unilaterally-set minimum price requirements"; that "Fanatics has threatened to cut off supply to local card shops"; that "Fanatics has forced case breakers onto Fanatics' new case-breaking platform (Fanatics Live) . . . and then imposed draconian terms to drive them out of business"; and that Fanatics has "coerc[ed] big box retailers to limit the lines of trading cards offered in their stores to only those owned by Fanatics/Topps"); see also id. ¶¶ 131-39).) None of these allegations, however, substantiate the named Plaintiffs' claims, which are expressly limited to purchasing cards "directly" from Defendants. (See id. ¶ 56 (defining the putative class as "[a]ll persons or entities in the United States that purchased MLB Trading Cards, NFL Trading Cards, or NBA Trading Cards directly from one of the Defendants"); see also Pls. Opp. to MTD at 74 ("[E]ach [named Plaintiff] purchased Trading Cards directly from Fanatics[.]"), 80-82 (distinguishing Illinois Brick Co. v. Illinois, 431 U.S. 720 (1977) on the basis that "Plaintiffs [] all purchased Trading Cards directly from Fanatics").) Moreover, the FAC fails to specify how any of these allegations relate to fully licensed NBA Trading Cards or fully licensed NFL

---

16    The following discussion focuses on the second part of Plaintiffs' theory, that Defendants "will continue to [cause inflated prices] as Defendants continue to cement the Fanatics monopoly." (See supra pp. 16-18 (explaining that the first part of Plaintiffs' theory, that "Defendants' anticompetitive conduct has already inflated Trading Card prices," has not been pleaded adequately).)

Trading Cards, given that Fanatics was unable to sell such cards as of the filing of the FAC.  For example, there could not have been any "supply" or "unilaterally-set minimum price requirements" for cards that were not sold yet.  Plaintiffs' allegations, while phrased in past tense, actually relate to future conduct.  There is simply no factual basis for an inference that such future conduct will come to bear.

Plaintiffs also allege that Fanatics engaged in anticompetitive conduct towards Panini.  (See FAC ¶¶ 81-98 (Fanatics acquired Panini's manufacturer, GC Packaging, LLC and caused production to decrease), ¶¶ 99-107 (Fanatics unlawfully solicited Panini's employees), ¶¶ 108-12 (Fanatics entered into agreements with star, and rookie, players to not deal with Panini), ¶¶ 113-17 (Fanatics disseminated false and derogatory statements about Panini), ¶¶ 118-20 (Fanatics cut Panini off from uniforms), ¶¶ 121-26 (Fanatics induced NLFPA to terminate its license with Panini), ¶¶ 127-30 (Fanatics induced World Wrestling Entertainment to terminate its license with Panini).)  Plaintiffs, however, fail to show how these allegations have any bearing on whether named Plaintiffs will pay supracompetitive prices for trading cards, as none of these allegations address price at all.

Next, Plaintiffs attempt to analogize their circumstances to those underlying the decision in Panini Am., Inc. v. Fanatics, Inc., No. 23-CV-9714-LTS-VF, 2025 WL 753954 (S.D.N.Y. Mar. 10, 2025), which held that a complaint, which made many of the same allegations made here, survived a motion to dismiss.   (See Pls. Opp. MTD at 28-30, 33-36, 50.)  That decision does not control, however.  In Panini, Panini brought Section 1 unreasonable restraint of trade and Section 2 monopolization and attempted monopolization claims against Fanatics premised on many of the same allegations raised here.  2025 WL 753954, at *2-3, *5-10.  In sustaining Panini's antitrust claims, the Court held that Panini, which was "Fanatics'

only competitor in the Relevant Market [of NFL, NBA, and MLB Trading Cards]," had "adequately pleaded a direct injury, both already realized and sufficiently likely to occur in the future," based on Panini's alleged "loss of business opportunities, sales, and exclusion from the market because of Fanatics' anticompetitive, coercive acts." Id. at *6-7; see also id. at *8 ("Panini has adequately pleaded that its injury—market exclusion—flows from Fanatics' anticompetitive conduct."). Here, named Plaintiffs fail to plead any concrete facts supporting their claim that they will pay higher prices for trading cards.[17] Furthermore, the injuries alleged here are fundamentally different from the injuries Panini claimed to have suffered. Indeed, Plaintiffs themselves acknowledge that "Panini's claims concern its own lost profits as a manufacturer of Trading Cards, while Plaintiffs' claims concern overcharges to direct purchasers of Trading Cards." (Pls. Opp. to MTD at 76.) These different injuries are "fundamentally different theories of harm." Sabol v. PayPal Holdings, Inc., No. 23-CV-05100-JSW, 2024 WL 3924686, at *4 (N.D. Cal. Aug. 23, 2024) (quoting 8 P. Areeda & H. Hovenkamp, Antitrust Law at 346 (4th ed. 2013); Apple Inc. v. Pepper, 587 U.S. 273, 287 (2019)).

Ultimately, Plaintiffs ask us to infer, based on allegations of Fanatics' monopolization and harm to Fanatics' competitor, Panini, that Fanatics has increased prices. (Pls. Opp. to MTD at 46 ("That fewer competitors lead to higher prices is not a novel concept[.]"

---

[17] Plaintiffs state that Panini "recognized as plausible" Plaintiffs' allegation that "Trading Card prices already have been inflated." (Pls. Opp. to MTD at 50 (citing Panini, 2025 WL 753954, at *6).) That is an erroneous reading of Panini. In Panini, the Court only decided that Panini had alleged Fanatics' monopoly power via "its ability to set prices and exclude competitors." Panini, 2025 WL 753954, at *6. Consumer overcharge injuries were never at issue in Panini, and the Court never considered whether Fanatics had actually set prices at supracompetitive levels.

(citing cases)[18]).) But, without any specific factual allegations regarding the prices of trading cards and the timing of price changes relative to allegedly important events, that inferential leap is simply too great. See Mathias v. Daily News, L.P., 152 F. Supp. 2d 465, 479 (S.D.N.Y. 2001) ("[A]llegations of injury to competitors alone, no matter how numerous or conclusory, are insufficient to state antitrust injury."); Rebel Oil Co. v. Atl. Richfield Co., 51 F.3d 1421, 1433 (9th Cir. 1995) ("Of course, conduct that eliminates rivals reduces competition. But reduction of competition does not invoke the Sherman Act until it harms consumer welfare.").

Indeed, the FAC is devoid of any concrete allegations about the price—past or future—of NBA Trading Cards or NFL Trading Cards. The only specific allegations in the FAC about the price of any trading cards relate to the price of MLB Trading Cards. (FAC ¶ 17.) Setting aside whether these allegations are sufficient to even plead an "injury-in-fact" with respect to MLB Trading Cards, see infra pp. 24-28 (discussing the insufficiency of these allegations), there is no allegation connecting the price of MLB Trading Cards to those of NBA Trading Cards or NFL Trading Cards. If anything, Plaintiffs have suggested that prices for trading cards in one sport are not affected by prices for trading cards in another sport. (See FAC ¶ 149 ("[M]any sports fans do not consider professional player trading cards from one league to be interchangeable with another. For these fans, cross price elasticity of demand is limited to each of these professional sports leagues individually.").) Plaintiffs attempt to rescue their case by positing that the FAC's two price comparison graphs "show[] that Fanatics inflated

---

[18]    The two cases cited by Plaintiffs have nothing to do with the issue at hand, which is whether consumer plaintiffs have adequately alleged overcharge injuries. See PepsiCo, Inc. v. Coca-Cola Co., 315 F.3d 101, 106-08 (2d Cir. 2002) (analyzing "the possession of monopoly power in the relevant market"); Xerox Corp. v. Media Scis. Int'l, Inc., 511 F. Supp. 2d 372, 381 (S.D.N.Y. 2007) (analyzing whether plaintiff, which was a "direct competit[or]" of defendant, had suffered an antitrust injury for purposes of antitrust standing).

the price of Topps cards [i.e., MLB Trading Cards] so that it could price off a higher reference price once the anticompetitive agreements [i.e., the NFL, NFLPA, NBA, and NBAPA licenses] go into effect." (Pl. Opp. to MTD at 32.) Not only was this theory not pleaded but it is also entirely hypothetical and speculative as proffered in Plaintiffs' opposition papers.

In sum, any allegations as to the future prices of fully licensed NBA Trading Cards and fully licensed NFL Trading Cards are too hypothetical and conjectural to support Article III standing. Plaintiffs speculate, without any factual allegations, that Defendants' conduct will cause prices to rise at some point in the future. That is plainly insufficient to meet Plaintiffs' burden under Article III. See Arcesium, LLC v. Advent Software, Inc., No. 20-CV-4389-MKV, 2021 WL 1225446, at *7 (S.D.N.Y. Mar. 31, 2021) (holding that allegations "that prices could rise" are "not factual allegations, but instead are speculative and conclusory allegations that do not suffice to defeat a Rule 12(b)(6) motion to dismiss" (emphasis in original)); Knudsen v. MetLife Grp., Inc., 117 F.4th 570, 580-82 (3d Cir. 2024) (dismissing case for lack of standing where plaintiffs had not alleged "concrete facts" establishing cost increases, because "'allegations that stand on nothing more than supposition' cannot establish financial harm"); Duty Free Ams., Inc. v. Estée Lauder Cos., Inc., 797 F.3d 1248, 1273 (11th Cir. 2015) (dismissing case for lack of standing where plaintiff was "not a customer of" defendant and where plaintiff alleged that it might purchase from defendant in the future, because these allegations "cannot be characterized as a 'concrete' or 'actual' injury in fact because, by its very terms, it has not yet occurred and indeed may never occur"). For that same reason, the named Plaintiffs lack standing to seek future injunctive relief. See In re DDAVP Indirect Purchaser Antitrust Litig., 903 F. Supp. 2d 198, 210 (S.D.N.Y. 2012) (dismissing injunctive relief claim

where plaintiffs' claim of future injury to remedy alleged anticompetitive effects was "wholly speculative").

### 2. MLB Trading Cards

Next, the Court turns to whether named Plaintiffs have standing to raise their MLB Trading Card claims (Counts One, Two, Seven, and Eight).[19]  Unlike Fanatics' licenses with NBA, NBAPA, NFL, and NFLPA, which had not yet gone into effect as of the filing of the FAC, Fanatics' licenses with MLB and MLBPA began in January 2022 with Fanatics' acquisition of Topps.  (FAC ¶¶ 79, 155, 166.)  Plaintiffs' theory of harm is that, since 2022, as a result of Defendants' anticompetitive conduct, the prices of Fanatics' MLB Trading Cards have been higher than the prices of comparable cards.  The allegations in support of Plaintiffs' theory are, however, too conclusory to establish standing.

As a threshold issue, named Plaintiffs Scaturo, Mardakhaev, and Bubnick do not have standing because they did not purchase any MLB Trading Cards before the FAC was filed on May 8, 2025.  (Docket entry nos. 164-1, 164-3, 164-5.)  While named Plaintiffs Davidov and Madar allege that they purchased MLB Trading Cards before the FAC was filed (docket entry nos. 164-2, 164-4),[20] they do not allege adequately that they purchased cards at inflated prices.  Rather, Plaintiffs' allegations of injury are entirely conclusory and speculative.  See Maddox v. Bank of N.Y. Mellon Tr. Co., N.A., 19 F.4th 58, 65-66 (2d Cir. 2021) (Plaintiffs must "plead enough facts to make it plausible that they did indeed suffer the sort of injury that would entitle

---

[19]    As used in this section, the term "Defendants" refers to all the Defendants involved with the MLB Trading Card claims (Counts One, Two, Seven, and Eight): MLB, MLBP, MLBPA, MLBPI, Fanatics, and OneTeam.  See also supra note 11 (explaining the term "Defendants").

[20]    Madar purchased cards on April 2, 2025 and September 18, 2025.  (Docket entry no. 164-4 ¶¶ 2-3.)  Only the former predates the filing of the FAC on May 8, 2025.

them to relief." (quoting Harry v. Total Gas & Power N. Am., Inc., 889 F.3d 104, 110 (2d Cir. 2018))).

The only specific factual allegations that Plaintiffs proffer in support of their claim of price overcharges are presented in the form of two graphs: one graph compares the price of Fanatics' "Topps Series 1 Baseball Hobby Box" with the price of Panini's "Panini Donruss Baseball Hobby Box," and the other graph compares the price of Fanatics' "Topps Chrome Blaster" with the price of Panini's "Panini Prizm Blaster." (FAC ¶ 17.) According to the graphs, the prices of Fanatics' two cards have increased by 49% and 31%, while the prices of Panini's two cards have increased by 24% and decreased by14%, respectively. (Id.) In making this comparative analysis, the FAC asserts that Fanatics' and Panini's cards are "comparable" (id.), but the FAC provides no further details of how exactly the cards are "comparable." See Treiber v. Aspen Dental Mgmt., Inc., 635 F. App'x 1, 3 (2d Cir. 2016) (dismissing for lack of standing where "plaintiffs' assertion of price gouging . . . is wholly conclusory and unsupported by any facts," because plaintiffs "fail to demonstrate how the value differential between the dental services as advertised and the care received can be measured"). Likewise, the FAC does not explain whether the difference in prices was traceable to extraneous factors, such as production costs or quality differences, or whether the difference was traceable to Defendants' anticompetitive conduct. See Somosky v. Consumer Data Indus. Ass'n, No. 20-CV-4387-MKV, 2022 WL 596480, at *3 (S.D.N.Y. Feb. 28, 2022) (holding that alleged injury was not "fairly traceable" to defendant because it was "the result of the independent action of some third party" (quoting Lujan, 504 U.S. at 560)). For example, Plaintiffs concede that Panini's cards are not fully licensed, but they fail to exclude that explanation as a reason for the difference in prices. (See Pls. Opp. to MTD at 32 (acknowledging that Topps and Panini cards are not in the same

relevant market).)  Similarly, Plaintiffs assert, without any specific factual support, that their price comparison analysis demonstrates that "Panini prices stay[] flat," which "shows that there was not a price increase in card stock or other inputs that caused Topps to raise its prices."  (Id.)

Furthermore, neither Davidov nor Madar is alleged to have purchased the "Topps Series 1 Baseball Hobby Box" or "Topps Chrome Blaster," which are the two cards that Plaintiffs analyzed prices for.  As to the cards that Davidov and Madar actually purchased, the "2025 Topps Heritage Baseball" and "New York Yankees Trading Card 50-Count Set," there are no allegations about the prices of those cards.[21]  (Docket entry nos. 164-2; 164-4.)  Nor is there any discussion in the FAC of whether the "2025 Topps Heritage Baseball" and "New York Yankees Trading Card 50-Count Set" are similar to the "Topps Series 1 Baseball Hobby Box" or "Topps Chrome Blaster."  Two cherry-picked examples of alleged overcharge cannot "be reasonably extrapolated to the [named] [P]laintiff's individual purchase."  Kell v. Lily's Sweets, LLC, No. 23-CV-0147-VM, 2024 WL 1116651, at *4 (S.D.N.Y. Mar. 13, 2024) (dismissing for lack of standing where "the Consumer Reports findings in this case [the factual allegations of harm] are based on just two or three samples, and the Complaint lacks any factual allegations about whether [plaintiff's purchases] and the samples tested by Consumer Reports were purchased in similar circumstances"); see also Onaka v. Shiseido Americas Corp., No. 21-CV-10665-PAC, 2023 WL 2663877, at *5 (S.D.N.Y. Mar. 28, 2023) ("Plaintiffs provide no facts from which the Court could extrapolate that their isolated testing should apply broadly to Defendant's Products[.]"); In re RealPage, Inc., Rental Software Antitrust Litig. (No. II), 709 F. Supp. 3d 478, 533 (M.D. Tenn. 2023) (finding allegations "far too narrow to plausibly support

---

21    Madar would not even have standing to raise the class claims because he purchased a "repack," which is not a set of newly issued cards, and because he did not purchase any card directly from Defendants.  See supra notes 7-8.

Plaintiffs' claims of [price increases caused by] a 13-year conspiracy occurring in college towns and cities across the United States").

Finally, while each named Plaintiff attests that he generally intends to purchase sports trading cards in the future (docket entry nos. 164-1 ¶ 4; 164-2 ¶ 5; 164-3 ¶ 6; 164-4 ¶ 6; 164-5 ¶ 9), there are no plausible factual allegations that any named Plaintiff intends to purchase the two specific trading cards that are graphed in the FAC (Fanatics' "Topps Series 1 Baseball Hobby Box" and Fanatics' "Topps Chrome Blaster").  Thus, any argument that Plaintiffs face a future threat of injury fails because "'some day' intentions—without any description of concrete plans, or indeed even any specification of when the some day will be—do not support a finding of the 'actual or imminent' injury that our cases require."  Lujan, 504 U.S. at 564; see Albert v. Blue Diamond Growers, 151 F. Supp. 3d 412, 417 (S.D.N.Y. 2015) (finding that Plaintiffs lacked standing to seek injunctive relief where "Plaintiffs have not alleged that they will purchase [deceptively labeled] products . . . in the future").

In their opposition papers, Plaintiffs point to allegations of Fanatics' allegedly anticompetitive conduct towards third-party distributors and towards Panini.  Plaintiffs ask the Court to infer, based on allegations of monopolization by Fanatics, that Fanatics has increased, and will increase, prices.  (Pls. Opp. to MTD at 48 ("That fewer competitors lead to higher prices is not a novel concept[.]" (citing cases)).)  As explained above, however, Plaintiffs' proposed inferential leap is too great.  Supra pp. 18-24.

As Plaintiffs admit, their allegations of MLB Trading Card price overcharges are "limited."  (Pls. Opp. to MTD at 31-32.)  While the motion to dismiss standard is lenient, it is not so lenient as to permit the Court to accept conclusory allegations with no factual support. Plaintiffs' allegations that they paid higher prices for MLB Trading Cards are just that—

conclusory. These allegations are therefore insufficient to support Plaintiffs' assertion of standing.

### 3. Class Standing Is Irrelevant

In their opposition papers, Plaintiffs argue that their allegations are sufficient because, under the doctrine of class standing, a named plaintiff's "power to prosecute claims on behalf of the full class, is often broader than his individual Article III standing." (Pls. Opp. to MTD at 68.) According to Plaintiffs, "when a class is defined to include purchasers of multiple products affected by an anticompetitive conspiracy, a purchaser of one product has suffered a similar enough injury to purchasers of the other products, and it therefore has the correct incentives for class standing." (Id. at 68 (citing Sullivan v. UBS AG, 149 F.4th 206, 225 (2d Cir. 2025))).

Plaintiffs' attempt to rely on class standing principles is misplaced because, as shown above, they have not pleaded any basis for the named Plaintiffs' own standing to sue. The class standing doctrine addresses the ability of a named plaintiff, who has individual standing, to represent the interests of absent class members. Afriyie, 775 F. Supp. 3d at 800. "To establish class standing . . . , a named plaintiff must show '(1) that he personally has suffered some actual . . . injury as a result of the putatively illegal conduct of the defendant' (i.e., that he has standing in his own right), and '(2) that such conduct implicates the same set of concerns as the conduct alleged to have caused injury to other members of the putative class by the same defendants' (i.e., that he has standing to represent the class)." Id. (quoting NECA-IBEW, 693 F.3d at 162 (internal quotations omitted)).

Here, Plaintiffs have failed to make the first required showing—that any of the named Plaintiffs have standing to raise any claim against any Defendant. As discussed above, named Plaintiffs lack standing to raise claims related to NBA Trading Cards, NFL Trading

Cards, or MLB Trading Cards.  Because Plaintiffs fail to establish standing as to any Defendant and as to any claim, the inquiry never "shifts to whether the named Plaintiffs have class standing to represent" absent class members.  See id. at 799 (citing Cent. States, 504 F.3d at 241; In re LIBOR-Based Fin. Instruments Antitrust Litig., 299 F. Supp. 3d 430, 459 (S.D.N.Y. 2018)).

### III.    CONCLUSION

For the reasons explained above, all of the Defendants' motions to dismiss the FAC under Rule 12(b)(1) are granted in full (docket entry nos. 128, 130, 132, 134, 136, 138, 143, 145), all of the Defendants' motions to compel arbitration are denied as moot (docket entry nos. 136, 139, 145), Plaintiffs' motion for leave to file a sur-reply in opposition to the motions to compel arbitration is denied as moot (docket entry no. 182), and the First Amended Class Action Complaint is dismissed in its entirety.  Plaintiffs are, however, granted permission to file a motion for leave to file a further amended complaint **within 21 days of the date of this Memorandum Opinion and Order**.  Any such motion must comply with all applicable federal, local and individual rules of procedure (including Local Civil Rule 15.1).[22]  Failure to make a timely motion for leave to supplement their allegations in a further amended complaint, or to demonstrate in such a motion that amendment would not be futile, will result in dismissal of this action with prejudice.  If Plaintiffs move to amend, discovery shall remain stayed pending further order of the Court.  (See docket entry no. 172, at 2 (staying discovery "pending disposition of the

---

[22]    If Plaintiffs' proposed amended pleading includes events subsequent to the original filing date, they should specifically address the issue of "whether events subsequent to the filing of the original complaint can cure a jurisdictional defect."  Scahill v. District of Columbia, 909 F.3d 1177, 1183 (D.C. Cir. 2018) (noting a Circuit split on this issue and citing cases).

pending motions to dismiss and motions to compel arbitration").)  This Memorandum Opinion and Order resolves docket entry nos. 128, 130, 132, 134, 136, 138, 139, 143, 145, and 182.


SO ORDERED.

Dated: New York, New York
       March 23, 2026


                                          /s/ Laura Taylor Swain
                                          LAURA TAYLOR SWAIN
                                          Chief United States District Judge